**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| WALTER S. PREBLE,              )<br>                                )<br>              Plaintiff,          )<br>                                )<br>        v.                      )   Civil Action No. 04-11005-RWZ<br>                                )<br>TRANSPORTATION DISPLAYS, INC.,  )<br>d/b/a VIACOM OUTDOOR, and       )<br>PAINTERS AND ALLIED TRADES      )<br>DISTRICT COUNCIL 35, IUPAT,     )<br>AFL-CIO,                        )<br>                                )<br>              Defendants.        ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT TRANSPORTATION DISPLAYS, INC.'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Defendant Transportation Displays, Inc., d/b/a Viacom Outdoor ("TDI") terminated the employment of plaintiff Walter Preble because he ignored repeated instructions not to drive his company-supplied truck off route, an infraction that came at the end of a long history of misuse of the truck. His termination had nothing to do with his age or his diabetes, and he has no evidence on which a reasonable jury could find discrimination.

He has no direct evidence of discrimination; he admits that no one ever mentioned his age or medical condition, much less said anything to suggest that either was the basis of his discharge. Nor does he have any statistics or comparative evidence to suggest that he was treated less favorably than younger or healthier employees. Nor does he have any evidence of pretext; indeed, when asked in deposition to explain why he thought his age played a role in TDI's termination decision, he responded simply: "I don't know any

other reason." Asked the same question about his disability, he replied, "As I said, I have no idea why I was terminated." There is no genuine issue of material fact, and TDI is entitled to summary judgment.

## SUMMARY OF UNDISPUTED FACTS

TDI is in the business of outdoor advertising. As relevant here, TDI employees, under contract to the Massachusetts Bay Transit Authority ("MBTA"), install advertising materials on buses, subway cars, and commuter trains, including the metal frames which hold those materials. Deposition of Walter Preble ("Preble Dep.") at 20-22. In general, Preble's responsibility on a particular day was to drive a TDI-supplied truck to the MBTA "barns," where he would install advertising on the vehicles there. Id. at 27-28. Preble had been working for a company known as Park Transit, which he testified was acquired by TDI, also known as Viacom Outdoor, in the summer of 2000. Id. at 26.

### A.   Preble Is Instructed Not To Drive Off His Route.

With the acquisition by TDI, Preble gained a new supervisor, Richard MacLean. Id. Rather than driving their own vehicles to the MBTA barns, as they had when working for Park Transit, employees were now required to drive company vans. Id. at 28-29. MacLean told the employees on several occasions that they were not to drive the company trucks off route: "He said we couldn't take the trucks off route to do anything – we're supposed to be on route for whatever job we were doing," Preble acknowledged, though he considered that instruction vague. Id. at 30. He admits, though, that before the incident for which he was terminated, MacLean had told him not to go home for lunch. Id. at 94.

2

### B. Preble Has A Series Of Accidents, Incidents of "Road Rage," And Other Misuse Of Company Vehicles.

#### 1. Preble Runs Into A Door.

Preble's first truck-related problem occurred shortly after TDI took over Park Transit. Preble drove the truck into an overhead door at the TDI garage in Randolph, Massachusetts. Id. at 31-32. Though he was spoken to about the accident, and was chastised for refusing to take responsibility for it, id. at 34, he was not otherwise disciplined, id. at 35.

#### 2. Preble Takes The Truck Home For Lunch And Locks The Keys In It.

Within a few months, in approximately September 2000, Preble locked his keys in the truck, and had to call a co-worker to drive into Boston from Randolph to unlock it. Id. at 36-37. Preble was at home at the time, having driven the truck to his house in South Boston to eat lunch. Id. at 36. Preble's home is east of the easternmost MBTA barn that he services south of the city. See Preble Dep. at 72-74 & Ex. 2. Preble believes that MacLean learned about this second incident, but MacLean did not speak to him about it at the time and, again, he was not disciplined. Id. at 38.

