UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WALTER S. PREBLE,<br><br>     Plaintiff,<br><br>     v.<br><br>TRANSPORTATION DISPLAYS, INC.,<br>d/b/a VIACOM OUTDOOR, and<br>PAINTERS AND ALLIED TRADES<br>DISTRICT COUNCIL 35, IUPAT,<br>AFL-CIO,<br><br>     Defendants. | Civil Action No. 04-11005-RWZ |

**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF DEFENDANT TRANSPORTATION DISPLAYS, INC.'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, defendant Transportation Displays, Inc., d/b/a Viacom Outdoor ("TDI") submits this statement of undisputed facts in support of its motion for summary judgment on all counts of the Complaint.

1.   TDI is in the business of outdoor advertising.

2.   Among other things, TDI employees, under contract to the Massachusetts Bay Transit Authority ("MBTA"), install advertising materials on buses, subway cars, and commuter trains, including the metal frames which hold those materials.  Deposition of Walter Preble ("Preble Dep.") at 20-22.  A copy of cited excerpts from the Preble Deposition is attached to the Declaration of Mark W. Batten ("Batten Declaration"), submitted herewith, at Tab A.

3.   In general, Preble's responsibility on a typical day was to drive a TDI-supplied truck to the MBTA "barns," where he would install advertising on the vehicles there.  Id. at 27-28.

4. Preble had been working for a company known as Park Transit, which he testified was acquired by TDI, also known as Viacom Outdoor, in the summer of 2000. Id. at 26.

5. After TDI acquired Park Transit, Richard MacLean became Preble's supervisor. Id.

6. After TDI acquired Park Transit, employees were required to travel to and from customer sites in company vans, rather than driving their own vehicles, as they had when working for Park Transit. Id. at 28-29.

7. MacLean told the employees on several occasions that they were not to drive the company trucks off route. Id. at 30. Preble considered the instruction vague. Id.

8. Before the incident for which he was terminated, MacLean had told Preble not to go home for lunch. Id. at 94.

9. In 2000, Preble drove a TDI truck into an overhead door at the TDI garage in Randolph, Massachusetts. Id. at 31-32.

10. Preble was not disciplined for the overhead door accident, except that he was spoken to about it and was criticized for refusing to take responsibility for it. Id. at 34-35.

11. In approximately September 2000, Preble locked his keys in the truck, and called a co-worker to drive into Boston from Randolph to unlock it. Id. at 36-37.

12. At the time of the September 2000 incident, Preble was at home, having driven the truck to his house in South Boston to eat lunch. Id. at 36.

13. Preble's home is east of the easternmost MBTA barn that he services south of the city. See Preble Dep. at 72-74. A map of the relevant

2

area showing the location of Preble's home and two of the MBTA barns, including the easternmost, is attached to the Batten Declaration at Tab B.

14. Preble believes that MacLean learned about the incident in which he locked his keys in the truck, but MacLean did not speak to him about it at the time and he was not disciplined. Id. at 38.

15. In approximately October 2000, Preble became frustrated by a driver in front of him whom he considered to be driving too slowly. Id. at 41-42.

16. After honking his horn twice without success, Preble pulled his truck into the left lane and passed the driver. Id. at 42-43.

17. Preble contends that the "lane opened up" with a "broken white line" that became a solid white line closer to the intersection, and that passing was legal until the white line became solid. Id. at 43.

18. A police officer visited the TDI garage on the evening of the passing incident described above. Id. at 42.

19. MacLean learned of the passing incident, and characterized it as "road rage" to Preble. Id. at 45. Preble responded that "I considered it everyday driving." Id.

20. MacLean warned Preble not to let it happen again, telling him that he could be fired "[i]f I had another incident of road rage, . . . or if I gave somebody the finger or some other form of communication, I guess." Id.

21. In or about February 2001, Preble was driving in the center lane of a three-lane roadway, with another truck to his left. Id. at 47. Both vehicles turned left, Preble turning from the center lane. Id.

6880/76665-002 BNLIB1/7220v1

22. After making the turn, and still driving alongside the other truck on its right, Preble realized that his lane was about to become a right-turn-only lane. He tried to pass the truck next to him, unsuccessfully, so he "hit[ ] the brakes" and pulled left behind the other truck. Id. at 48-49.

23. In pulling behind the other truck, Preble realized from the truck's vanity plate that the truck was driven by an MBTA mechanic who lived near Preble in South Boston, although the two had never actually met. Id. at 50.

24. Preble followed the MBTA mechanic to his home; he contends that he was planning to drive on that street in any case to avoid expressway traffic. Id. at 51, 53-54.

25. Preble and the driver of the other truck exchanged words. Preble spoke first, concerning the other driver's refusal to let him pass. Id. at 51-52. The other driver told Preble that Preble's original left turn was illegal, and gestured at Preble with a wooden club. Id. at 52-53.

