Walter S. Preble
Transportation Displays, Incorporated, et al.
Case 1:04-cv-11005-RWZ   Document 24-2   Filed 11/03/2004   Page 1 of 7
Walter S. Preble
Vol. 1, August 24, 200

Page 1

Volume I
Pages 1 to 126
Exhibits See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WALTER S. PREBLE,
    Plaintiff,
vs.                             : Civil Action
                                : No. 04-11005 RWZ
TRANSPORTATION DISPLAYS,
INCORPORATED, dba VIACOM
OUTDOOR and PAINTERS AND
ALLIED TRADES DISTRICT
COUNCIL 35, IUPAT, AFL-CIO,
    Defendants.

DEPOSITION OF WALTER S. PREBLE, a witness called on behalf of the Defendant Transportation Displays, Incorporated, taken pursuant to the Federal Rules of Civil Procedure, before Catherine A. Handel, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Proskauer Rose LLP, One International Place, Boston, Massachusetts, on Tuesday, August 24, 2004, commencing at 10:00 a.m.

PRESENT:
    Paul L. Nevins, Esq.
    47 Church Street, Wellesley, MA 02482,
       for the Plaintiff.
    Proskauer Rose LLP
       (by Mark W. Batten, Esq.)
    One International Place, 14th Floor,
    Boston, MA 02110-2600, for the Defendant
    Transportation Displays, Incorporated.
       (Continued on Page 2)

Page 2

PRESENT (Continued):
    Feinberg, Campbell & Zack, P.C.
       (by Jonathan M. Conti, Esq.)
    177 Milk Street, Boston, MA 02109,
       for the Defendants Painters and Allied
    Trades District Council 35, IUPAT, AFL-CIO.

Page 3

[1]              INDEX
[2] EXAMINATIONS                        PAGE
[3] WALTER S. PREBLE
[4] DIRECT EXAMINATION                     5
    BY MR. BATTEN
[5]
    CROSS EXAMINATION                    102
[6] BY MR. CONTI
[7] CROSS EXAMINATION                    121
    BY MR. NEVINS
[8]
    REDIRECT EXAMINATION                 123
[9] BY MR. BATTEN
[10]
[11]
[12]
[13]
                 EXHIBITS
[14]
[15]
    NO.    DESCRIPTION              PAGE
[16]
    1   Letter of Suspension to Mr.    56
[17]    Preble
[18] 2  Map of the area of the incident  72
[19] 3  Document entitled "Driver's     82
        Report of Accident"
[20]
     4  Document entitled "In Case of a   82
[21]    Motor Vehicle Accident
[22] 5  Plaintiff's handwritten         89
        description of the accident
[23]
     6  Plaintiff's handwritten         90
[24]    description of damage to the van

Walter S. Preble v.
Transportation Displays, Incorporated, et al.
Case 1:04-cv-11005-RWZ   Document 24-2   Filed 11/03/2004   Page 2 of 7
Walter S. Prebl
Vol. 1, August 24, 200

Page 8

[1] A: Yes.
[2] Q: And since December of 2001, when you left
[3] Viacom, what have you done to try to look for work?
[4] A: I've checked out the want ads. I've gone
[5] to unemployment agencies to find any type of lead to
[6] apply for different types of jobs.
[7] Q: Is there a particular geographic area that
[8] you were looking in?
[9] A: No, nothing really, in particular.
[10] Q: Did you look outside eastern Massachusetts?
[11] A: No.
[12] Q: Did you look outside Boston?
[13] A: If any was available, yes.
[14] Q: Other than the work that you just told me
[15] about that you've done since Viacom, have you
[16] applied for any other jobs?
[17] A: I have applied for two, three different
[18] other jobs, but nothing — I was driving — applying
[19] for MBTA fueler's job and they told me my medical
[20] condition had to be upgraded to suffice their
[21] requirements, I believe.
[22] Q: Did they tell you specifically what it was
[23] about your medical condition?
[24] A: They said my eyesight wasn't clear enough

