Walter S. Preble v. Transportation Displays, Incorporated, et al.
Case 1:04-cv-11005-RWZ   Document 24-3   Filed 11/03/2004   Page 1 of 7
Walter S. Preble
Vol. 1, August 24, 2004

Page 32

[1] particular morning was the only time the door wasn't
[2] completely opened. Supposedly the painters working
[3] there opened the door. Nobody would find out
[4] exactly how he opened the door that morning, but
[5] that I had looked up and I had clearance to clear
[6] the door, but as you're going down the ramp, which
[7] is a tilted ramp, the back of the truck caught the
[8] door and knocked it off the pins.
[9]   Q: As I understand it, you were driving the
[10] truck forward, not backward?
[11]   A: Right.
[12]   Q: And you were driving it out of the building
[13] and down the ramp?
[14]   A: Right.
[15]   Q: Do you remember when this happened?
[16]   A: When they — within the first month or so
[17] when the company had taken over.
[18]   Q: Viacom, you mean?
[19]   A: Yes.
[20]   Q: And this was at the Randolph garage?
[21]   A: Yes.
[22]   Q: Was anybody there and saw it happen?
[23]   A: Mr. MacLean, Kenny Barrus, Joey Maikis, as
[24] well as anybody else that worked the day shift at

Page 33

[1] that time.
[2]   Q: Did anybody speak to you about it?
[3]   A: They called me in. Bill Murphy came,
[4] called me in. He came in from New York to talk to
[5] me about it.
[6]   Q: Who is Bill Murphy?
[7]   A: He used to be the BA and now he's the
[8] representative of the company for this local region,
[9] I believe.
[10]   Q: Meaning New England?
[11]   A: Yes.
[12]   Q: And you say he came from New York
[13] specifically to talk to you about this door
[14] incident?
[15]   A: Well, that's — I assumed he did. I didn't
[16] know for a fact if he did or not. He lives in the
[17] area, but he was working out of Viacom out of New
[18] York, I believe.
[19]   Q: But he lives in the Boston area?
[20]   A: Yes — well, outside the suburban area, but
[21] I'm not sure exactly where.
[22]   Q: So you don't know that he made a special
[23] trip to talk to you?
[24]   A: No, I don't.

Page 34

[1]   Q: What did Mr. Murphy say to you about it?
[2]   A: That it was — that I couldn't admit that
[3] it was my fault, basically.
[4]   Q: He said that he thought you couldn't admit
[5] it?
[6]   A: Right. I explained to him what happened,
[7] and he said, "Well, why can't you just admit that
[8] you did it." I said I did do it, but I didn't think
[9] that I was responsibile for the door being
[10] partially — not being opened all the way, and I
[11] essentially cleared the front of the truck, and when
[12] it was — I was going down the ramp that the tail
[13] end of the truck caught the door and knocked it off
[14] its pins.
[15]   Q: He said to you, "Why can't you just admit
[16] it?" What you just described?
[17]   A: Yes.
[18]   Q: And then what did he say in response?
[19]   A: How if somebody had been hurt during this,
[20] I would be fired. I also had people directing me
[21] out of the building at the time, also.
[22]   Q: Who was that?
[23]   A: I believe it was Kenny Barrus and maybe
[24] someone else. I'm not sure exactly. But they're

Page 35

[1] telling me to go, okay, okay.
[2]   Q: Other than this conversation with
[3] Mr. Murphy, were there any other consequences for
[4] you from this incident?
[5]   A: Not that I know of.
[6]   Q: They didn't put anything in your personnel
[7] file?
[8]   A: Not that I know of.
[9]   Q: You weren't suspended?
[10]   A: No.
[11]   Q: You didn't lose any pay?
[12]   A: No.
[13]   Q: And I gather you weren't given anything in
[14] writing about the incident?
[15]   A: No.
[16]   Q: And then at some point after that incident,
[17] you locked your keys in the truck; is that right?
[18]   A: Yes.
[19]   Q: When did that happen?
[20]   A: I would say maybe three or four months
[21] after that.
[22]   Q: Around September of 2000, does that sound
[23] right?
[24]   A: As good as any date for me. I can't

