Walter S. Preble 4:
Case 1:04-cv-11005-RWZ    Document 24-4    Filed 11/03/2004    Page 1 of 6 Walter S. Pr
Transportation Displays, Incorporated, et al.                    Vol. 1, August 24, 2...

Page 72

[1]   Q: And had Mr. Barrus had lunch that day, do
[2] you know?
[3]   A: He had as usual 9:00, 9:30 in the morning.
[4] I think he went across the street and got a sandwich
[5] or something.
[6]   Q: It was his practice to eat at 9:00 or 9:30
[7] and then not again for the rest of the day?
[8]   A: He would stop and buy a candy bar or
[9] something or he'd still probably have a sandwich if
[10] he had a chance to, but most of the time he would
[11] bring his lunch, but he would eat it in the morning.
[12]   Q: Let me see if I can get some of this
[13] geography clear.
[14]   MR. BATTEN: Can you mark this.
[15]     (Document marked as Preble
[16] Exhibit 2 for identification)
[17]   Q: Let me just show you the one with the
[18] sticker.
[19]   A: (Examines document)
[20]   Q: This is a little map that I just put
[21] together. And do you see there's a little thumbtack
[22] that's marked 589 East Fifth Street, South Boston?
[23] Do you see that?
[24]   A: (Examines document) Yes.

Page 73

[1]   Q: Is that about where your house is?
[2]   A: Roughly, yes.
[3]   Q: And there's another thumbtack on there
[4] marked 275 Dorchester Avenue. Do you see that in
[5] almost in the dead center of the page?
[6]   A: Yes.
[7]   Q: Is that about where the Cabot garage is?
[8]   A: More or less, yes.
[9]   Q: It is on Dorchester Avenue, right?
[10]   A: Yes.
[11]   Q: And can you see on this map where the
[12] Albany Street garage would be?
[13]   A: Would be in the opposite side of the
[14] Expressway.
[15]   Q: Can you just take my pen and can you put an
[16] "A" in a circle about where the Albany Street garage
[17] is?
[18]   A: Let me see.
[19]   Q: Take your time.
[20]   A: (Marking)
[21]   Q: So Albany Street runs right up under the
[22] Expressway there; is that right?
[23]   A: Right.
[24]   Q: And the garage is —

Page 74

[1]   A: To the left of Albany Street.
[2]   Q: So it's sort of tucked under the
[3] Expressway, the garage?
[4]   A: Well, it's — the Expressway is clearly
[5] above it on the right, but the street itself is
[6] partially under the Expressway, but the garage
[7] itself is not. You can clearly see the garage from
[8] the Expressway.
[9]   MR. NEVINS: Cabot is further down here?
[10]   THE WITNESS: Yes.
[11]   MR. BATTEN: I'll send you copies.
[12]   MR. CONTI: Okay.
[13]           BY MR. BATTEN:
[14]   Q: And the Bartlett garage, I guess, would not
[15] be on this map?
[16]   A: No. Just slightly off the edge here.
[17]   Q: In the bottom left corner?
[18]   A: Yes.
[19]   Q: You were going to say you could actually —
[20]   A: (Indicating) Right here, on the corner
[21] right there would be —
[22]   Q: It's not too far from it if —
[23]   A: No.
[24]   Q: That's about where it is?

Page 75

[1]   A: Pretty close, yes.
[2]   Q: How long was your lunch that day?
[3]   A: About a half an hour, I think.
[4]   Q: Is that about the normal time you took for
[5] lunch?
[6]   A: Yes.
[7]   Q: Were you routinely going home for lunch
[8] during the time that you were employed at Viacom?
[9]   A: Yes.
[10]   Q: Do you know whether Mr. MacLean knew that
[11] you were going home for lunch?
[12]   A: I don't know specifically if he knew, but
[13] everybody else knew, Joey Maikis and anybody else
[14] that I had worked with for 24 years.
[15]   Q: Did any of them ever say anything to you
[16] about that?
[17]   A: No.
[18]   Q: Now, after lunch the particular day that
[19] we're talking about, you had an accident of some
[20] kind; is that right?
[21]   A: Yes.
[22]   Q: And where was the accident?
[23]   A: On the corner of — let's see. On the
[24] corner of B and West Fourth maybe.

