**Page 96**

[1] would make jokes about it.
[2] Q: What kinds of jokes?
[3] A: Well, he can't do that or how I was the
[4] biggest person there, but I was always the brunt of
[5] the jokes about if I couldn't — I asked for
[6] something else to do because I'm not supposed to do
[7] it. So I hear comments back and forth about
[8] different things like from my own co-workers.
[9] Q: But it was about not lifting things?
[10] A: Right.
[11] Q: Did they know that it was because of your
[12] diabetes that you couldn't lift things?
[13] A: No. It was because of my heart condition.
[14] Q: Did they know it was because of your heart
[15] condition?
[16] A: Yes.
[17] Q: You had told them that?
[18] A: Yes.
[19] Q: Did they —
[20] A: It was recommended by the doctor not to
[21] lift anything heavy.
[22] Q: Do you remember exactly what kinds of
[23] things they said about your not lifting things?
[24] A: Usually the paper that we use to mount on

**Page 97**

[1] the boards would come in and weigh roughly probably
[2] 50 pounds to 60 pounds. I'm not exactly sure what
[3] they weighed, but I did do a lot of the lifting in
[4] the place and I would still do it even though my
[5] doctors told me not to, but I tried to avoid doing
[6] that, and I would get comments about different
[7] things, about not doing the work, this, that, and
[8] the other thing.
[9] Q: Angry comments or joking comments?
[10] A: But I never got a comment from —
[11] Mr. MacLean would be, "What's taking Walter so long
[12] to do this?" I could never do the job right in his
[13] eyes for some reason or another. I never understood
[14] why.
[15] Q: Well, let's focus specifically on comments
[16] by Mr. MacLean as opposed to other people because I
[17] gather there were — your co-workers would make
[18] comments about your not lifting things, right?
[19] A: Right. Mr. MacLean — I really never heard
[20] from him about —
[21] Q: You never heard him make a comment about —
[22] A: No.
[23] Q: — about lifting things or anything else
[24] about your medical conditions; is that right?

**Page 98**

[1] A: No. When I mentioned to him about my heart
[2] condition, he told me, well, whenever I had to, to
[3] take it easy, take a break, or whatever I needed to
[4] do to take care of my situation.
[5] Q: Why do you think that you were terminated
[6] because of your age, sir?
[7] A: I don't know any other reason.
[8] Q: Is there anything that happened that makes
[9] you think your age was involved or is it that you
[10] can't think of another reason?
[11] A: I just can't think of a legitimate reason
[12] for being terminated for any reason, really.
[13] Q: Do you know how old Mr. MacLean is?
[14] A: I have no idea.
[15] Q: Is he older than you?
[16] A: I believe he is.
[17] Q: Is he a lot older than you?
[18] A: I have no idea.
[19] Q: Do you think he has had some kind of bias
[20] against old workers?
[21] A: I have no idea.
[22] Q: He's never said anything to make you think
[23] that, right?
[24] A: No.

**Page 99**

[1] Q: Who's Ed Ha?
[2] A: He's the secretary that came in with
[3] Mr. MacLean. I thought he was working together, but
[4] maybe he was just hired out. I was never told one
[5] way or the other.
[6] Q: Did he work in Randolph?
[7] A: Yes.
[8] Q: Is he older than you?
[9] A: I have no idea.
[10] Q: Did you ever have any interaction with him
[11] on the job?
[12] A: Not really, no. I would say hi to him and
[13] he would hand us a paycheck. That would be about
[14] it.
[15] Q: Why do you think that your termination had
[16] something to do with your diabetes?
[17] A: As I said, I have no idea why I was
[18] terminated, medical-wise, health-wise, age-wise,
[19] work-wise.
[20] Q: Well, might it not be just because you
[21] clipped the taillight of that truck?
[22] A: I don't think that would be sufficient
[23] reason to fire somebody.
[24] Q: And what makes you think that's not