#### 3. Preble Passes Another Driver In A Left-Turn Lane.

A month later, Preble became frustrated by a driver in front of him whom he considered to be driving too slowly. Id. at 41-42. After honking his horn twice without success, Preble pulled his truck into a left-turn-only lane and passed the driver. Id. at 42-43.[1] The driver apparently reported Preble to the

---

[1] Preble contends that the "lane opened up" with a "broken white line" that became a solid white line closer to the intersection, and that passing was legal until the white line became solid. Id. at 43.

police, because a police officer visited the TDI garage that evening.  Id. at 42.  This time MacLean learned of the incident, which he characterized as "road rage."  Id. at 45.  Preble responded that "I considered it everyday driving."  Id.  MacLean warned Preble not to let it happen again, telling him, as he testified, that he could be fired "[i]f I had another incident of road rage, . . . or if I gave somebody the finger or some other form of communication, I guess."  Id.

### 4. Preble Has An Altercation With An MBTA Employee.

Within a few months, however, in February 2001, Preble had his fourth driving incident, again involving an altercation with another driver.  Preble was driving in the center lane of a three-lane roadway, with another truck to his left.  Id. at 47.  Both vehicles turned left, Preble turning from the center lane.  Id.  After making the turn, and still driving alongside the other truck on its right, Preble realized that his lane was about to become a right-turn-only lane.  He tried to pass the truck next to him, unsuccessfully.[2]  Id. at 48-49.  So he "hit[ ] the brakes" and pulled left behind the other truck.  Id. at 48.  Doing so, he realized from the truck's vanity plate that the truck was driven by an MBTA mechanic who lived near him in South Boston, although the two had never actually met.  Id. at 50.  Preble followed the MBTA mechanic to his home (though Preble contends he was heading in that direction anyway).  Id. at 51, 53-54.  The two exchanged words, with Preble first confronting the other driver about refusing to let him pass.  Id. at 51-52.  The other driver told Preble that his original left turn was illegal, and allegedly gestured at Preble with a wooden

---

[2] Passing on the right is illegal in most circumstances.  See Mass. Gen. L. c. 89, §2.

4

club. Id. at 52-53. Preble said "Why don't you go back to Charlestown," and drove away. Id. at 53.

Preble did not report this fourth incident to MacLean, but the MBTA employee did. Id. at 54. Preble was suspended for a week, with MacLean noting that an altercation with an MBTA employee was especially serious because of TDI's relationship with the MBTA. See Preble Dep. Ex. 1. MacLean also advised Preble "that any similar misconduct be it of the road rage variety, unsafe operation of a company vehicle or a confrontation with an MBTA employee will result in immediate dismissal." Id.

Preble spoke to a representative of his union, Charles Fogell, about his desire to grieve the suspension. Id. at 61. Fogell declined, and told Preble among other things that he was wrong to have been "out of his area" by driving through South Boston near his home. Id. at 62-63. Preble testified that he had already heard the same instructions from MacLean before speaking to Fogell. Id. at 61-62.

### 5.    Preble Takes His Truck Home For Lunch Again And Hits A Parked Car.

Despite MacLean's instructions not to take the truck off route, and even despite the caution from his own union representative about taking his truck to South Boston, Preble continued routinely to drive his truck home for lunch. Id. at 75. After doing so on December 18, 2001, as he returned to work, Preble struck a parked car as he turned a corner in South Boston. Id. at 76-77. He did not realize he had hit the car, but a police officer flagged him down. Id. at 77. Preble then drove back to the MBTA garage where he had left his partner, and returned to the TDI garage in Randolph. Id. at 78-79. Preble did not tell

his partner about the accident, and told no one else that afternoon, either. Id. at 79-80. He wrote no report. Id. at 80.[3]

The following day, Preble reported the incident to MacLean, who told him to write up an account of it. At the end of that work day, TDI terminated Preble's employment. Id. at 91. MacLean said again that Preble had been off his route. Id. at 92-93.