26. Preble said "Why don't you go back to Charlestown," and drove away. Id. at 53.

27. Preble did not report the interaction with the MBTA employee to MacLean, but the MBTA employee did. Id. at 54.

28. Preble was suspended for a week. A true and correct copy of the notice of suspension is attached to the Batten Declaration at Tab C.

29. After receiving the suspension notice referred to in the prior paragraph, Preble spoke to a representative of his union, Charles Fogell, about his desire to grieve the suspension. Id. at 61.

4

30. Fogell declined to grieve the suspension. Among other things, he told Preble that Preble was wrong to have been "out of his area" by driving through South Boston near his home. Id. at 62-63.

31. Preble had already heard the same instructions about driving through South Boston from MacLean before speaking to Fogell. Id. at 61-62.

32. Preble routinely drove his truck home for lunch throughout the time he was employed at TDI. Id. at 75.

33. On December 18, 2001, as he returned to work from lunch at his house, Preble struck a parked car as he turned a corner in South Boston. Id. at 76-77.

34. Preble did not immediately realize he had hit the car, but a police officer flagged him down. Id. at 77.

35. Preble then drove back to the MBTA garage where he had left his partner, and then returned to the TDI garage in Randolph. Id. at 78-79.

36. Preble did not tell his partner about the accident, and told no one else that afternoon, either. Id. at 79-80. He wrote no report. Id. at 80.

37. Preble previously had had another accident in which the truck's mirror was struck by another car, and his passenger at the time, another TDI employee, wrote a report of the incident. Id. at 81. MacLean had required Preble and others to write reports of accidents in the past. Id. at 84-85.

38. On December 19, 2001, Preble reported the parked-car accident to MacLean, who told him to write up an account of it. At the end of that work day, TDI terminated Preble's employment. Id. at 91. MacLean said again that Preble had been off his route. Id. at 92-93.

6880/76665-002 BNLIB1/7220v1

39. When employed at TDI, Preble suffered from Type II diabetes, which required no insulin injections but did require him to monitor his blood sugar. Id. at 12-13.

40. Once per day, Preble would prick his finger, draw blood onto a test strip, and insert the strip in a small handheld machine, a process that took "a minute." Id. at 17.

41. Preble's practice was to test his blood sugar at lunch time, and then he either would eat lunch or not, depending on the reading. Id.

42. Preble could have taken the blood testing machine with him to work. Id. at 94-95.

43. Preble could have brought a lunch to work that would have allowed him to meet the dietary restrictions of his diabetes. Id. at 107.

44. After his termination, Preble filed a grievance through his union, the the Painters And Allied Trades District Council 35. The Union representative, Fogell, pursued the grievance beyond "Step I" – an initial meeting between Fogell and MacLean – to "Step II," a December 28, 2001 meeting attended by Fogell, MacLean, Preble, and Bill Murphy, id. at 111, who was a senior manager of the company based in New York and responsible for operations throughout New England, id. at 33.

45. The company denied the grievance, and the Union elected not to pursue it to arbitration; Fogell told Preble that the Union would not pursue the grievance because "we can't win this." Id. at 116.

46. Preble filed a claim with the Massachusetts Commission Against Discrimination on May 17, 2002, alleging discrimination on the basis of age and disability.

47. At no point during the grievance process did Preble tell anyone in the Union, or at TDI, that he thought he had been discriminated against. Id. at 114.

48. Preble's diabetes did not affect his ability to perform any job, nor restrict how long he could work on any particular day. Id. at 18.

49. Asked more generally how his diabetes "affect[ed his] daily life" while employed at TDI, he responded, "Not too much. As long as I kept my [blood sugar] numbers in check, I was fine." Id. at 16.

50. As a result of a heart attack in 1997, Preble has been advised "not to lift extremely, you know, heavy items," or to shovel snow, but other than that has no restrictions on his work activities. Id. at 11-12.

51. Preble has no reason to believe that his supervisor, MacLean, ever made any comments about his diabetes or heart condition. Preble Dep. at 96-97.

52. When MacLean learned of Preble's condition, MacLean's response was "whenever I had to, to take it easy, take a break, or whatever I need to do to take care of my situation." Id. at 98.

53. Preble has no reason to believe that MacLean, who is older than he, has a bias against older workers. Preble Dep. at 98.

54. Preble is unaware of any other employee with a driving record comparable to his who was treated more favorably. Cf. Preble Dep. at 100.

6880/76665-002 BNLIB1/7220v1

Respectfully submitted,

TRANSPORTATION DISPLAYS, INC.

By its attorneys,

/s/ Mark W. Batten_____
Mark W. Batten, BBO #566211
PROSKAUER ROSE LLP
One International Place, 14th Floor
Boston, MA 02110
(617) 526-9850

Dated: November 3, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record, either through the electronic filing process or by first-class mail, postage prepaid, this 3rd day of November, 2004.

/s/Mark W. Batten_____
Mark W. Batten