Page 9

[1] and I needed a note from my doctor saying my
[2] diabetes was under control.
[3] Q: Did you visit your doctor with the idea of
[4] getting that kind of a letter from him?
[5] A: Yes.
[6] Q: Did he say your diabetes wasn't
[7] sufficiently under control?
[8] A: He wouldn't give me a letter to that
[9] effect. My eyes are fine, but the — I started
[10] shooting insulin at that point to try to get it
[11] under control.
[12] Q: Who is your doctor?
[13] A: Dr. Aaron Thomas.
[14] Q: Is he affiliated with a particular
[15] hospital?
[16] A: Brigham and Women's.
[17] Q: Do you know what the MBTA fueler's job
[18] would have paid if you had gotten it?
[19] A: I'm not sure. I'd say roughly $15 an hour.
[20] I'm just guessing.
[21] Q: Did you apply for any other jobs?
[22] A: I filled out applications, but it wasn't
[23] anything in particular.
[24] Q: Do you remember any of the applications —

Page 10

[1] or any of the places that you applied?
[2] A: It was a supply company on — I think it
[3] was Colonial or Nike Company on Dorchester Ave.,
[4] driving a truck for them.
[5] Q: You filled out an application and did you
[6] get an interview?
[7] A: I interviewed, but that was it. That
[8] was —
[9] Q: Did they tell you why they didn't hire you?
[10] A: No.
[11] Q: Do you know what that would have paid?
[12] A: Around the same ballpark, about — I'm
[13] assuming $15.
[14] Q: And any other applications?
[15] A: No.
[16] Q: Can you tell me what — you mentioned
[17] diabetes. Do you have any other health problems?
[18] A: Heart condition. I guess you would — I've
[19] had a heart attack in the past.
[20] Q: When was your heart attack?
[21] A: Roughly seven years.
[22] Q: Seven years ago?
[23] A: Yes.
[24] Q: Are you currently under any kind of

Page 11

[1] treatment for your heart condition?
[2] A: Just medication.
[3] Q: What medication?
[4] A: Iantan.
[5] Q: Do you know how you spell that?
[6] A: I-a-n-t-a-n —
[7] MR. NEVINS: You want to try a piece of
[8] paper?
[9] A: (Marking) That's not right, but close
[10] enough.
[11] Q: A-t-e-n-a-n-a-l?
[12] A: Yes.
[13] Q: Okay. Close enough. How long have you
[14] been taking that medication?
[15] A: I'd say six, seven years.
[16] Q: Pretty much since your heart attack?
[17] A: Yes.
[18] Q: Are you under any other kind of
[19] restrictions because of your heart condition in
[20] terms of jobs you can perform or things you can do
[21] during the day?
[22] A: They say not to lift extremely, you know,
[23] heavy items.
[24] Q: Anything else?

Page 12

[1] A: More or less, no. Or shoveling snow.
[2] Q: As I understand it, there are different
[3] types of diabetes; is that right?
[4] A: Yes.
[5] Q: What type of diabetes do you have?
[6] A: I started out with Type II. That's what I
[7] consider I still am, even though I'm on the needle.
[8] Q: And when you did first — when were you
[9] first diagnosed with Type II diabetes?
[10] A: I would say about two years after the heart
[11] attack.
[12] Q: So about five years ago?
[13] A: Yes.
[14] Q: Sometime until 1999, does that sound right?
[15] A: Yes.
[16] Q: And at what point did you start taking
[17] insulin?
[18] A: I would say two years ago.
[19] Q: 2002?
[20] A: Yes.
[21] Q: So after your employment at Viacom had
[22] ended?
[23] A: Actually, yes.
[24] Q: So you weren't injecting insulin at any

Page 13

[1] time while you were employed at Viacom; is that
[2] right?
[3] A: Let me think. No, I was not.
[4] Q: During the time that you were employed at
[5] Viacom, how did you treat your diabetes?
[6] A: I would just check my numbers, usually
[7] around lunchtime.
[8] Q: When you say check your numbers, what do
[9] you mean?
[10] A: I would have a blood testing machine. I
[11] would prick my finger and find out what the blood
[12] sugar count was at that time and I would eat
[13] accordingly.
[14] Q: Can you tell me a little bit about the
[15] numbers, like what the numbers would be that would
[16] require you to do or not do something?
[17] A: The average person would be about 120 blood
[18] sugar, normal. Mine was 300 or more at different
[19] times. The highest it's ever been was 628, I
[20] believe.
[21] Q: When was that?
[22] A: When I was first diagnosed with diabetes;
[23] I'd say five years ago.
[24] Q: And have you been seen regularly by a