Page 36

[1] remember when exactly, what...
[2] Q: But your best recollection is three or four
[3] months after the overhead door incident?
[4] A: Yes.
[5] Q: And where was the truck at the time?
[6] A: On East Fifth Street in South Boston.
[7] Q: Is that where you live?
[8] A: Yes.
[9] Q: Is that still where you live today, by the
[10] way?
[11] A: Yes, it is.
[12] Q: And what time of day was it?
[13] A: I would say 1:00 in the afternoon.
[14] Q: Why were you at home that day?
[15] A: I was having lunch, checking my numbers.
[16] Q: As I understand it, when you drive a route
[17] on any given day, there's a partner in the truck
[18] with you; is that right?
[19] A: Sometimes.
[20] Q: Were there days when you're sent out alone?
[21] A: Yes.
[22] Q: Had you been sent out alone on this
[23] particular day?
[24] A: On the key incident?

Page 37

[1] Q: Yes.
[2] A: Yes, I was.
[3] Q: And how did you resolve the problem with
[4] the keys being locked in the truck?
[5] A: I called the shop and asked Joey to come
[6] out with an extra set of keys to unlock it.
[7] Q: So he was in Randolph?
[8] A: Yes.
[9] Q: Do you know whether Mr. Maikis reported
[10] that to anyone, that he had done that?
[11] A: Not that I know of. I'm sure he must have
[12] told Dick that that's where he was going, but I have
[13] no recollection — he never said it to me that he
[14] told him or not.
[15] Q: Did you report it to anybody?
[16] A: When I called the shop to tell Joey about
[17] it.
[18] Q: Did you tell anybody other than Joey that
[19] you locked the keys in the truck?
[20] A: No. He's my senior — my first person I
[21] would tell and it's his — it would be his job to
[22] tell anybody if he so choose to, or whatever, or
[23] choose not to.
[24] Q: Does he have some kind of supervisory role

Page 38

[1] or did he at the time?
[2] A: He was a lead man. He would hand out the
[3] jobs and we would talk directly to him for most
[4] problems.
[5] Q: At some point did you end up discussing
[6] this with Dick MacLean?
[7] A: No.
[8] Q: Were there any consequences for you from
[9] this incident in terms of an oral reprimand or
[10] written warning or anything like that?
[11] A: No.
[12] Q: To this day do you know whether Dick
[13] MacLean knew around that time that this had
[14] happened?
[15] A: The documentation he put in my file after
[16] the fact, I would say he knew about it, but before
[17] that, no.
[18] Q: And he didn't speak to you about it at the
[19] time?
[20] A: No.
[21] Q: Has he ever spoken to you about it?
[22] A: No.
[23] Q: Did you ever have a conversation with
[24] Mr. Barrus about using the truck to go home for

Page 39

[1] lunch?
[2] A: Not generally, no, not that I — he told me
[3] I was off my route one day, and I said to him —
[4] explained to him what the situation driving from
[5] Bartlett to Albany Street, if one road is blocked,
[6] you take the next parallel road, which is what I was
[7] doing. And he told me, no, I was wrong. I said,
[8] actually, it was a shorter distance to traveling
[9] Harrison Ave. than it was traveling Albany because
[10] of the construction that was going on, and he told
[11] me I was wrong.
[12] Q: Now, Mr. Barrus wasn't senior to you,
[13] right?
[14] A: No.
[15] Q: And where was this conversation that you
[16] just described?
[17] A: On Harrison Ave. driving to Albany Street.
[18] Q: He was in the truck with you?
[19] A: Yes.
[20] Q: And he said he thought you were off route?
[21] A: Yes.
[22] Q: And what did you say?
[23] A: I explained to him that this was actually a
[24] shorter distance traveling from Bartlett to Albany