Page 76

[1]   Q: To the extent you can, would you just put
[2]   an "X" about where the accident was. It might be
[3]   kind of covered up by some of the print.
[4]     A: Sure. (Marking)
[5]   Q: Thank you. And this was as you were coming
[6]   from your house to go back to Cabot —
[7]     A: Yes.
[8]   Q: — to install the rest of the signs on the
[9]   Cabot buses?
[10]    A: Yes.
[11]  Q: And what happened exactly?
[12]    A: I was coming down — it was B Street and I
[13] was going to take a right-hand turn onto West Fourth
[14] and they were setting up a detail for construction
[15] or something in the middle of the street. Police
[16] officer was there. Construction vehicle was parked
[17] just before the intersection. So I had to go around
[18] to the left of the truck that was parked there. And
[19] they had a metal cage set up to go in like a manhole
[20] cover and that was up in the middle of the
[21] intersection. So I had to stay to the left and then
[22] take a sharp right in the middle of the
[23] intersection.
[24]  Q: Sort of around the manhole —

Page 78

[1] windshield of the vehicle.
[2]   Q: Was he directing traffic in the
[3] intersection?
[4]     A: Well, he wasn't doing — he was about to.
[5] He wasn't at that point. He was setting up the
[6] construction site at that point. He was standing in
[7] the middle of street. He was directing traffic, but
[8] he wasn't actually doing it at that point.
[9]   Q: Did he write you a ticket or anything?
[10]    A: No.
[11]  Q: Just left your information on the
[12] windshield?
[13]    A: He said, "There's no big deal, just write
[14] the information, put it on the windshield."
[15]  Q: Did he say, "It's no big deal"?
[16]    A: Yes.
[17]  Q: And then you continued on to Cabot?
[18]    A: Yes.
[19]  Q: And how long were you at Cabot that day?
[20]    A: Until it was 3:30. I believe that's the
[21] time I went to pick Mr. Barrus up.
[22]  Q: And you picked him up after that at Albany
[23] Street?
[24]    A: Yes.

Page 77

[1]     A: Right. Instead of taking the normal
[2] right-hand turn, I took it from the left-hand side
[3] of the road because the right was already blocked
[4] up.
[5]   Q: And what happened?
[6]     A: As I turned the corner, the little pad on
[7] the back of the truck hit the lens of the vehicle
[8] that was parked in the intersection.
[9]   Q: You mean of the headlight or the taillight?
[10]    A: Taillight.
[11]  Q: And did you realize, as you had gone around
[12] the corner, that you had hit the truck?
[13]    A: No, I did not. The police officer
[14] mentioned to me, said —
[15]  Q: The police officer was there with the
[16] construction that was going on?
[17]    A: Yes.
[18]  Q: And he flagged you down, did he?
[19]    A: He was standing in the middle of the
[20] intersection as I was going through it and he
[21] informed me at that point. So I pulled over and
[22] parked, double parked my vehicle to get out to see
[23] what happened, and then I wrote down the
[24] information. The officer took it and put it on the

Page 79

[1]   Q: Did you tell him about —
[2]     A: After I woke him up. I didn't say anything
[3] at that point, no.
[4]   Q: Why not?
[5]     A: He had no need to know. He was not my
[6] supervisor that I report to.
[7]   Q: And you went from Albany Street straight
[8] back to Randolph?
[9]     A: Yes.
[10]  Q: What time —
[11]    A: Well, to Dorchester Ave. through the back
[12] roads, not directly on the Expressway. I always try
[13] to avoid the Expressway at that time of day.
[14]  Q: So you took Dorchester Avenue back to
[15] Randolph?
[16]    A: I believe.
[17]  Q: What time did you get back to the shop, do
[18] you remember?
[19]    A: It might have been quarter past four,
[20] roughly. I'm not sure exactly.
[21]  Q: Is that pretty typical?
[22]    A: Yes.
[23]  Q: Time for you to get back to the garage?
[24]    A: Yes.