**Page 100**

[1] sufficient reason? Is there some — well, let me
[2] ask you a different question. Have other people at
[3] the Randolph shop been in traffic accidents?
[4]   A: Yes, they have.
[5]   Q: Who?
[6]   A: Well, no one has ever admitted to it.
[7] They've come back with dents, bumps, scratches,
[8] scrapes, and nobody ever admitted it, to my
[9] knowledge.
[10]  Q: Did you ever witness an accident caused by
[11] anybody else?
[12]  A: No.
[13]  Q: Did anybody else in the garage ever tell
[14] you that they had an accident?
[15]  A: Not personally, no.
[16]  Q: Did you hear from anybody else that
[17] somebody had had an accident?
[18]  A: I've heard they've had, but they just won't
[19] admit it.
[20]  Q: Are there particular individuals or
[21] particular accidents that you have in mind?
[22]  A: Nothing.
[23]  Q: Have there been any other incidents of road
[24] rage by — let me not say "other incidents." Are

**Page 101**

[1] there any other incidents of road rage that you're
[2] aware of involving other employees of Viacom?
[3]   A: No.
[4]   Q: Do you know John Hayes?
[5]   A: I think he was one of the people that was
[6] hired after they — the company took over.
[7]   Q: After Viacom took over?
[8]   A: Yes.
[9]   Q: Do you know whether he's still at Viacom?
[10]  A: I have no idea. I think he's not, if it's
[11] the same person I think it is.
[12]  Q: Do you know whether he left voluntarily?
[13]  A: I have no idea. I was never informed.
[14]  Q: Do you know whether he's older or younger
[15] than you?
[16]  A: I have no idea.
[17]  Q: Now, you know Brian Carson, correct?
[18]  A: Yes.
[19]  Q: And he was working for Viacom while you
[20] were there, correct?
[21]  A: Yes.
[22]  Q: Do you know whether he's still working for
[23] Viacom?
[24]  A: I don't. I have no idea. I haven't talked

**Page 102**

[1] to anybody from that place.
[2]   Q: Is he younger than you are, Brian?
[3]   A: Yes.
[4]   Q: Do you know if he's under 40?
[5]   A: Yes.
[6]   Q: Is there anybody else at the Randolph
[7] garage or — who was there when you were working
[8] there who had any kind of health condition that
[9] you're aware of?
[10]  A: I know Joey was epileptic, but he never had
[11] a seizure in front of me, although I was informed
[12] that he was.
[13]  Q: Anybody else?
[14]  A: Not that I know of.
[15]  Q: Do you know whether anybody ever treated
[16] Mr. Maikis differently because he was epileptic?
[17]  A: I have no idea.
[18]  MR. BATTEN: I think that's all I have.
[19]  MR. NEVINS: Just one second.
[20]  MR. BATTEN: Sure.
[21]  (Discussion off the record)
[22]           CROSS EXAMINATION
[23]           BY MR. CONTI:
[24]  Q: My name is Jonathan Conti and I'm the

**Page 103**

[1] attorney for the Painters District Council No. 35.
[2]   Again, if you don't understand my
[3] questions, ask me to repeat them and I will. Again
[4] I ask that you answer verbally rather than shaking
[5] your head or "mm-hmm" or anything like that.
[6]   A: Yes.
[7]   Q: When did you first start with the company
[8] that preceded Viacom? I don't mean immediately
[9] preceding, but going all the way back.
[10]  A: I believe it was '77.
[11]  Q: 1977, who was the company at that time?
[12]  A: I believe it was Transit America.
[13]  Q: And it's changed numerous times since 1977?
[14]  A: Yes.
[15]  Q: And when you were first hired in 1977, was
[16] the Painters District Council the union for the
[17] employees there?
[18]  A: 391, I believe, was always the union. I
[19] think they just joined Local 35 just recent.
[20]  Q: But it was the Painters' local union?
[21]  A: Yes.
[22]  Q: And did you become a member of that union
[23] when you were hired?
[24]  A: Yes, I did.