### C. Preble's Medical Condition Did Not Require Him To Go Home For Lunch.

When employed at TDI, Preble suffered from Type II diabetes, which required no insulin injections but did require him to monitor his blood sugar. Id. at 12-13. Once per day, Preble would prick his finger, draw blood onto a test strip, and insert the strip in a small handheld machine, a process that took "a minute." Id. at 17. His practice was to test his blood sugar at lunch time, and then he either would eat lunch or not, depending on the reading. Id.

Preble admits that he could have taken the blood testing machine with him to work, id. at 94-95, and also that he could have brought a lunch to work that would have allowed him to meet the dietary restrictions of his diabetes, id. at 107.

### D. Preble Pursues A Grievance, But Never Mentions Discrimination.

After his termination, Preble filed a grievance through his union (the Painters And Allied Trades District Council 35, the other defendant in this

---

[3] Preble testified that he previously had had another accident in which the truck's mirror was struck by another car, and his passenger at the time, another TDI employee, wrote a report of the incident. Id. at 81. He also knew that MacLean's practice was to have him write an account of any incidents, because MacLean had required Preble and others to do so in the past. Id. at 84-85.

action). The Union representative, Fogell, pursued the grievance beyond "Step I" – an initial meeting between Fogell and MacLean – to "Step II," a December 28, 2001 meeting attended by Fogell, MacLean, Preble, and Bill Murphy, id. at 111, who was a senior manager of the company based in New York and responsible for operations throughout New England, id. at 33. The company denied the grievance, and the Union elected not to pursue it to arbitration.[4]

Preble filed a claim with the Massachusetts Commission Against Discrimination on May 17, 2002, alleging discrimination on the basis of age and disability. At no point during the grievance process did he tell anyone in the Union, or at TDI, that he thought he had been discriminated against. Id. at 114.

## ARGUMENT

To prevail on his claim of disability discrimination, Preble first must show that he suffered from a "substantially limiting" impairment, a handicap of sufficient severity to be protected by law. As shown in Part A, below, Preble cannot satisfy this preliminary requirement; neither his diabetes nor his heart condition imposes any substantial restrictions on the work he can do.

In any event, Preble will have to offer evidence on which a reasonable jury could conclude that TDI terminated his employment because of his age or his diabetes, and not for his series of traffic accidents, road rage, and misuse of the truck TDI entrusted to him, about which he was repeatedly warned and progressively disciplined. He may attempt that proof either by offering direct evidence of an illicit motive, or by demonstrating, under the familiar

---

[4] Fogell told Preble that the Union would not pursue the grievance because "we can't win this." Id. at 116.

McDonnell-Douglas burden-shifting standard, that the legitimate reasons for termination on which TDI relies are mere pretexts for unlawful discrimination. See McDonnell Douglas v. Green, 411 U.S. 792, 802-805 (1973); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000); Abramian v. President and Fellows of Harvard College, 432 Mass. 107, 116 (2000) (applying McDonnell Douglas under Massachusetts law). On the undisputed facts, Preble cannot sustain either burden, as shown in Parts B and C below.

Finally, Preble fails even to state a claim against TDI for retaliation, as alleged in Count IV of the Complaint, because TDI took no action against him at any time after he exercised any protected rights, as explained in Part D. There is no genuine issue of fact, and TDI is entitled to summary judgment.

**A.    Preble Does Not Suffer From A Disability Protected By Massachusetts Law.**

Preble's state-law claim of disability discrimination (Count III of the Verified Complaint) fails at the threshold because he does not suffer from a condition that qualifies as a "disability" under Massachusetts law. Like its federal counterparts, the Rehabilitation Act of 1973 and the Americans With Disabilities Act, the Massachusetts statute prohibits discrimination against a person who has a "physical or mental impairment which substantially limits one or more major life activities." Mass. Gen. L. c. 151B, §1(17).[5]

Preble does not suffer from such an impairment. He testified that his diabetes did not affect his ability to perform any job, nor restrict how long he

---

[5] The statute also prohibits discrimination against those who have "a record of having such an impairment" and those regarded by the employer as having such an impairment, see id., but neither of those clauses is implicated here.

could work on any particular day.  Preble Dep. at 18.  Asked more generally how his diabetes "affect[ed his] daily life" while employed at TDI, he responded, "Not too much.  As long as I kept my [blood sugar] numbers in check, I was fine."  Id. at 16.  All he had to do to treat himself for that condition was to test his blood sugar once per day, a simple process involving a handheld machine that took "a minute."  Id. at 17.  Depending on the results of the daily check, he would either eat lunch or not.  Id.