Page 14

[1] physician for your diabetes?
[2] A: Yes.
[3] Q: Is that Dr. Thomas?
[4] A: Yes.
[5] Q: And have you been seeing him the entire
[6] five-year period?
[7] A: Yes.
[8] Q: How often do you see him for your diabetes?
[9] A: Once maybe every six months.
[10] Q: Do you see any other — have you seen any
[11] other physicians in the last five years?
[12] A: Yes.
[13] Q: Who else?
[14] A: Jeffrey Woo. He's my primary care
[15] physician.
[16] Q: And what hospital is he affiliated with?
[17] A: Brigham and Women.
[18] Q: And anybody else?
[19] A: Dr. Leonard Lily, cardiologist.
[20] Q: Also at Brigham?
[21] A: Yes — well, now he's at Faulkner Hospital.
[22] Q: Are you still seeing him today?
[23] A: Yes.
[24] Q: Any other doctors?

Page 15

[1] A: Not generally, no.
[2] Q: You say "not generally." What do you mean?
[3] A: Well, if I have a problem with my knee, he
[4] sends me to a knee specialist generally. I would
[5] not see them on a regular basis.
[6] Q: Have you seen specialists for your knee?
[7] A: Previously I have, yes.
[8] Q: When you say "previously," what do you
[9] mean?
[10] A: I had an injury in softball and I went to
[11] have it checked out and he told me I had arthritis
[12] in it and I could rehab it if I wanted to, but that
[13] was the only advice I got from that doctor. I
[14] couldn't tell you his name.
[15] Q: When was that that you injured your knee?
[16] A: About — originally when I was 17 years
[17] old. It's been acting up since then.
[18] Q: When did you see the doctor?
[19] A: This particular doctor was probably nine
[20] years ago, ten years ago.
[21] Q: Are you seeing anybody for your knee since
[22] that time?
[23] A: No, I haven't.
[24] Q: Now, during the time that you were working

Page 16

[1] at Viacom or TDI, how did your diabetes affect your
[2] daily life?
[3]   A: Not too much. As long as I kept my numbers
[4] in check, I was fine.
[5]   Q: And if you took a blood test and found that
[6] your number was particularly high, what would you do
[7] about it?
[8]   A: You wouldn't be able to eat to — eat to
[9] take care of it. Depends on what you would eat.
[10]  Q: So you would eat something different or
[11] would you skip a meal if you had a —
[12]  A: Depends on the condition.
[13]  Q: I'm sorry?
[14]  A: I would probably skip the meal.
[15]  Q: You mentioned a blood testing machine?
[16]  A: Yes.
[17]  Q: How big is that?
[18]  A: (Indicating) It comes in a case and it's
[19] probably four inches by three inches, maybe, as well
[20] as needles and other materials that go with it, the
[21] test strips.
[22]  Q: So can you just describe for me exactly
[23] what it is that you do in order to check your blood
[24] sugar?

Page 17

[1]   A: You poke your finger, draw blood, put it on
[2] a test strip and insert it into the machine and the
[3] machine will tell you what your blood sugar count
[4] is.
[5]   Q: How long does that whole process take?
[6]   A: A minute.
[7]   Q: How many times a day do you check your
[8] blood sugar?
[9]   A: I generally only checked it once a day. It
[10] was recommended to test it three or four, but the
[11] insurance wouldn't cover my test strips at the time
[12] and they're very expensive to buy. So I only did it
[13] on a basis where I felt like I didn't feel well.
[14]  Q: And I think you said earlier that, in
[15] general, you tested once a day around lunchtime; is
[16] that right?
[17]  A: Yes, that's usually when the blood sugar is
[18] the lowest.
[19]  Q: So tell me if I'm wrong, but what I'm
[20] understanding is that during the time that you were
[21] working at Viacom, on a typical day you would test
[22] your blood sugar around lunchtime and then either
[23] eat or not eat, depending on what the result was?
[24]  A: Yes.

Page 18

[1]   Q: At that time did your diabetes affect your
[2] ability to perform any jobs?
[3]   A: Not to my knowledge.
[4]   Q: Did it restrict how long you could work on
[5] a particular day?
[6]   A: No.
[7]   Q: And did it affect your diet?
[8]   A: Yes.
[9]   Q: In other words, the things you eat as
[10] opposed to whether you ate or not?
[11]  A: Oh, yes.
[12]  Q: In what ways?
[13]  A: Basic sugar — you know, different type
[14] foods break down in the system differently. For a
[15] diabetic, candy bars is the same as having a mashed
[16] potato or a banana. The sugar breaks down so fast
[17] in the system, you're not supposed to have that. So
[18] their system reacts the same way, say, to a mashed
[19] potato as it would to a candy bar or any other form
[20] of sugar.
[21]  Q: So what kinds of things do you eat?
[22]  A: Generally I try to have a salad, sandwich,
[23] soup, things that have — more things with fiber in
[24] it, but you can't always get what is best for you.