Page 40

[1] Street. Because of the construction going on on
[2] Albany Street, you had to reroute your way around
[3] the Expressway to get back to Albany Street. Just
[4] go to — in the back door from Harrison Ave. was
[5] actually a shorter distance. I was trying to make
[6] the point, how ridiculous he was to say that, but he
[7] didn't get the point.
[8]   Q: So he wasn't joking with you; he was
[9] seriously concerned about you being a block away?
[10]   A: Well, he's the type of person he is. He
[11] was elected shop stewardship only because no one
[12] else wanted to do the job, and he probably took it
[13] to heart, or whatever way you want to describe the
[14] power he thought he had by being shop steward.
[15]   Q: So he was a little up-tight about your
[16] being off the route that day?
[17]   A: Well, he mentioned it as we're talking in
[18] the conversation. Otherwise, he didn't say anything
[19] about it to me.
[20]   Q: But you never had a similar conversation
[21] with him about taking the truck home for lunch?
[22]   A: No.
[23]   Q: Or about using the truck for other personal
[24] business?

Page 41

[1]   A: No. Mr. MacLean would say, "You're
[2] supposed to eat your lunches together." Mr. Barrus
[3] would eat his lunch at 9:00 o'clock in the morning
[4] on the way out, and I just didn't — I couldn't do
[5] that. He would usually sleep at his lunchtime or he
[6] would grab a box of Juicy Fruit — not Juicy Fruit;
[7] the fruit and nut candy, whatever it is.
[8]   Q: Now, about a month after the keys-locked-
[9] in-the-truck incident, there was an incident
[10] involving passing a car in a left-turn lane?
[11]   A: No. Mr. MacLean describes the turn as
[12] being illegal, which I tried to explain to him on
[13] the broken white line, you can pass another vehicle
[14] on two lanes. He told me, "Oh, that's strictly for
[15] left-hand turn only." I said, "Not when there's a
[16] broken white line." With a solid white line, yes.
[17] I had passed on the broken white line.
[18]   Q: Can you back up a little bit and can you
[19] tell me exactly what happened?
[20]   A: I was driving back to the shop. It was
[21] roughly 4:15, 4:30 in the afternoon. I had to go
[22] back to the gas station to refuel and I was
[23] traveling from Braintree Five Corners back to the
[24] Randolph shop, which is probably two miles on one

Page 42

[1] straight road. A gentleman in front of me was
[2] traveling maybe 15, 20 miles per hour, about ten
[3] miles per hour under the limit. I was behind him
[4] with maybe 12 cars behind me, and at one point I
[5] beeped the horn to try to have him wake up and move
[6] faster. At that point he slowed down even slower to
[7] get kind of aggravating. So I beeped another time
[8] and he started doing the same thing he was. So I
[9] eventually — when the road opened up to two lanes,
[10] that's when I passed him. I went to the gas
[11] station. He followed me into the gas station and
[12] sat back about, I say, 30 yards, never said
[13] anything, never did anything.
[14]   Q: He stayed in his truck while you were
[15] getting gas?
[16]   A: I was getting gas at the gas station. He
[17] pulled into the side of the gas station and just sat
[18] there. I drove back to the shop. That night, an
[19] officer showed up at — I believe it was 11:30 that
[20] night, saying there was a hit and run involving one
[21] of the company vehicles.
[22]   Q: When you passed him, what street were you
[23] on, do you remember?
[24]   A: Just that main street that — I can't think

Page 43

[1] of the name of it, but it runs from Braintree Five
[2] Corners through to Randolph. Bright's Bakery,
[3] Burlington Coat Factory are all on the same road
[4] heading towards Randolph garage. I can't think of
[5] the name of it.
[6]   Q: And when you passed him, were there two
[7] lanes of traffic and a parking lane or was it just
[8] two lanes of traffic?
[9]   A: Two lanes — well, two — the lane opened
[10] up. So there's a broken white line until there's a
[11] solid white line for eventually a left-hand turn
[12] only. So when it first opens up, you have a broken
[13] line, which that's the point I had passed the
[14] gentleman. He was traveling 15, 20 miles per hour.
[15] Doesn't take long to pass a person traveling that
[16] slow.
[17]   Q: Did you pass him before it became a solid
[18] right line, to your memory?
[19]   A: I passed him before it became a solid white
[20] line.
[21]   Q: So you had no conversation with that driver
[22] at any point?
[23]   A: No. I beeped twice at him. He ignored me
[24] and slowed down. That's the only communication I