Page 80

[1] Q: When you got back to the — back to
[2] Randolph, did you tell anyone about the traffic
[3] accident?
[4] A: No, I did not.
[5] Q: Why not?
[6] A: Mr. MacLean was in with four, five
[7] gentlemen that I had no idea who they were. I
[8] assumed they were from New York. And they were
[9] talking with Mr. MacLean about — I have no idea
[10] what. I didn't want to disturb his meeting. I
[11] assume it was a meeting.
[12] Q: Were they in an office?
[13] A: Yes, in his office.
[14] Q: His office. And when did you leave
[15] Randolph that day?
[16] A: 4:30.
[17] Q: And the visitors were still with him when
[18] you left?
[19] A: Yes.
[20] Q: Did you tell anybody else about the
[21] accident that day before you left?
[22] A: I don't believe so.
[23] Q: Did you write any report that day?
[24] A: No, I did not.

Page 81

[1] Q: Had you ever written an accident report
[2] before?
[3] A: Personally, no. There was an incident that
[4] we had with — on Route 60 one time when I was
[5] driving along and passing another vehicle and the
[6] other car crossed over and hit my mirror, and my
[7] passenger at the time was Brian Carson. He wrote
[8] out the report for me.
[9] Q: When was that?
[10] A: That was probably four, five months before
[11] the incident for suspension, maybe.
[12] Q: But it was during the time that Viacom was
[13] on the scene?
[14] A: Yes.
[15] Q: And where did Mr. Carson get the form that
[16] he filled out, do you know?
[17] A: He just had a piece of paper in his hand
[18] that he — we have sheets that we are working with.
[19] He just turned the piece of paper over and wrote it
[20] on that, I believe.
[21] Q: So there wasn't like an accident report
[22] form?
[23] A: Not that I know of. I was told afterwards
[24] that they're in the glove box, but I never saw one.

Page 82

[1] I never knew it was there.
[2] Q: I'm going to ask you a couple more
[3] questions.
[4] (Document marked as Preble
[5] Exhibit 3 for identification)
[6] Q: Have you ever seen Exhibit 3 before, sir?
[7] A: (Examines document) No, I haven't.
[8] Q: Today is the first time you've ever seen
[9] it?
[10] A: Yes. When Mr. MacLean handed me the piece
[11] of paper to fill out, he handed me a yellow
[12] envelope — yellow type of paper with blue lines.
[13] He never handed me a form like this. He told me to
[14] describe the accident on the piece of paper.
[15] (Document marked as Preble
[16] Exhibit 4 for identification)
[17] Q: You wanted to say something?
[18] A: It was just that if this was available, why
[19] wasn't I handed that to fill out the following day
[20] instead of the yellow piece of paper?
[21] Q: Have you ever seen Exhibit 4 before?
[22] A: (Examines document) Not in the company,
[23] no. I have a little card that tells you the same
[24] thing.

Page 83

[1] Q: You have a card in your wallet that tells
[2] you what?
[3] A: What to do in case of an accident.
[4] Q: Is that something that Viacom gave you?
[5] A: No, sir, it's not.
[6] Q: It's something you had from a prior
[7] employer?
[8] A: Yes — well, I just happened to have — I'm
[9] not sure if it's my wallet any more. I just have a
[10] small card in there telling me the steps to proceed,
[11] and I think there was a chant on the other side of
[12] it.
[13] Q: Did you have a phone number to call in the
[14] event of an accident?
[15] A: I believe it did. It was my own insurance
[16] company, I believe.
[17] Q: So you didn't use that card the day of this
[18] accident?
[19] A: No, I did not.
[20] Q: Because that was your personal insurance?
[21] A: Yes. Well, I just didn't think to take it
[22] out.
[23] Q: Do you still have that card today?
[24] A: I'm not sure. I might not. I'd have to