Page 104

[1] Q: So you've been a member of the union — you
[2] were a member of the union from 1977 until the time
[3] you were terminated?
[4] A: Yes.
[5] Q: And are you familiar with an individual by
[6] the name of Chuck Fogell?
[7] A: Yes.
[8] Q: Do you recall when you first met Mr.
[9] Fogell?
[10] A: I don't. Several years, maybe. I'm not
[11] sure. When he started.
[12] Q: So there was somebody who preceded him as
[13] the representative for your unit?
[14] A: Yes.
[15] Q: And who was that?
[16] A: I can't think of his name. He was only in
[17] for a short time, but the original BA was Bill
[18] Murphy.
[19] Q: Going back to 1977?
[20] A: Yes.
[21] Q: And at some point Mr. Fogell became the BA;
[22] is that correct?
[23] A: Yes.
[24] Q: You're saying you think that was a few

Page 105

[1] years ago?
[2] A: Yes.
[3] Q: And you were discharged in December of
[4] 2001. When do you recall — how long did you know
[5] Mr. Fogell before you were —
[6] A: I would say maybe five, six years before
[7] that.
[8] Q: So he came in probably sometime in the
[9] mid '90s?
[10] A: I would guess. I never followed it.
[11] Occasional meeting here and there, but...
[12] Q: Other than the termination, did you
[13] previously file a grievance with the union through
[14] the union?
[15] A: Just for the suspension. That was the
[16] first time I've contacted the union about anything.
[17] Q: And in February of — that was in February
[18] of 2001, the suspension?
[19] A: I believe.
[20] Q: And now you said you did file a grievance
[21] at that time?
[22] A: I tried to, but Mr. Fogell said he didn't
[23] think we should go ahead with the grievance because
[24] he didn't want to cause waves.

Page 106

[1] Q: Is that all he said?
[2] A: We were going to negotiate a new contract
[3] with the company. I believe it was six months down
[4] the road.
[5] Q: Did he make any comments regarding the
[6] merits of your grievance?
[7] A: He just said that was wrong, to take the
[8] grievance — to take the suspension.
[9] Q: Did he state that, "I will not file a
[10] grievance on your behalf"?
[11] A: No, he did not.
[12] Q: Did you tell him, "I really want" — strike
[13] that.
[14] After he urged you not to file the
[15] grievance, did you make any statements indicating
[16] that he still wanted to file a grievance?
[17] A: No, I did not.
[18] Q: Prior to your termination from employment,
[19] did you ever tell Mr. Fogell that you had a heart
[20] condition?
[21] A: I don't think I ever told Mr. Fogell, no.
[22] Q: Did you ever tell Mr. Fogell prior to your
[23] termination that you had diabetes?
[24] A: No.

Page 107

[1] Q: Now, in December of 2001, I think you
[2] stated that you and your partner would each carry a
[3] radio; is that correct?
[4] A: Yes.
[5] Q: Is that like a two-way phone kind of deal
[6] or —
[7] A: Yes, I believe.
[8] Q: And on December 11th, did you call anybody
[9] at the company requesting to go home for lunch?
[10] A: No.
[11] Q: And on December 11th, did you mention to
[12] Mr. Barrus that you were going home for lunch?
[13] A: Yes.
[14] Q: Did he say anything about that?
[15] A: No.
[16] Q: Did you ever bring a lunch with you to
[17] work?
[18] A: No.
[19] Q: Would it have been possible for you to
[20] bring a lunch to work that would have met the
[21] diabetes restrictions you had?
[22] A: Yes.
[23] Q: Did you ever tell Mr. Fogell either before
[24] or following your termination that you needed to go