Similarly, Preble's heart condition – he had a heart attack in 1997 – imposes few limits on his ability to work.  He takes heart medication, and has been advised "not to lift extremely, you know, heavy items," or to shovel snow, but other than that has no restrictions on his work activities.  Id. at 11-12.

These conditions do not qualify as disabilities because they do not substantially limit any of Preble's major life activities.  Though Massachusetts law on the point is scarce, federal case law demonstrates that Preble does not have the sort of substantially limiting disability protected by law.[6]  First, lifting restrictions alone generally are not sufficiently disabling to qualify as a protected "handicap."  See, e.g., Benoit v. Technical Mfg. Corp., 331 F.3d 166, 176 (1st Cir. 2003) ("The only activity that Benoit was advised by his doctor to avoid was "heavy lifting," and Benoit has not demonstrated that this precluded him from working in a substantial class or broad range of jobs"); Marinelli v.

---

[6] Cf. Dube v. Middlesex Corp., 59 Mass. App. Ct. 734, 737 (2003) (Noting lack of Massachusetts case law concerning substantial limitations on the major life activity of working, noting similarity of federal statute, and adopting U.S. Supreme Court holding that "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs.") (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999)).

City of Eerie, 216 F.3d 354, 364 (3rd Cir. 2000) (lifting restrictions insufficient to create protected disability);[7] Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 645 (2d Cir. 1998) (inability to lift "very heavy objects" did not impair a major life activity). Similarly, merely having diabetes, unaccompanied by major symptoms that preclude work, is not a protected disability. Nawrot v. CPC Int'l, 277 F.3d 896, 904 (7th Cir. 2002) ("diabetic status, per se, is not sufficient to qualify as a disability under the ADA").[8]

Because Preble did not suffer from a disability protected by law, Count III of the Complaint fails at the outset, as a matter of law and undisputed fact, and without even considering TDI's motivation for firing him. In any case, as shown in the two following sections, Preble lacks sufficient evidence to reach a jury on his disability claim even if he had a qualifying impairment. TDI is entitled to summary judgment.

---

[7] Marinelli involved a plaintiff unable to lift ten pounds; the court there also cited cases from other circuits rejecting ADA claims where the plaintiff was restricted from lifting 25 pounds. See, e.g., Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349 (4th Cir. 1996); Ray v. Glidden Co., 85 F.3d 227, 229 (5th Cir. 1996); Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1319 (8th Cir. 1996); Thompson v. Holy Family Hosp., 121 F.3d 537 (9th Cir. 1997) (per curiam). Here, by contrast, Preble testified only that his doctor precluded his lifting "extremely . . . heavy items," Preble Dep. at 11, and he testified that he lifted 50-60 pound objects at work with some regularity, id. at 96-97.

[8] See generally Orr v. Wal-Mart Stores, Inc., 297 F.3d 720, 724 (8th Cir. 2002) ("'[M]ost disabilities from which people suffer," including diabetes, "do not have a substantial enough effect on their major life activities." Berg v. Norand Corp., 169 F.3d 1140, 1145 (8th Cir. 1999) (quoting Dalton v. Subaru-Isuzu Auto., Inc., 141 F.3d 667, 675 (7th Cir. 1998)). Health conditions that cause moderate limitations on major life activities do not constitute disabilities under the ADA. See Taylor v. Nimock's Oil Co., 214 F.3d 957, 960 (8th Cir. 2000) (heart disease); Weber v. Strippit, Inc., 186 F.3d 907, 914 (8th Cir. 1999) (heart disease).").