Page 19

[1]   Q: And if you can't get what's best for you,
[2] do you eat anyway or do you not eat?
[3]   A: Well, it depends on the situation. If it's
[4] on — sometimes you do have to have food regardless
[5] of what it is, and if your sugars are too low, you
[6] do have to have sugar, candy bar, regular tonic,
[7] orange juice to bring your numbers up. So sometimes
[8] you have to have sweets, sometimes you don't; it all
[9] depends on your blood sugar count.
[10]  Q: Now, as I understand it, before you were
[11] working for Viacom doing transportation displays
[12] work, you were working at some other company doing
[13] the same kind of work; is that right?
[14]  A: Yes.
[15]  Q: What was the name of that company?
[16]  A: Park Transit Display was the previous name.
[17]  Q: How long had you worked for Park Transit
[18] before Viacom came into the picture?
[19]  A: I believe it was three to four years,
[20] maybe. Every few years the name changes.
[21]  Q: And what kind of work did you do for Park
[22] Transit?
[23]  A: Same type of advertising, putting
[24] advertising signs up on the buses, trains, trolleys,

Page 20

[1] taking them down, repairing frames, everything the
[2] same.
[3]  Q: Just to be sure that I understand the job,
[4] part of it was taking advertising materials and
[5] putting them into the frames on buses or subway cars
[6] or commuter rail trains; is that right?
[7]  A: Yes.
[8]  Q: Beyond that what other kinds of things did
[9] you do?
[10]  A: We would make signs up, big signs on the
[11] outside of the bus, have to be made into — posted
[12] onto a board.
[13]  Q: What do you mean?
[14]  A: Usually comes — used to be in glue. You
[15] have to run it through a glue machine and put it
[16] down on the board and put them on the skid and take
[17] them out at roughly 100 at a time.
[18]  Q: Are you saying that you've physically
[19] created the piece of cardboard that went on the bus?
[20]  A: No. The cardboard was there. We just put
[21] the vinyl or paper onto the cardboard and then we
[22] would put it onto the bus.
[23]  Q: I see. So you got the ad on either —
[24]  A: Pre-made paper, right.

Page 21

[1]  Q: You glued it to a stiffer card and then put
[2] it in the frame, wherever it was going?
[3]  A: Yes.
[4]  Q: Thank you. Anything else that was within
[5] your job while you were at Park Transit?
[6]  A: Just anything that had to be done; fix
[7] frames, remove frames, put frames up.
[8]  Q: Did your responsibilities change over the
[9] time you were employed at Park Transit or were you
[10] pretty much doing the same kind of work?
[11]  A: Pretty much. Different people do different
[12] type jobs and they get into the ruts, and whatever
[13] you want to call it, and they perform — we have one
[14] gentleman that used to have — a framer that used to
[15] work for us from the MBTA. When they changed
[16] contracts previously, they got rid of him and then
[17] one of our guys started doing the framing work. So
[18] he got into the habit of doing that. We all were
[19] qualified at the time to do it, but he got into the
[20] habit of doing it all the time.
[21]  Q: And at the time that you were at Park
[22] Transit before it became Viacom, was it all MBTA-
[23] related work that you were doing?
[24]  A: Yes, that's always been MBTA related for

Page 22

[1] every company that's ever owned us.
[2]  Q: And then when Viacom came into the picture
[3] and you were working for them, did your job change
[4] at all or was it the same thing?
[5]  A: Same thing.
[6]  Q: And, again, throughout the time you were at
[7] Viacom, it was all MBTA-related work?
[8]  A: Yes.
[9]  Q: Now, when you were with Park Transit, how
[10] did you get around from place to place to put the
[11] cards on the buses?
[12]  A: Sometimes you use your own vehicle,
[13] sometimes you use the company vehicle. It depends
[14] on the amount of stock, availability of vehicles.
[15]  Q: So that would change from day to day?
[16]  A: Yes.
[17]  Q: You would come into work and either drive
[18] your own car or take the company car, depending on
[19] what was available?
[20]  A: Yes.
[21]  Q: Were there any rules at Park Transit about
[22] where you could drive or not drive regardless of
[23] what kind of car you were in?
[24]  A: No.