Page 44

[1] had with the gentleman.
[2] Q: And when the police officer came to the
[3] shop at 11:30 that evening, you weren't there,
[4] obviously, right?
[5] A: No.
[6] Q: Was anybody there?
[7] A: The evening shift were.
[8] Q: And do you know who the police officer
[9] spoke to?
[10] A: I'm not sure.
[11] Q: Did he leave any documentation or anything?
[12] A: No. I guess he checked — I was told he
[13] checked the vehicle to see about any damage on the
[14] back of the vehicle. He found none, and he left.
[15] Q: And how did you hear about the police
[16] officer's visit?
[17] A: The next morning when I came in,
[18] Mr. MacLean explained what happened and wanted to
[19] know why I was involved in a hit and run, and I
[20] said, "I was not aware I was."
[21] Q: Did you describe to Mr. MacLean what had
[22] happened?
[23] A: Yes.
[24] Q: Did he tell you that you acted improperly?

Page 45

[1] A: He told me I was lying; that you can't take
[2] the turn from that lane and that's for left turn
[3] only.
[4] Q: What did you say to that?
[5] A: I said that, yes, on a solid white line you
[6] cannot pass; on a broken white line you can pass.
[7] Q: And then what did he say?
[8] A: That I was wrong.
[9] Q: Did he give you a warning of some kind?
[10] A: Not that I know of.
[11] Q: Did he tell you you would be fired if
[12] something like that happened again?
[13] A: He said something like it was an act of
[14] road rage, and I told him, no, that's — I
[15] considered it everyday driving.
[16] Q: And did he say something about firing you
[17] if it happened again?
[18] A: If I had another incident of road rage, I
[19] could be fired, or if I gave somebody the finger or
[20] some other form of communication, I guess.
[21] Q: That's what he said to you?
[22] A: Yes.
[23] Q: And what happened with the police about the
[24] hit-and-run issue?

Page 46

[1] A: I had a couple of phone conversations. I
[2] called them up and asked them what the story was and
[3] they said, "Well, there was an accident involving
[4] property damage, leaving the scene of an accident."
[5] I said, "Well, I was told it was hit and run and I
[6] had to come down to the police station." So I came
[7] down to the police station and asked for Officer
[8] Jackson. Officer Jackson came out and said, "I want
[9] your name and date of birth." And he said, "And any
[10] other information that you'll need, we'll mail it to
[11] you," and that's all he said to me. I said, "Well,
[12] I'd like to have a police report. If there's a
[13] police report, I would like to see it." He said,
[14] "We'll make up one for you, if you want, for $5." I
[15] said, "I don't want anything made up. I want to see
[16] one if you have one." They didn't have one.
[17] Q: Did you hear anything more about the
[18] incident from the police after that?
[19] A: No.
[20] Q: Then there was an incident involving a
[21] Mr. Gotto or Gatto?
[22] A: Gatto.
[23] Q: And when was that, do you remember?
[24] A: It was in the middle of the summer. I'm

Page 47

[1] not sure exactly timewise.
[2] Q: It was after the incident that we just
[3] described about passing the car, correct?
[4] A: Yes.
[5] Q: How long after that, would you say?
[6] A: Four, five months, maybe.
[7] Q: And what happened in that incident?
[8] A: I was driving back from Charlestown. The
[9] Expressway was not moving. So I would go the back,
[10] which is cutting through South Boston and under the
[11] City Square area to cut through South Boston, so I
[12] could get home and get back to the shop in a timely
[13] fashion. Otherwise, you sit on the expressway and
[14] you're not going anywhere.
[15] Q: And what happened?
[16] A: I was taking a turn onto Summer Street,
[17] which is three lanes. Left-hand turn is left turn
[18] only, center lane is left turn or straight, and
[19] right lane was straight or right. I was in the
[20] center lane. He was in the left-turn lane. We both
[21] turned left at the intersection. Traveling down to
[22] the next intersection, he decided he didn't want me
[23] to pass him on that side of the road. So he kept on
[24] the person in front of me — in front of him, on his