Page 84

[1] look.
[2]　Q: If you wouldn't mind.
[3]　(Witness looking in his wallet)
[4]　A: Could be in any of three places.
[5]　MR. NEVINS: I see you have my card.
[6] That's important.
[7]　A: Jimmy Wahl, state trooper; got McDonalds.
[8] I don't think it would be in there or there. No, I
[9] don't.
[10]　Q: Okay. Thank you for checking.
[11] Was there any policy at Viacom at the time
[12] about writing an accident report?
[13]　A: Not that I know about. We were always
[14] handed a piece of paper, like I said, that was
[15] yellow with blue lines, anything would ever happen,
[16] and said describe what you feel what happened and I
[17] would write it down.
[18]　Q: Somebody had told you that before this
[19] incident or after?
[20]　A: After, I assumed — well, Mr. MacLean —
[21] every time something would happen, he would say,
[22] "Write it out, your explanation, on the piece of
[23] paper," basically.
[24]　Q: Not just to you, but to other people?

Page 85

[1]　A: Yes.
[2]　Q: Apart from accident reports, are there
[3] other kinds of reports that you filled out
[4] regularly?
[5]　A: Just the daily work numbers that we record
[6] for that day.
[7]　Q: Is that called a Daily Production Report?
[8]　A: He might have it that. We just — it was a
[9] number bus — you put the sign on and you write down
[10] the number of the bus. That's basically — that's
[11] the report, I would consider.
[12]　Q: Is that the only report that you regularly
[13] filled out?
[14]　A: Well, he would write down if he saw a
[15] broken frame or something wasn't right, you would
[16] write down information on a — I don't think I've
[17] ever filled out — other than a couple of broken
[18] frames here or there, I don't think I ever wrote out
[19] a form.
[20]　Q: And the document that you're talking about
[21] where you would write the number, the bus number —
[22]　A: Right.
[23]　Q: — or the broken frames, was that a form or
[24] was it just any piece of paper?

Page 86

[1]　A: Piece of cardboard.
[2]　Q: So you went home after the taillight
[3] incident? I mean —
[4]　A: At that —
[5]　Q: At 4:30?
[6]　A: Right.
[7]　Q: And you came back to work the next day at
[8] the regular time?
[9]　A: Yes.
[10]　Q: So does that mean you arrived at the
[11] Randolph garage around 7:30?
[12]　A: Yes, 7:30, yes.
[13]　Q: Did you go out on a route that day?
[14]　A: Not until Mr. MacLean came in.
[15]　Q: Why not?
[16]　A: We were waiting for him to come in to give
[17] out the orders for that day.
[18]　Q: What time did he come in?
[19]　A: About ten o'clock.
[20]　Q: Was that the usual time that he came in?
[21]　A: He came in whenever — sometimes he worked
[22] the night shift with the night crew and he would
[23] come in at different times at different dates. Most
[24] of the time he would come in at 7:30, but

Page 87

[1] occasionally he just came in 10:00, whenever.
[2]　Q: And I gather that on any day, you couldn't
[3] go out on a route until he came in to tell you where
[4] to go?
[5]　A: Generally, right. He wasn't in that day.
[6]　MR. BATTEN: Excuse me just a second.
[7]　(Recess taken)
[8]　　　　　BY MR. BATTEN:
[9]　Q: How often was it that Mr. MacLean wasn't in
[10] at 7:30?
[11]　A: Once or twice a week, maybe. He didn't
[12] have to be there for us to get our orders for the
[13] day, but he would generally call in if he's going to
[14] be late or something. He brought the orders to Joey
[15] over the phone.
[16]　Q: So was it unusual, then, for you to be
[17] still in Randolph at ten o'clock?
[18]　A: Yeah, it is unusual, but it happened
[19] previous times.
[20]　Q: So at least on this particular day, nobody
[21] had the schedules?
[22]　A: No.
[23]　Q: And Mr. MacLean came in around 10:00 a.m.,
[24] you said?