Page 108

[1] home for lunch because of your diabetes?
[2]  A: I didn't really talk to Mr. Fogell about
[3] anything like that, no, or anything else.
[4]  Q: Now, you were terminated on December 12th,
[5] 2001, correct?
[6]  A: Yes.
[7]  Q: After you were terminated, what did you do?
[8]  A: I believe I went to Mr. Fogell to grieve —
[9] go to arbitration about this or talk to somebody,
[10] what I am supposed to do, the next step in the
[11] process.
[12]  Q: Did you meet with Mr. Fogell or did you
[13] speak with him on the phone?
[14]  A: I spoke with him on the phone.
[15]  Q: And how long were you on the phone?
[16]  A: I also met him in his office as well.
[17]  Q: But on the 12th did you —
[18]  A: I might have just talked to him on the
[19] phone for a few minutes.
[20]  Q: And what did you discuss with Mr. Fogell at
[21] that time?
[22]  A: That the — I was being terminated and what
[23] do I have to do to start the process about
[24] arbitration, or whatever. I never been involved in

Page 109

[1] it, so I had no idea what to do.
[2]  Q: What did he tell you?
[3]  A: He told me to meet him in his office the
[4] following day, I believe it was.
[5]  Q: And did you do that?
[6]  A: Yes.
[7]  Q: That would have been December 13th?
[8]  A: Yes. It was snowing.
[9]  Q: And how long did you meet with Mr. Fogell
[10] on the 13th?
[11]  A: I'd say maybe half an hour, hour.
[12]  Q: And at that time did you fill out a
[13] grievance?
[14]  A: I explained to him what happened and he
[15] asked me to do a couple of things for him: Write
[16] down the mileage between my house and the Cabot
[17] garage, and I wrote down all the information for him
[18] and I brought it to his office and gave it to him.
[19]  Q: To your knowledge, did Mr. Fogell file a
[20] grievance on your behalf?
[21]  A: I assumed he did. I don't know.
[22]  Q: He didn't send you a copy of the grievance
[23] report?
[24]  A: He might have. I don't remember.

Page 110

[1]  Q: Did you speak with Mr. Fogell several days
[2] after the December 13th meeting? Did you ever meet
[3] with him or talk with him on the phone?
[4]  A: I assume I did. I'm not sure, but the
[5] thing he told me at that meeting was kind of ironic.
[6]  Q: Which meeting are we at?
[7]  A: The first one where I gave him the
[8] measurements. He told me, "Whatever you do, don't
[9] lie." And I said, "I'm not."
[10]  Q: And you said he asked you to get the
[11] mileage and things like that?
[12]  A: Yes.
[13]  Q: When did you provide him with that?
[14]  A: The following day. It was snowing. I went
[15] out and did the measurements on my car from my house
[16] to the accident scene, from the accident scene to
[17] the Cabot garage, from Cabot to Albany Street.
[18]  Q: So that was sometime after December 13th
[19] you provided him with that information?
[20]  A: I believe it was the 13th, yes.
[21]  Q: You believe you provided him the
[22] information on the 13th?
[23]  A: Yes.
[24]  Q: So on the 12th he told you to collect that

Page 111

[1] information?
[2]  A: No. On the 13th I had talked to him on the
[3] phone, and I went out and did the mileage, and I
[4] drove over to the Randolph — or the union hall.
[5]  Q: So you met with him and you spoke with him
[6] on the telephone on the same day, on the 13th?
[7]  A: I believe so.
[8]  Q: Did you attend a Step I grievance
[9] meeting —
[10]  A: No, I did not.
[11]  Q: — on December 19th?
[12]  A: No. I wasn't told about it.
[13]  Q: Do you know if Mr. Fogell attended that
[14] meeting?
[15]  A: I believe he did. I was informed after the
[16] meeting they had the meeting.
[17]  Q: Did you attend a Step II grievance meeting
[18] on December 28th, 2001?
[19]  A: Yes, I did.
[20]  Q: And who was present at that meeting?
[21]  A: Bill Murphy, Dick MacLean, Chuck Fogell and
[22] myself.
[23]  Q: Now, did Mr. Fogell make any statements to
[24] the company arguing your case at that meeting?