10

### B. Preble Has No Direct Evidence Of Discrimination.

Direct evidence "consists of statements by a decision-maker that directly reflect the alleged animus and bear squarely on the contested employment decision." Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000). Preble has no such evidence. Although he contends that co-workers made jokes about his inability to lift heavy objects, which he says was a result of his heart condition, he has no reason to believe that his supervisor, MacLean, ever made such a comment. Preble Dep. at 96-97. To the contrary, Preble testified that when MacLean learned of his condition, MacLean said "whenever I had to, to take it easy, take a break, or whatever I need to do to take care of my situation." Id. at 98. Whether or not his co-workers commented on his health, statements by colleagues who played no role in the termination decision have no bearing on the reasons for the termination decision, and so cannot constitute direct evidence. See, e.g., Wallace v. O.C. Tanner Co., 299 F.3d 96, 100 (1st Cir. 2002) ("brief, stray remarks unrelated to the termination decisional process" had no "significant probative value"); Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 13 (1st Cir. 1998) (no direct evidence because plaintiff "adduced no evidence that [the speaker] had authority to determine whether [plaintiff] was to be retained by [the employer]"). In fact, not even all comments by decision-makers constitute direct evidence. Wallace, 299 F.3d at 100-101; see also Beeck v. Federal Express Corp., 81 F. Supp. 2d 48, 53 (D.D.C. 2000) (saying that plaintiff "could not keep up with us young guys" not probative of age discrimination, because "[d]irect evidence does not include stray remarks in the workplace, even if made by decision-makers, where the remarks are unrelated to the decisional process itself . . .

11

there must be a nexus between the remark and the adverse employment decision.").

Accordingly, Preble cannot prevail unless he can present evidence sufficient for a jury to conclude that TDI's articulated reasons for his termination are pretexts for unlawful discrimination. As shown in the following section, he has no such evidence and cannot create a genuine issue of material fact warranting a trial.

### C. There Is No Evidence On Which A Reasonable Jury Could Find Pretext.

The burden of demonstrating pretext requires Preble to make "a substantial showing" that the reasons TDI has given for his termination are false. Williams v. Raytheon Co., 220 F.3d 16, 19 (1st Cir. 2000); see also Shorette, 155 F.3d at 13 (plaintiff "must do more than cast doubt on the rationale proffered by the employer; the 'evidence must be of such strength and quality as to permit a reasonable finding that the . . . [termination] was *obviously or manifestly unsupported*'") (quoting Ruiz v. Posadas de San Juan Assocs., 124 F.3d 243, 248 (1st Cir. 1997)) (original emphasis). He must also provide evidence on which a reasonable jury could conclude that TDI's reasons are not only a pretext, but a pretext for unlawful discrimination. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) ("It is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination") (original emphasis).

Preble cannot meet either of these burdens. He has not a whisper of evidence to suggest that TDI is being untruthful, let alone that it is doing so to cover up a discriminatory motive. Preble's series of incidents with the truck is

6880/76665-002 BNLIB1/7034v1

undisputed: in less than two years of employment with TDI, he twice collided with stationary objects, twice drove aggressively in a manner that his employer considered inimical to its interests, and persistently drove home for lunch despite admitting that he was instructed not to do so.  TDI responded to these incidents in a measured, progressive way: moving from no discipline at all for the first two incidents, to an oral warning that further misuse of the truck could lead to termination, then a week-long suspension, and finally termination.

Preble quarrels with these facts only to argue that TDI took them too seriously.  What TDI considered "road rage," he considered "everyday driving," Preble Dep. at 45; he thinks striking a parked car is not "sufficient reason to fire somebody," id. at 99.  And as to his consistent practice of driving his truck home to eat lunch, he was simply insubordinate: he admits that he was instructed not to go home for lunch, id. at 94, but did so anyway because "I don't think anybody has the right to tell you where to eat."  Id. at 95.  And Preble told MacLean so.  Id.