Page 23

[1]  Q: Were you paid by the hour or by salary at
[2] Park Transit?
[3]  A: I'd say the hour.
[4]  Q: Do you remember what you earned?
[5]  A: I believe it was $17-something an hour. It
[6] changed every couple of six months or a year; we
[7] would get raises.
[8]  Q: Were you required to account for the number
[9] of hours you worked on a particular day in some way?
[10]  A: No, just coming in and leaving roughly the
[11] same time; nothing —
[12]  Q: You didn't do anything in writing?
[13]  A: No, no time clock.
[14]  Q: You didn't punch in or out?
[15]  A: No.
[16]  Q: Or fill out a time sheet or anything like
[17] that?
[18]  A: No.
[19]  Q: Did you work overtime?
[20]  A: Occasionally.
[21]  Q: Did you have to account for that?
[22]  A: No.
[23]  Q: How did the company know to pay you for any
[24] particular number of hours of overtime in a given

Page 24

[1] week?
[2]  A: They had, say — they would just pay you
[3] eight hours overtime, or whatever, for that
[4] particular job or other jobs or whatever time they
[5] consider would be the length of time. If they're
[6] offering four hours to do the work, you do it in
[7] four hours. If they offer you eight hours, you do
[8] it in eight hours. There was no time clock type
[9] situation.
[10]  Q: It was determined in advance of a job how
[11] many hours they thought it should take and how many
[12] they were going to pay you for?
[13]  A: Yes.
[14]  Q: When you were working at Park Transit, did
[15] you go home for lunch?
[16]  A: Yes.
[17]  Q: Every day?
[18]  A: Yes, just — I would say if I was in the
[19] area, I would.
[20]  Q: And if you weren't in the area, how would
[21] you get your lunch?
[22]  A: Generally I would be in the — no matter
[23] where I was in the system, I considered it in the
[24] same area because it's — there's four barns south

Page 25

[1] of the city, four barns north of the city and I'm in
[2] between generally any of them.
[3]  Q: So are you saying whether you were north or
[4] south of the city, you would go home for lunch?
[5]  A: Generally.
[6]  Q: On most days?
[7]  A: Yes.
[8]  Q: But sometimes, I gather — again, we're
[9] still talking about when you were with Park Transit.
[10] Sometimes you didn't go home for lunch?
[11]  A: Right.
[12]  Q: Occasionally, anyway; is that right?
[13]  A: Right.
[14]  Q: And on those occasions, would you just skip
[15] lunch or did you eat somewhere else?
[16]  A: I would eat something else, but sometimes
[17] they keep you inside the shop for the day. So you
[18] had to find some place around the area to get lunch.
[19]  Q: And what kinds of places were there around
[20] the Park Transit office where you found lunch?
[21]  A: There was Papa Gino's. There was all
[22] different types of — I don't consider fast food or
[23] general Stop & Shop would have sandwiches made up
[24] and soups, and that type of stuff, but you still can

Page 26

[1] find a decent meal.
[2]  Q: Now, how did it happen that you came to be
[3] working for Viacom? Did Viacom buy Park Transit?
[4]  A: Yes.
[5]  Q: So did you leave one company and get hired
[6] by another one or did you —
[7]  A: No. We were just taken over from one to
[8] the other.
[9]  Q: Do you know whether anybody who had been
[10] working for Park Transit was not hired by Viacom?
[11]  A: No. We were all taken over, I believe.
[12]  Q: And when was that?
[13]  A: In 2000, I believe.
[14]  Q: Do you know what month in 2000?
[15]  A: I believe it was in the summertime
[16] sometime. I'm not sure.
[17]  Q: June or July?
[18]  A: Yes.
[19]  Q: And when did Richard MacLean become your
[20] supervisor?
[21]  A: When the company took over.
[22]  Q: Was he already with Viacom before you got
[23] there?
[24]  A: I believe he was.