Page 48

[1] back so I couldn't get in between the two vehicles.
[2]   Q: I don't understand what you mean by that.
[3] There are two lanes of traffic?
[4]   A: There's two lanes of traffic. Eventually
[5] the right-hand lane changes to right turn only.
[6]   Q: Okay.
[7]   A: At the Pappas Building.
[8]   Q: This is after you've made the left turn?
[9]   A: Yes, I would say 200, 300 yards down the
[10] road. So I had my directional on to take the
[11] left-hand turn. He stays in between the car in
[12] front of him so I can't — leaves no space between
[13] the car in front of him, and I'm here in the
[14] right-hand lane trying to change lanes.
[15]   Q: You need to move into the left turn where
[16] he was because your lane is about to become right
[17] turn only?
[18]   A: Right.
[19]   Q: He won't —
[20]   A: He won't let me in. So I end up hitting
[21] the brakes and stopping to eventually get over into
[22] the left-hand lane.
[23]   Q: Behind him?
[24]   A: Behind him.

Page 49

[1]   Q: Before you go any further, while you were
[2] trying to get in front of him, were you looking at
[3] that driver and was he looking at you?
[4]   A: No. I noticed he had come up beside me
[5] most of the time on that straightaway, but he had
[6] plenty of time to see my directional and he just
[7] pulled up so I couldn't turn.
[8]   Q: So I gather, then, that you had been in
[9] front of him so that he could see your signal?
[10]   A: Right.
[11]   Q: And he wouldn't let you in?
[12]   A: When he saw the signal on, he just pulled
[13] up behind the other car, slowed up a little bit. I
[14] start to turn. He pulled up again.
[15]   Q: And how long did that go on?
[16]   A: Ten seconds, the length of 20 yards,
[17] however long it takes.
[18]   Q: How fast were you driving?
[19]   A: I would say 25.
[20]   Q: So eventually you slowed down?
[21]   A: Yes.
[22]   Q: And got in right behind him?
[23]   A: Behind him, yes.
[24]   Q: What happened next?

Page 50

[1]   A: I just traveled the rest of the road and
[2] about four blocks away was where he lives, because I
[3] live roughly three blocks away. I recognized the
[4] vehicle because of the vanity plate that was on the
[5] back.
[6]   Q: What was the vanity plate?
[7]   A: Got "AGATTO."
[8]   Q: AGATTO?
[9]   A: Yes.
[10]   Q: And so what happened?
[11]   A: I recognized the plate and the vehicle, was
[12] a mechanic at the Charlestown garage, who I had
[13] never actually met.
[14]   Q: Charlestown MBTA garage?
[15]   A: Yes.
[16]   Q: So you knew at that time he was an MBTA
[17] employee?
[18]   A: Yes. I also know he was a neighbor of mine
[19] that I actually never had met, even though he lives
[20] one block away from me.
[21]   Q: And even though you had never met him, you
[22] knew he was a neighbor because —
[23]   A: I had seen the vehicle in the area many
[24] times.

Page 51

[1]   Q: And so what happens?
[2]   A: I rolled down my window and asked him what
[3] the problem was.
[4]   Q: Had he stopped at that point?
[5]   A: Yes.
[6]   Q: And you stopped also?
[7]   A: Yes. I pulled next to him. I rolled down
[8] my window and he pulled his window.
[9]   Q: So at that point the both of you are side
[10] by side in two lanes of the street?
[11]   A: Yes. Well, he's — he parked his vehicle
[12] on Sixth Street, and I was pulling up. I pulled up
[13] next to him and asked him what the problem was.
[14]   Q: Was there a lane of traffic that was open
[15] to your left or were the two of you blocking
[16] traffic?
[17]   A: We weren't blocking traffic. I was — it's
[18] a two-lane road. I was double parked next to him
[19] where he had just parked his vehicle.
[20]   Q: So he was parked, you were to his left, and
[21] there was an open lane of traffic to your left?
[22]   A: Yes — to my right.
[23]   Q: And why did you stop?
[24]   A: I asked him what the problem was, why he