Page 88

[1]  A: Yes.
[2]  Q: And you spoke to him at some point about
[3] the accident?
[4]  A: Maybe about 10:15, actually. Gave him a
[5] chance to take his coat off.
[6]  Q: What were you doing between 7:30 and 10:15?
[7]  A: Cleaning the shop.
[8]  Q: And did you go see him or did he come see
[9] you?
[10]  A: I went to see him.
[11]  Q: And what did you say and what did he say?
[12]  A: I explained what happened the previous day
[13] and he said, "Oh, this is serious." And I told him
[14] I didn't consider it serious, but he did.
[15]  Q: Was this the first he was hearing about it,
[16] as far as you know?
[17]  A: As far as I know.
[18]  Q: Then what did he say?
[19]  A: He told me to go with Brian Carson and not
[20] drive that day.
[21]  Q: Had you always been the driver before this?
[22]  A: Yes.
[23]  Q: Was there some practice that the senior
[24] person is the driver or did it not work out —

Page 89

[1]  A: I don't trust anybody else with my life
[2] except for myself. That's why — I know the other
[3] people and I'm not going to put my life in their
[4] hands.
[5]  Q: So you just always insist on driving?
[6]  A: Yes.
[7]  Q: Before you went out with Mr. Carson,
[8] though, you wrote up an account of the accident; is
[9] that right?
[10]  A: Yes.
[11]  Q: Did Mr. MacLean ask you to do that?
[12]  A: Yes.
[13]     (Document marked as Preble
[14] Exhibit 5 for identification)
[15]  Q: Is Exhibit 5 a copy of what you wrote up?
[16]  A: (Examines document) Yes. It's like
[17] yellow, like it used to be.
[18]  Q: But that's your handwriting?
[19]  A: Yes, it is.
[20]  Q: And that's your map?
[21]  A: Yes.
[22]  Q: There's a note in a different handwriting
[23] bottom left that says, "Received this from Walter
[24] approximately 10:40 a.m.," if I'm reading it

Page 90

[1] correctly.
[2]  A: Yes.
[3]  Q: Do you see that?
[4]  A: Yes.
[5]  Q: Is that about when you gave it to
[6] Mr. MacLean?
[7]  A: Yes.
[8]  Q: And when you gave this to him, did he say
[9] anything else to you?
[10]  A: No. He just told me to go with Brian and
[11] not drive that day.
[12]  Q: Did you write up anything else about the
[13] accident?
[14]  A: No, not that I know of.
[15]     (Document marked as Preble
[16] Exhibit 6 for identification).
[17]  Q: Is Exhibit 6 something you wrote?
[18]  A: (Examines document) Yes. He wanted me to
[19] describe the damage to our truck.
[20]  Q: To the Viacom truck?
[21]  A: Yes.
[22]  Q: Can you just read that, your note, to me.
[23]  A: "Our truck has driver's side rear bumper,
[24] about one inch on black paint. Other" — looks

Page 91

[1] like, "vehicle had rear lights on driver's side."
[2]  Q: It says "BC cube van," at the top; is that
[3] right?
[4]  A: Oh, B5.
[5]  Q: Van B5. What's the cube van?
[6]  A: It's the big truck.
[7]  Q: This one says, "Received from Walter
[8] approximately 10:45 a.m."?
[9]  A: Yes.
[10]  Q: Is that because he went back and asked you
[11] for more information?
[12]  A: Yes.
[13]  Q: And it was after this that you went out
[14] with Mr. Carson and worked the rest of the day?
[15]  A: Yes.
[16]  Q: And you came back to Randolph at the end of
[17] the day and you were terminated; is that right?
[18]  A: Yes.
[19]  Q: And I gather it was Mr. MacLean who
[20] terminated you?
[21]  A: Yes.
[22]  Q: What did he say and what did you say?
[23]  A: He handed me a piece of paper with one
[24] sentence on it saying I was terminated.

Walter S. Preble
Vol. 1, August 24, 2004

Case 1:04-cv-11005-RWZ    Document 24-4    Filed 11/03/2004    Page 6 of 6    Preble  v.
Transportation Displays, Incorporated, et al.