**Page 112**

[1] A: Not too much. He didn't say too much.
[2] Q: Well, what did he say?
[3] A: Not that much that I recall, if he even
[4] made a statement at all. They wanted to know what
[5] steps they were taking. The first comment made to
[6] me was from Mr. Murphy who called me a homicidal
[7] maniac, and said he would not wait for Walter to
[8] kill somebody on the road.
[9] Q: And you're telling me that Mr. Fogell did
[10] not speak during that meeting?
[11] A: No. He kept on writing.
[12] Q: Did he make any statements during that
[13] meeting?
[14] A: Nothing — he asked a couple of questions.
[15] Q: Let me finish my question. Did he make any
[16] statements during that meeting?
[17] A: Not that I recall.
[18] Q: Did he ask any questions?
[19] A: Yes.
[20] Q: What did he ask?
[21] A: I don't recall the questions he asked, but
[22] they had nothing to do with the berating I was
[23] receiving from the former BA.
[24] Q: Isn't it true that during the course of

**Page 113**

[1] that meeting, you laughed in MacLean's face?
[2] A: No. I laughed in the — at Mr. Murphy.
[3] First he laughed and I laughed back at him. And he
[4] said, "The meeting is over." That's it.
[5] Q: What do you mean, you laughed back at him?
[6] A: He made a comment about something or other.
[7] I said — I mentioned something about the rule being
[8] in the book. And he says, "I'll put the rule in the
[9] book next week if that's what you want." And he
[10] made a comment and he laughed about it. So I
[11] answered him with another laugh. I did not laugh at
[12] Mr. MacLean. I was laughing at Mr. Murphy after he
[13] had laughed at me for whatever question I had asked
[14] him.
[15] Q: Following your termination, in any of the
[16] meetings you had with Mr. Fogell prior to the Step
[17] II grievance meeting, did you ever suggest to him
[18] that you had been discharged because of your age?
[19] A: Not that I remember. I don't — I had a
[20] 10-minute meeting or 15-minute meeting before the
[21] Step II process, and other than that I —
[22] Q: You spoke with him on the telephone on
[23] December 12th, you just said, right?
[24] A: Right.

**Page 114**

[1] Q: Did you suggest to him at that time that
[2] you believed your termination was due to your age?
[3] A: No.
[4] Q: Did you suggest at that time that you
[5] believed your termination was due to your medical
[6] condition?
[7] A: No.
[8] Q: How about when you met with him on December
[9] 13th, did you discuss your age or your medical
[10] condition with Mr. Fogell at that time?
[11] A: No, I did not.
[12] Q: You stated you spoke with Mr. Fogell prior
[13] to the Step II grievance meeting?
[14] A: Right.
[15] Q: Did you discuss your age or your disability
[16] at that time?
[17] A: No.
[18] Q: Did you ever provide the company or Mr.
[19] Fogell with any kind of medical documentation
[20] showing that you needed to go home for lunch due to
[21] your diabetes?
[22] A: No, I did not.
[23] MR. CONTI: Mark that as Union 1, please.
[24]

**Page 115**

[1] (Document marked as Union
[2] Exhibit 1 for identification)
[3] Q: Showing you what's been marked as Union
[4] Exhibit 1, do you recall seeing that letter prior to
[5] today?
[6] A: (Examines document) Yes.
[7] Q: And do you recall when you received that?
[8] A: After I was terminated.
[9] Q: Would you agree that it was on or around
[10] January 2nd, 2002?
[11] A: Sure. Yes.
[12] Q: And if you look at the second, third and
[13] fourth pages of that document, do you recall whether
[14] those pages were attached to that letter when you
[15] received it?
[16] A: (Examines document) Yes.
[17] Q: And what was your understanding as to
[18] Mr. Fogell's position once you read that letter?
[19] A: I understood that he was — this is
[20] what they were giving me for assistance on finding a
[21] job.
[22] Q: And anything else?
[23] A: That's about it.
[24] Q: Did you understand that he would be