Such disagreements are not evidence of pretext; TDI is free to make its own judgments about the severity of Preble's driving record, the importance of preventing employees from going home during the work day, and the need to prevent its employees from having altercations with employees of the MBTA, an important customer.  To challenge such judgments, Preble must move beyond mere disagreement and offer evidence sufficient to support a jury determination that they were made for discriminatory reasons – generally by presenting evidence that TDI singled out Preble for harsher treatment because of his age or disability.  "[T]he question is not whether [plaintiff] was actually

13

performing below expectations, but whether [the employer] believed that she was." Feliciano v. El Conquistador Resort and Country Club, 218 F.3d 1, 7 (1st Cir. 2000); see also Kariotis v. Navistar Int'l Transport Corp., 131 F.3d 672, 677 (7th Cir. 1997) ("arguing about the accuracy of the employer's assessment is a distraction, because the question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest"). "Courts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991).

There simply is no evidence that TDI took the view it did of Preble's driving record because of his age or his alleged disability. He does not cite a single other employee with a driving record comparable to his who was treated more favorably. Cf. Preble Dep. at 100.[9]

Indeed, Preble thinks age might have been involved only because he "do[esn't] know any other reason," and admits that he has no reason to believe that MacLean, who is older than he, has a bias against older workers. Preble Dep. at 98. As to his diabetes or his heart condition, he similarly offers no reason to believe that TDI considered it in making its termination decision; the only comment any supervisor ever made about it was to tell him "to take it easy, take a break, or whatever I needed to do." Id. at 98. Asked directly why he thinks his health was involved, Preble responded, "I have no idea why I was terminated, medical-wise, health-wise, age-wise, work-wise." Id. at 99. As a

---

[9] There Preble contended that he had heard that others had had traffic accidents, but when asked whether there were "particular individuals or particular incidents that you have in mind," he responded, "Nothing." Id. He also was unaware of any incidents of "road rage" involving other TDI employees. Id. at 100-101.

matter of law, that is insufficient to reach a jury. "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (collecting cases).

There is no genuine issue of fact for a jury to consider, because there is nothing here to rebut TDI's explanation of the reasons for Preble's termination. He was warned, he was suspended, and when his dangerous and insubordinate use of the truck continued, he was terminated. TDI is entitled to summary judgment.

### D.  Preble Fails To State A Claim Against TDI For Retaliation.

Count IV of the Verified Complaint alleges that the defendants retaliated against Preble because he "exercised statutory rights permitted and protected under M.G.L. c. 151B." Verified Complaint ¶46. At least as alleged against TDI, this claim not only lacks supporting evidence sufficient to survive summary judgment, but fails even to state a claim.

Preble does not allege any exercise of rights guaranteed by Mass. Gen. L. c. 151B other than filing a complaint with the Massachusetts Commission Against Discrimination, which (of course) occurred after his termination. He does not allege that TDI took any adverse action against him after the filing of his complaint, and accordingly does not even intelligibly allege that TDI took any action to "coerce, intimidate or threaten or interfere with [his] exercise or enjoyment of any right granted or protected by this chapter." Mass. Gen. L. c. 151B, §4(4A), quoted in Verified Complaint ¶45. Preble fails to state a claim for retaliation against TDI, and Count IV should be dismissed.

## CONCLUSION

For all of the foregoing reasons, defendant TDI's motion for summary judgment should be granted.

<div style="margin-left: 50%;">

Respectfully submitted,

TRANSPORTATION DISPLAYS, INC.

By its attorneys,


/s/ Mark W. Batten_____
Mark W. Batten, BBO #566211
PROSKAUER ROSE LLP
One International Place, 14th Floor
Boston, MA 02110
(617) 526-9850

</div>

Dated: November 3, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record, either through the electronic filing process or by first-class mail, postage prepaid, this 3rd day of November, 2004.

<div style="margin-left: 50%;">

/s/Mark W. Batten
Mark W. Batten

</div>

6880/76665-002  BNLIB1/7034v1