Page 27

[1]  Q: Did he —
[2]  A: He was introduced as an employee of Viacom
[3] to us. We don't know how long he had been employed
[4] by them previous to that point.
[5]  Q: To your knowledge, had Viacom been in the
[6] Boston area — Viacom Outdoor had been in the Boston
[7] area before it took over Park Transit?
[8]  A: I don't believe it was.
[9]  Q: So did Mr. MacLean come from some other
[10] place?
[11]  A: I heard he came up from Rhode Island.
[12]  Q: And he was your supervisor, correct?
[13]  A: Yes.
[14]  Q: And was he responsible for setting your
[15] route on a given day?
[16]  A: He handled the jobs, basically, or gave
[17] them to Joey Maikis to hand them out on a general
[18] basis per day.
[19]  Q: Was there a daily schedule of some kind?
[20]  A: They would send you to do different routes,
[21] north barns, south barns, or sometimes both.
[22]  Q: Did you know in advance — before you came
[23] into work on a particular day, did you know where
[24] you were going to be going that day?

Page 28

[1] A: No, you don't.
[2] Q: You come into work and then you find out
[3] that morning what it is you're going to do?
[4] A: What you do, yes.
[5] Q: Is it posted in writing somewhere?
[6] A: No.
[7] Q: Someone just tells you where to go?
[8] A: Yes.
[9] Q: And, in general, who was it who would tell
[10] you?
[11] A: Joey Maikis; he was the lead man.
[12] Q: Were you still being paid on an hourly
[13] basis when Viacom took over?
[14] A: Yes.
[15] Q: Did they have any — did Viacom have any
[16] different rules about how you accounted for the
[17] number of hours you worked on a given day?
[18] A: We had to sign a card on the — we would
[19] sign in every week — or every day.
[20] Q: Would you sign out at the end of the day?
[21] A: Yes.
[22] Q: As I understand, once Viacom took over, you
[23] were always driving company-owned vehicles; is that
[24] right?

Page 29

[1] A: Yes.
[2] Q: You would always have to come back to
[3] the —
[4] A: Randolph garage.
[5] Q: — Randolph garage to drop off the car or
[6] drop off the vehicle and go home; is that right?
[7] A: Right.
[8] Q: And you would sign out at that point?
[9] A: Yes.
[10] Q: Did you account separately for the time
[11] that you took for lunch on the sign-in and sign-out
[12] sheet?
[13] A: I don't — we didn't — we didn't sign out
[14] at lunch time or sign back in after lunch, no.
[15] Q: So in terms of the company records, is it
[16] fair to say there would be a record of the time you
[17] came in in the morning and the time that you went
[18] home at the end of the day, but that would be all —
[19] A: Yes.
[20] Q: Now, early on in your employment at
[21] Viacom — that is the summer of 2000 — Mr. MacLean
[22] said something to you about not taking the truck off
[23] route?
[24] A: Yes.

Page 30

[1] Q: What did he say?
[2] A: He said we couldn't take the truck off
[3] route to do anything — we're supposed to be on
[4] route for whatever job we were doing, and I would
[5] ask him what route he meant and he would — he never
[6] described what route it was.
[7] Q: Is this a particular conversation that you
[8] had with him or more than one?
[9] A: We would generally have a group meeting and
[10] explain to different people and I asked him what it
[11] meant. Does he mean we can't go to McDonalds or go
[12] to Burger King or — he would never answer the
[13] question. He would say you couldn't go off route,
[14] but when I asked him what the route was, he wouldn't
[15] explain what route it was.
[16] Q: And how often did you ask him that
[17] question?
[18] A: Whenever he would — I would say maybe two
[19] or three times, whenever he mentioned about going
[20] off route. I told him — like I said, my area
[21] route, anything inside that four-garage area north
[22] or south that the MBTA covered.
[23] Q: When did you tell him that?
[24] A: Any time he asked me about routes.

Page 31

[1] Q: And you say that happened two or three
[2] times?
[3] A: Yes. It was never clear exactly what he
[4] meant by "route." We would discuss it amongst
[5] ourselves, and then somebody would ask him what he
[6] meant by it and he would never define it. The first
[7] time I ever heard the definition was during my
[8] unemployment procedure.
[9] Q: And did he announce this rule about not
[10] taking the truck off the route in the meeting with
[11] you alone or with everybody present or —
[12] A: With everyone present.
[13] Q: Now, at some point, according to some of
[14] the documents, you backed the truck into an overhead
[15] door; is that right?
[16] A: No. I drove it into the overhead door
[17] after I was told that it was — it started — that
[18] morning where the door was — the truck was actually
[19] parked illegally. It's not supposed to be parked
[20] inside the building. I suggested to Mr. MacLean
[21] that they have little stickers on the door saying
[22] the proper height for the door to open because there
[23] is no indication on when the door is opened part of
[24] the way if the truck can go in and out. At this