Page 52

[1] cut me off back there.
[2] Q: Did you raise your voice?
[3] A: No.
[4] Q: And what did he say?
[5] A: He said I could not take the turn back
[6] there like I did.
[7] Q: He said you couldn't take the turn?
[8] A: Right.
[9] Q: Meaning the left turn?
[10] A: Yes. I assumed that's what he meant. I
[11] didn't ask.
[12] Q: And when he said you shouldn't have taken
[13] that turn, how did you respond?
[14] A: I said, "I most certainly could."
[15] Q: Those were the words you used?
[16] A: Yes.
[17] Q: What did —
[18] A: No swearing, no raising my voice. And at
[19] that point he looked down at his hand. He had a
[20] club in his hand (indicating) and he looked at me.
[21] Q: And he's in a truck, right?
[22] A: Yes.
[23] Q: And you're in a truck?
[24] A: Yes.

Page 53

[1] Q: Where is he holding this club?
[2] A: In his right hand.
[3] Q: If he's holding it down in his lap the way
[4] you're showing me now, how is it that you can see
[5] it?
[6] A: I'm in the same level as he is. His van
[7] and my van is roughly the same level.
[8] Q: How big a club?
[9] A: I would say roughly about this big
[10] (Indicating).
[11] Q: Foot-and-a-half?
[12] A: Yes.
[13] Q: And how big around?
[14] A: I'm not sure. I'd say an inch, two inches.
[15] Q: And he didn't say anything; he just looked
[16] at the club and looked at you?
[17] A: Right.
[18] Q: And then what happened?
[19] A: I said, "Why don't you go back to
[20] Charlestown?"
[21] Q: What did he do then?
[22] A: I don't know. I drove off at that point.
[23] I think his wife was coming out of the house at the
[24] same time and asked him what I said and — I don't

Page 54

[1] know what he said to his wife, but according to the
[2] documents I heard from Mr. MacLean afterwards, it
[3] had all sorts of other things in there, saying I
[4] threatened him with bodily harm or something, or he
[5] was afraid because I'm such a big guy. And I said
[6] to myself, he's just as big as I am. He might be a
[7] couple of years older, but it had nothing to do with
[8] the conversation that we had.
[9] Q: And did you report this incident to Dick
[10] MacLean?
[11] A: No, I did not.
[12] Q: Why not?
[13] A: I don't think it was an incident.
[14] Q: But I gather he learned about it?
[15] A: I guess Mr. Gatto called up and reported
[16] what happened or his version of what happened.
[17] Q: Did Mr. MacLean tell you that he had had a
[18] call from Mr. Gatto?
[19] A: Maybe a couple of days after the fact, but
[20] not initially.
[21] Q: And what conversation did you have with
[22] Dick MacLean?
[23] A: He was saying I was involved in a serious
[24] incident. Some gentleman was going home to drive

Page 55

[1] his wife to the doctor's or some other to that
[2] effect and...
[3] Q: Did he say anything else?
[4] A: Not that I recall.
[5] Q: What did you say?
[6] A: I just told him exactly what had happened;
[7] that I had an incident with the gentleman. I asked
[8] him what the problem was. He said you couldn't take
[9] the turn back there like I did. I told him, "Yes, I
[10] could," and I told him, "Why don't you go back to
[11] Charlestown?" And at that point I drove off.
[12] Q: And what did Mr. MacLean say to that?
[13] A: He didn't say anything, to my knowledge. I
[14] can't remember what he said.
[15] Q: But you were suspended as a result of this
[16] incident; is that right?
[17] A: Yes.
[18] Q: Did he tell you in that conversation that
[19] you had with him that you were going to be
[20] suspended?
[21] A: I don't believe so. He may have. I don't
[22] recall.
[23] MR. BATTEN: Mark this, please.
[24]

Walter S. Preble
Vol. 1, August 24, 2004
Case 1:04-cv-11005-RWZ    Document 24-3    Filed 11/03/2004    Page 7 of 7
Preble v.
Transportation Displays, Incorporated, et al.