Page 92

[1]    (Document marked as Preble
[2]  Exhibit 7 for identification)
[3]    Q: Is this the document that he handed you
[4]  that you were just talking about?
[5]    A: (Examines document) Yes, it is.
[6]    Q: Did he tell you why you were terminated?
[7]    A: Not specifically.
[8]    Q: Did he say anything to you about being off
[9]  route?
[10]    A: He said it was out of my area, and we had
[11]  the same conversation we've had in the past. I
[12]  said, "What you do mean? Describe out of my area."
[13]  I said, "My area to me is any area inside the MBTA
[14]  lines, north or south of the city."
[15]    Q: What did he say?
[16]    A: He just — he never said, "This is where
[17]  you're supposed to go," or, "This is how you're
[18]  supposed to drive," or —
[19]    Q: On this particular conversation, though, he
[20]  said you were out of your area and you said — well,
[21]  what did you say?
[22]    A: I believe I said, "Well, what do you mean
[23]  by 'out of area'?"
[24]    Q: Did you say, "Define route"?

Page 93

[1]    A: "Define route," yes.
[2]    Q: Because he had said you were out of your
[3]  route?
[4]    A: Yes.
[5]    Q: You said, "Define route"?
[6]    A: Meaning tell me which way I'm supposed to
[7]  go or where was I supposed to be.
[8]    Q: But your words were, "Define route"?
[9]    A: Yes.
[10]    Q: And what did he say?
[11]    A: He kept on arguing about something else.
[12]  He never would — he never defined route to me.
[13]    Q: He didn't answer your question?
[14]    A: No.
[15]    Q: Did you have any other conversation with
[16]  him that day about being off route?
[17]    A: Not that I know of — remember.
[18]    Q: Did he tell you that he had consulted with
[19]  anybody else about what to do?
[20]    A: He said he talked to Mr. Murphy and they
[21]  determined it was time to terminate me, I guess.
[22]    Q: In this conversation on December 12th, did
[23]  Mr. MacLean say anything to you about going home for
[24]  lunch? Did the topic of lunch come up?

Page 94

[1]    A: He might have said, "I told you before in
[2]  the past," I believe. And I said, "Well, it's the
[3]  same as telling me I can't go to McDonalds or if I
[4]  can cross the street to go to Burger King." I said,
[5]  "It was never defined." No one told us what streets
[6]  to take or what area to go to until one time in the
[7]  future about — during the unemployment deposition
[8]  was the first time I ever heard his definition of
[9]  what out of area is.
[10]    Q: But he had told you not to go home for
[11]  lunch before, hadn't he?
[12]    A: Yes.
[13]    Q: And you had not said to him that you needed
[14]  to go home because of your diabetes, right?
[15]    A: I don't think I ever mentioned that to him
[16]  about...
[17]    Q: And the truth is that you didn't have any
[18]  medical reasons to have to go home for lunch, as I
[19]  understand it; is that correct?
[20]    MR. NEVINS: Objection.
[21]    A: I don't know what you mean by — I have to
[22]  test my blood sugar before I eat. If that's not a
[23]  medical reason, I don't know what is.
[24]    Q: Well, could you have taken the blood

Page 95

[1]  testing machine in the truck with you?
[2]    A: I could have.
[3]    Q: And the test strips?
[4]    A: Yes. I've never taken them out of my
[5]  house. I just leave them at my house.
[6]    Q: And the fact is, you felt that Mr. MacLean
[7]  didn't have the right to tell you where to go for
[8]  lunch.
[9]    A: I don't think anybody has the right to tell
[10]  you where to eat.
[11]    Q: And you told him that that's what you
[12]  thought.
[13]    A: Yes.
[14]    Q: What did he say to that?
[15]    A: He just started arguing about something or
[16]  continued arguing about the same point.
[17]    Q: During the time that you were employed at
[18]  Viacom, did anybody ever make a comment to you about
[19]  your age or related to you about your age?
[20]    A: Not that I remember.
[21]    Q: Did anybody ever make any comment to you
[22]  about your diabetes?
[23]    A: They would not say the diabetes, but when I
[24]  told them I couldn't lift items, and all that, they