Page 116

[1] pursuing your grievance any further?
[2] A: Not after the second meeting. He told me
[3] they wouldn't — they can't win this, so we're not
[4] going to go forth with this.
[5] Q: He told you that at the grievance meeting?
[6] A: Right.
[7] Q: And then he sent you this letter?
[8] A: Right.
[9] Q: Did you understand after reading this
[10] letter that the union would not be going forward
[11] with your grievance?
[12] A: I questioned that and he went to
[13] Mr. Harrington, I believe — or Harriman, and I
[14] asked him about it and to bring it to his attention.
[15] And he said, "Oh, that's it; we can't go any" — I
[16] tried to appeal to him, and he said no.
[17] Q: And did you have a telephone conversation
[18] with Mr. Harriman?
[19] A: I believe so, yes.
[20] Q: You then also sent him a letter; is that
[21] correct?
[22] A: Yes.
[23]     (Document marked as Union
[24] Exhibit 2 for identification)

Page 117

[1] Q: Showing you what's been marked as Union
[2] Exhibit 2, have you ever seen that letter prior to
[3] today?
[4] A: (Examines document) Yes.
[5] Q: Do you recall when you received that
[6] letter?
[7] A: Roughly a week or so after the letter —
[8] the conversation I had with Mr. Harriman.
[9] Q: And what was your understanding as to the
[10] union's — Mr. Harriman's position after you
[11] received that document?
[12] A: That they weren't going to do anything else
[13] about my termination.
[14] Q: Following your termination, did you ever
[15] apply to any of the companies that were attached to
[16] Union Exhibit 1?
[17] A: Yes, I did.
[18] Q: Do you recall who you applied to?
[19] A: Coleman's Sign Company right here on the
[20] second page.
[21] Q: Anyone else?
[22] A: That was it.
[23] Q: You were not hired, I take it?
[24] A: No.

Page 118

[1] Q: Did you ever ask Mr. MacLean whether your
[2] house was considered off route?
[3] A: No.
[4] Q: During the five or six years in which you
[5] knew Mr. Fogell — or you've known Mr. Fogell, I
[6] assume it's longer now, but during the time from
[7] when you first met him in the mid 1990s when he
[8] became the business representative, and your
[9] termination, did you ever hear him make any comments
[10] about your age?
[11] A: No.
[12] Q: Did you ever hear him make any comments
[13] about anyone else's age?
[14] A: No.
[15] Q: Did you ever hear Mr. Fogell make any
[16] comments about your diabetes?
[17] A: No.
[18] Q: How about your heart condition?
[19] A: No.
[20] Q: Did you ever hear Mr. Fogell make any
[21] comments about any employee's medical conditions?
[22] A: No.
[23] Q: Do you think Mr. Fogell has a bias against
[24] older workers?

Page 119

[1] MR. NEVINS: Objection. Answer if you're
[2] able to.
[3] A: Not that I know of.
[4] Q: In your opinion —
[5] A: I don't know him that well.
[6] Q: Do you have any reason to believe that Mr.
[7] Fogell has a bias against older workers?
[8] A: I don't have any reason to believe.
[9] Q: Do you have any reason to believe that he
[10] has a bias against disabled employees?
[11] A: No.
[12] Q: What is the basis for your belief that Mr.
[13] Fogell did not file a grievance — did not take your
[14] grief to arbitration because of your age?
[15] A: I have no reason to believe otherwise other
[16] than he didn't want to go against his former friend,
[17] Bill Murphy, who was a former BA.
[18] Q: So you do not think it's because of your
[19] age?
[20] A: I have no idea why, but it makes sense
[21] because he had all those younger gentlemen at work
[22] on the evening shift.
[23] Q: You would agree that the union does not do
[24] the hiring, correct?