Page 60

[1] Q: And what did you say to Mr. Barrus about
[2] it?
[3] A: I told him I want to grieve to the union or
[4] talk to the union about this.
[5] Q: Did you tell him what had happened?
[6] A: Yes.
[7] Q: Did you show him the suspension letter?
[8] A: I'm not sure if I showed it to him. I had
[9] it in my hand when I was talking to him about it.
[10] Q: Did you go right from receiving the letter
[11] to talk to Mr. Barrus?
[12] A: Yes, what I thought the procedure was
[13] supposed to be.
[14] Q: What did you say and what did he say in
[15] that conversation?
[16] A: I explained to him I wanted to grieve — to
[17] talk to the union about it. He said, "Go ahead."
[18] He said, "You can call them up as well as I can."
[19] Q: That's what he said to you?
[20] A: Basically, yes.
[21] Q: And so was that the end of the
[22] conversation?
[23] A: Yes.
[24] Q: So what did you do?

Page 61

[1] A: Then I called up Chuck Fogell.
[2] Q: And was that the same day?
[3] A: I think it was maybe three, four days —
[4] might have been after the suspension. I'm not sure
[5] exactly when.
[6] Q: You mean after you came back to work from
[7] the suspension?
[8] A: Yes.
[9] Q: And you had a telephone conversation with
[10] Mr. Fogell?
[11] A: I believe it was telephone or I went to his
[12] office to talk to him.
[13] Q: Do you remember which it was?
[14] A: I believe I went to talk to him.
[15] Q: And what did you say and what did he say?
[16] A: I tried to explain to him what happened,
[17] and he was — I thought I was talking to Mr. MacLean
[18] again because every word that came out of his mouth
[19] was that — the same words I heard from Mr. MacLean,
[20] telling me how I'm out of my area, this, that, and
[21] the other, and I was wrong to do this, that — and I
[22] realized that they already discussed this whole
[23] situation and he was not on my side. So at that
[24] point I stopped talking about it because I knew it

Page 62

[1] was not going anywhere.
[2] Q: You mentioned that he said you were out of
[3] your area?
[4] A: Yes.
[5] Q: In that conversation, did he say that?
[6] A: Mr. MacLean had said to Mr. Fogell about
[7] that.
[8] Q: How do you know that?
[9] A: Because Mr. Fogell said it to me using the
[10] same words.
[11] Q: And, to the best of your memory, what
[12] exactly did Mr. Fogell say to you about being out of
[13] your area?
[14] A: He said, "You're out of your area."
[15] That's — that's —
[16] Q: That was the extent of it?
[17] A: That's the extent of all I ever heard about
[18] being out of the area, was "You're out of the area."
[19] Q: Did he say that you were wrong about
[20] anything — something else that you had done?
[21] A: He said I was wrong to follow this
[22] gentleman home. I said, "I wasn't following him
[23] home. I was going the same direction." And Mr.
[24] MacLean said I was out of my area for being in South

Page 63

[1] Boston. I said, "That's how I cut through Boston to
[2] avoid the traffic on the Expressway." I don't know
[3] how anybody else would do that. That's the best way
[4] that I know of and that's what I did my whole life.
[5] Q: Did you tell Mr. Fogell that you wanted to
[6] grieve the suspension?
[7] A: Yes.
[8] Q: And what did he say specifically about
[9] that?
[10] A: He said, "Well, we're having a negotiation
[11] with the contract in a couple of months; not to
[12] cause any waves; take the suspension." That's
[13] basically the whole conversation.
[14] Q: Why did you think that the suspension was
[15] unfair, if that's what you thought?
[16] A: I didn't think it was anything involved
[17] with road rage or — I thought it was my first
[18] offense on anything written or verbal or any other.
[19] I believe you're supposed to have three warnings
[20] before you — or your second warning would be a
[21] suspension.
[22] Q: You didn't consider this a second warning?
[23] A: No, I didn't think from the first —
[24] previously was the incident with the Randolph Police