7

(2)  With respect to Count 1, award the plaintiff money damages including back pay, compensation for all other lost employment benefits and front pay, plus pre-judgment interest and post-judgment interest.

(3)  With respect to Count 2, award the plaintiff triple damages, and his reasonable attorney's fees and costs as provided for under M.G.L. c. 151B, § 9.

(4)  With respect to Count 3, award the plaintiff money damages including back pay, compensation for all other lost employment benefits and front pay, plus pre-judgment interest and post-judgment interest.

(5)  With respect to Count 3, award the plaintiff exemplary damages.

(6)  With respect to Count 4, award the plaintiff money damages including back pay, compensation for all other lost employment benefits and front pay, plus pre-judgment interest and post-judgment interest.

(7)  With respect to Count 4, award the plaintiff exemplary damages.

(8) With respect to Counts 1, 2, 3 and 4 award the plaintiff his reasonable attorney's fees and costs as provided for under M.G.L. c. 151B, § 9.

(9)  Award the plaintiff such other and further relief as may be just and meet.

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) | Trial Court of Massachusetts Superior Court Department County: Suffolk |
|---|---|---|

**PLAINTIFF(S)**
Walter S. Prebble

**DEFENDANT(S)** Transportation Displays, Inc. dba Viacom OUtdoor, & Painters & Allied Trades, District Council 35, IUPAT, AFL CIO

**ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE**
Paul L. Nevins   781-237-9018
47 Church St., Wellesley, MA 02482
Board of Bar Overseers number:

**ATTORNEY (if known)**

### Origin code and track designation

Place an x in one box only:
- [X] 1. F01 Original Complaint
- [ ] 2. F02 Removal to Sup.Ct. C.231,s.104 (Before trial) (F)
- [ ] 3. F03 Retransfer to Sup.Ct. C.231,s.102C (X)

- [ ] 4. F04 District Court Appeal c.231, s. 97 &104 (After trial) (X)
- [ ] 5. F05 Reactivated after rescript; relief from judgment/Order (Mass.R.Civ.P. 60) (X)
- [ ] 6. E10 Summary Process Appeal (X)

### TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| B22 | Discrimination | ( F ) | ( X ) Yes   ( ) No |

**The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.**

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
2. Total Doctor expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
3. Total chiropractic expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
4. Total physical therapy expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
5. Total other expenses (describe) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
   Subtotal $. . . . . . . . . . .

B. Documented lost wages and compensation to date . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
C. Documented property damages to date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
D. Reasonably anticipated future medical and hospital expenses . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
E. Reasonably anticipated lost wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $. . . . . . . . . . .
F. Other documented items of damages (describe)
   $. . . . . . . . . . .

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

Plaintiff is a 48 year old male who suffers from Diabetes and a Heart condi
He was discharged from employment after 24 years.  He alleges unlawful age
and disability discrimination and unlawful retaliation          $
   TOTAL $ 100,000+ . . . . .

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

TOTAL $. . . . . . . . . . . .

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

**"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."**

Signature of Attorney of Record _____   DATE: _____

AOTC-6 mtc005-11/99
A.O.S.C. 1-2000

3

# *EXHIBIT 3*

DRAFT 10/30/01

# TRANSIT ADVERTISING
# COLLECTIVE BARGAINING AGREEMENT

## BETWEEN

## VIACOM OUTDOOR GROUP

## AND

## PAINTERS AND ALLIED TRADES
## DISTRICT COUNCIL 35
## IUPAT, AFL-CIO

### EFFECTIVE

### NOVEMBER 3, 2001

### THROUGH

### JULY 31, 2004

## SECTION 8.2 – RESIGNATIONS

An employee who resigns or retires from his/her employment with the company will give the company written notice of his/her intention to resign or retire. The notice shall specify the effective date of such resignation or retirement, which effective date shall be at least one (1) week after the date of giving such notice, and shall be at the end of the employee's work week. Such notice shall be given in accordance with Section 15.1 hereof. Failure of the employee to give notice as herein required will result in a forfeiture by such employee of any accrued vacation pay hereunder.

## SECTION 8.3 – DISCHARGE

Except as provided in Section 5.2 hereof relating to trainees, no employee shall be suspended, discharged or otherwise disciplined without just cause. The propriety of the disciplinary action taken by the company may be the subject of grievance and/or arbitration in accordance with Section 9.2 hereof. The company shall give notice to the Shop Steward of discipline, suspension or discharge of any employee.

## SECTION 8.4 – EFFECT OF PART-TIME EMPLOYEES

In the event of a layoff or reduction in the work schedule, part-time employees shall be laid off (in inverse order of their respective hiring dates) before any full-time employees are affected by said action.

## ARTICLE 9 – NO STRIKE, NO LOCK-OUT, GRIEVANCE AND ARBITRATION

## SECTION 9.1 – NO STRIKE, NO LOCK-OUT

During the term of this agreement there shall be no strikes, pickets, boycotts or other interference with the company's business and/or the company's operations and the company shall not lock-out the employees.

Nothing herein shall diminish the rights of an employee, acting as an individual, to refuse to enter upon the property and/or to cross any legal primary picket line in connection with a lawful primary labor dispute and the exercise of such rights by an employee shall not be cause for discharge or disciplinary action; nor shall any such action on the part of any employee constitute a violation of this agreement by the union.

## SECTION 9.2 – GRIEVANCE AND ARBITRATION

(a)    Any unresolved controversy between the company and the union pertaining to an alleged violation of a provision of this agreement ("grievance") shall be processed as follows:

DRAFT 10/30/01

Signed: FOR THE EMPLOYER          FOR THE PAINTERS DC #35 UNION

By: _____          By: _____
                                              (President)

_William F. Murphy_____                  _____
(print)                                       (Secretary-Treasurer)

TITLE: _EX V. P._____

VIACOM OUTDOOR GROUP              DC #35
49-29 Maspeth Avenue                  I.U.P.A.T, AFL-CIO
Maspeth, NY 11378                     Roslindale, MA 02131
(718-366-6180                         (617)522-0520

DATE: _11-02-01_____

Insurance Carrier for Workmen's Compensation: _____

Mass. Identification No: _____

Unemployment Compensation No: _____

DRAFT 10/30/01

# EXHIBIT "A"

### SENIORITY LIST FOR FULL-TIME EMPLOYEES – BOSTON

| EMPLOYEE | SENIORITY DATE |
|---|---|
| Alan Brunswick | 6/19/73 |
| Walter Preble | 6/16/77 |
| Joseph Maykis | 6/26/80 |
| Kenneth Barrus | 9/21/81 |
| Thomas Higgins | 1/31/94 |
| Leo Horne | 9/14/98 |
| Brian Carson | 9/27/00 |
| David Long | 10/14/00 |
| Kevin McCormack | 10/29/00 |
| Blake Beath | 11/6/00 |
| John Benoit | 11/22/00 |
| Hughnorton Laidley | 12/4/00 |
| Hak Ok | 2/20/01 |

<u>DRAFT 10/30/01</u>

# EXHIBIT "B"

## <u>TDI</u>
## <u>WORK RULES</u>

Adherence to TDI work rules is a condition of employment. Violation of these rules shall be cause for disciplinary action in accordance with the following set forth below:

1.    Being tardy without calling in and excessive tardiness.

|  |  |
|---|---|
| 1st Offense: | Verbal Warning |
| 2nd Offense: | Written Warning |
| 3rd Offense: | Suspension |
| 4th Offense: | Discharge |

2.    Being absent without prior authorization and/or excessive absenteeism.

|  |  |
|---|---|
| 1st Offense: | Written Warning |
| 2nd Offense: | Suspension |
| 3rd Offense: | Discharge |

3.    No call/No show.

|  |  |
|---|---|
| 1st Offense: | Written Warning |
| 2nd Offense: | Suspension |
| 3rd Offense: | Discharge |

4.    Possession or taking of alcoholic beverages and/or drugs, being under the influence of alcoholic beverages or drugs during working periods; or reporting for work under the influence of alcohol or drugs. <u>NOTE:</u> The only exception will be having a prior letter in the company personnel file from the employee's physician.

|  |  |
|---|---|
| 1st Offense: | Discharge |

<u>NOTE:</u> These rules are not intended to cover every circumstance under which discipline, up to and including discharge, may be appropriate. However and except as provided at Section 5.2, the company shall have the burden of demonstrating just cause for discipline should the union challenge the appropriateness of same. The union shall have the right to challenge any employee discipline in accordance with the grievance and arbitration provision set forth in the collective bargaining agreement.

n. H

# EXHIBIT 4

# VIACOM
## O U T D O O R

**EXHIBIT 1**
McLean
Ha. 4J503

## BOSTON MEMO

**TO:** Susan Anderson

**FROM:** Richard MacLean

**DATE:** ~~June 27, 2002~~ → Actual Date 7/22/02

**SUBJECT: Walter Preble**

---

The following information covers all of our current employees. It also gives the same information on Walter Preble as of his date of termination.

All are union members except for myself and Edward Ha.

Please note, none of the union members were our employees prior to 7/1/00.

Seniority dates listed prior to 7/1/00 are to be used for accumulated vacation and sick pay.

| Name | D.O.B. | Age | Date Hired | Current Position | Seniority Date |
|------|--------|-----|------------|------------------|----------------|
| Richard MacLean | 11/12/37 | 64 | 6/1/00 | Operations  Mgr. | N.A. |
| Edward Ha | 3/11/47 | 54 | 9/1/00 | Office Mgr. | N.A. |
| Joseph Maykis | 6/25/60 | 42 | 7/1/00 | Leadman | 6/26/80 |
| Leo Horne | 8/9/72 | 29 | 7/1/00 | Night Leadman | 9/14/98 |
| Alan Brunswick | 9/22/53 | 48 | 7/1/00 | Journeyman | 6/19/73 |
| Thomas Higgins | 3/25/54 | 48 | 7/1/00 | Journeyman | 1/31/94 |
| Kenneth Barrus | 2/20/59 | 43 | 7/1/00 | Leadman/Framer | 9/21/81 |
| Brian Carson | 9/3/80 | 21 | 9/27/00 | Car Carder | 9/27/00 |
| Blake Beath | 6/17/65 | 37 | 11/6/00 | Car Carder | 11/6/00 |
| David Long | 7/8/77 | 25 | 10/14/00 | Car Carder | 10/14/00 |
| John Benoit | 8/8/61 | 41 | 11/22/00 | Car Carder | 11/22/00 |
| Hughnorton Laidley | 11/24/56 | 45 | 12/4/00 | Car Carder | 12/4/00 |
| Hak Ok | 5/15/66 | 36 | 2/20/01 | Car Carder | 2/20/01 |
| Walter Preble As of Termination Date | 6/4/55 | 46 | 7/1/00 | Journeyman | 6/16/77 |

Regards,

Richard MacLean
Operations Manager

**45 Teed Drive, Randolph, MA 02368**
**781-961-5292 Fax: 781-961-3157**

# *EXHIBIT 5*

**Page 1**

1      VOLUME: I

2      PAGES: 1 to 83

3      EXHIBITS: 1 to 7

4      COMMONWEALTH OF MASSACHUSETTS

5      COMMISSION AGAINST DISCRIMINATION

6      - - - - - - - - - - - - - - - - - - x

7   WALTER S. PREBLE,

8            Complainant,

9      v.               Docket No.

10                      02BEM02103

11  TRANSPORTATION DISPLAYS,

12  INCORPORATED, dba

13  VIACOM OUTDOOR,

14            Respondent.

15  - - - - - - - - - - - - - - - - - - x

16

17      DEPOSITION OF RICHARD MACLEAN

18            April 25, 2003

19            10:00 a.m.

20      Law Office of Paul L. Nevins

21            47 Church Street

22        Wellesley, Massachusetts

23

24      Reporter: Karen A. Interbartolo, RPR

**Page 2**

1   APPEARANCES:

2

3      PAUL L. NEVINS, ESQ.

4      47 Church Street

5      Wellesley, Massachusetts 02482

6      (781) 237-9018

7      Counsel for the Complainant

8

9      CBS

10     By Susan K. Anderson, Esq.

11     1515 Broadway

12     New York, New York 10036-5794

13     (212) 846-3351

14     Counsel for the Respondent

15

16
17

18

19

20

21

22

23

24

**Page 3**

1            I N D E X

2   EXAMINATION OF:                 PAGE

3   RICHARD MACLEAN

4

5   Direct Examination by Mr. Nevins      5

6   Cross-Examination by Ms. Anderson     77

7   Redirect Examination by Mr. Nevins    80

8

9

10

11          E X H I B I T S

12  No.                     Page

13

14  1      Memorandum from Mr. MacLean    22

15         to Ms. Anderson

16  2      Three-Page Handwritten Note    27

17  3      Position Statement dated       40

18         8/16/02

19  4      Three-Page Handwritten Note    51

20  5      Memorandum dated 1/10/02 from  59

21         Ed to Sandy

22  6      Employee Status Change Report  61

23  7      Boston Police Letter           75

24

**Page 4**

1          P R O C E E D I N G S

2

3         MR. NEVINS: Let's talk about some

4   stipulations. We'll do the usual, waive objections,

5   except as to form of the questions, and motions to

6   strike until time of hearing.

7         MS. ANDERSON: And privilege.

8         MR. NEVINS: And do you want the

9   deponent to have the opportunity to sign?

10        MS. ANDERSON: Say that again.

11        MR. NEVINS: Do you want the deponent to

12  have the opportunity to sign his deposition, submit an

13  errata sheet?

14        MS. ANDERSON: Yes.

15        MR. NEVINS: And can we do it within 30

16  days after receipt?

17        MS. ANDERSON: Certainly.

18

19        RICHARD MACLEAN

20

21  a witness called for examination by counsel for the

22  Complainant, being first duly sworn, was examined and

23  testified as follows:

24

**5**

1       DIRECT EXAMINATION
2  BY MR. NEVINS:
3       Q.   Good morning, Mr. MacLean.  My name is Paul
4  Nevins.
5       A.   Good morning, Paul.
6       Q.   And I represent Walter Preble.  And I'm going
7  to be asking you some questions today.  If the
8  questions I ask you are incoherent, which many of them
9  are apt to be, don't hesitate to tell me you don't
10  understand the question.  We'll try to rephrase it.
11  I'm really looking for your knowledge, specific
12  information, so don't guess.  If you know, you know and
13  you'll testify.  If you don't recall, you don't recall.
14  That's perfectly fine also.
15       If at any time you want to take a break for
16  any reason, don't hesitate to ask.  We'll make this as
17  quick and informal as possible.  I would ask that you
18  give me the opportunity to complete the question before
19  you answer so the stenographer has a complete
20  transcript.  And that's especially important because I
21  sometimes tend to be too fast in my questioning and the
22  deponent responds quickly and it creates a problem.
23       A.   If I step in and say anything, you're allowed
24  to whack me.

**6**

1       Q.   No, we don't --
2            MS. ANDERSON:  The other thing you just
3  need to remember is you have to speak.  You can't nod
4  or say "uh-huh" because you have to think it's going to
5  be a written record.
6            THE WITNESS:  I'll try to remember.
7       Q.   So no gestures.  Have you ever been deposed
8  before?
9       A.   Yes.  I guess it was -- Well, we had a
10  hearing at the DET.
11       Q.   When you took testimony, sure.
12       A.   Yes.
13       Q.   And you will have an opportunity to review
14  the transcript.  And after you've reviewed it, you will
15  be permitted to submit an errata sheet to correct any
16  errors.  You can't change your testimony, but if there
17  are misspellings or words that are cut off, you'll be
18  able to indicate what that is.
19       A.   All right.
20       Q.   For the record, would you give us your
21  complete name, sir?
22       A.   It's Richard Louis MacLean, Senior.
23       Q.   And where do you reside, sir?
24       A.   32 Bates Road, that's B-A-T-E-S, Road in

**7**

1  Brockton, Mass.
2       Q.   For how long have you resided there?
3       A.   Let me throw a guess.  35 years.
4       Q.   And with whom do you reside?
5       A.   My wife Valerie.
6       Q.   Now, would you relate to us for the record
7  your educational background beginning with high school?
8       A.   High school, actually I did not complete high
9  school, but I did take a GED test.
10       Q.   Where did you go to high school?
11       A.   Dorchester High School.  I completed the
12  10th.
13            MR. NEVINS:  Just off the record.
14        (Discussion off the record.)
15       Q.   And after you received your GED, did you take
16  any further training as part of work that you
17  performed?
18       A.   No.
19       Q.   Now, after you left Dorchester High School,
20  could you relay to us, to the extent to which you can
21  remember today, your work background, your employment
22  background?
23       A.   Well, I was about 16 years old, and the first
24  job I had was in a produce stand.  I worked there for

**8**

1  about a year and a half.  And basically at that time I
2  was elevated to -- they opened up a small stand, put me
3  in charge of that when I was 16 years old.
4       But money wasn't good.  I left there and went
5  to work for the Green Shoe Manufacturing Company.  I
6  worked for the Green Shoe Manufacturing Company for
7  nine years.  There was one short break in there for six
8  months.
9       Then I went to work at a bakery.  That didn't
10  work out well, and I went back to the Green Shoe.  I
11  was promoted to a warehouse lead man.  I ran a
12  warehouse for them.
13       From there I went to work for Orion &
14  Batchelder.  They at that time, I believe it was 1963
15  or so, were just taking over the MBTA advertising
16  contract and they were in the process of installing a
17  lot of frames, new equipment.  I started on that on a
18  part-time basis.  And then I went to work for them as a
19  bill poster.  I worked there for about two years.  I
20  left there.  I went to work for TDI.  That was --
21       Q.   TDI, Transportation --
22       A.   Transportation Displays, Incorporated.  I
23  worked there for -- from 1964, '65 to 1980.  19 --
24            MS. ANDERSON:  Where was "there"?

**9**

1    A.   That was in Boston. Orion & Batchelder had
2    the MBTA contract for the advertising, and
3    Transportation Displays had a contract for New England
4    airports, New England railroads, et cetera, and some
5    bus terminals. By the time I had left there in 1980 I
6    had been promoted to a manager, New England regional
7    manager, covered six states in New England and one
8    airport in New York, Albany.
9         I left there because they had sold the
10   airport division. And I was offered relocation in San
11   Francisco, Chicago, et cetera, but at the time my
12   children were at a certain age and we didn't really
13   want to relocate. I went into construction. I had
14   some construction background from various odd jobs and
15   things. I went into construction. I worked
16   construction until 1988.
17   Q.   From 19 --
18   A.   From 1980 to 1988.
19   Q.   1988. Okay.
20   A.   In 1988 I was -- Transportation Displays
21   called me and wanted to know if I'd like to go back to
22   work for them. At the time I had no benefits with the
23   construction and everything else, and I thought
24   benefits and new pay and everything else, I went to

**10**

1    work for them in Rhode Island. It was a one-man
2    operation in Rhode Island. I ran that shop until 1998.
3         Transportation Displays, these contracts that
4    you get for the systems are bid on, and TDI did not bid
5    on the contract in 1998. I was picked up by a Heard
6    Communication --
7    Q.   Let me just step back to '98 with TDI. In
8    Rhode Island, were they doing advertising in the state
9    of Rhode Island?
10   A.   Yes. Plus advertising. And that basically
11   was it.
12   Q.   So you weren't picked up. And what happened?
13   A.   I chose to stay there and go to work with
14   Heard Communication. I worked for Heard Communication
15   for two years until 2000, the year 2000 in June. I
16   went to work for TDI again when they won the contract
17   in Boston and they asked me to manage. And I went back
18   to work for TDI. I started in June 1, 2000.
19        MS. ANDERSON: From whom did they win
20   the contract?
21   A.   From Park Communications -- or Park Transit
22   Advertising was the name of it.
23   Q.   Now, with Heard, were they involved in
24   outdoor advertising also?

**11**

1    A.   They had outdoor advertising. I worked for
2    them as was -- Heard is basically billboards, transit
3    advertising, et cetera. Rhode Island was transit
4    advertising, buses and -- commuter buses, small buses.
5    Q.   Now, when you returned to TDI in 2000, was
6    that a Viacom company at the time?
7    A.   No. It was Transportation Displays,
8    Incorporated.
9    Q.   Did it have a parent corporation, if you
10   know?
11   A.   No. I'm not -- No. The two sister
12   companies, Viacom -- Infinity Outdoor and -- I guess
13   they were purchased by Viacom afterwards or something.
14   And then in August of 2001, I believe it was, the two
15   sister companies merged and became Viacom Outdoor.
16   Q.   Now, when you took a job with TDI in
17   2000 -- 2000?
18   A.   Right.
19   Q.   Was it August?
20   A.   No.
21   Q.   June?
22   A.   June.
23   Q.   What position were you offered?
24   A.   Operations manager.

**12**

1    Q.   And where were you located physically?
2    A.   In Brockton, Mass. I was living in Brockton,
3    Mass.
4    Q.   Okay. And that's -- No, the shop. In other
5    words, where did you work from?
6    A.   Out of Randolph, Mass. In fact I helped sell
7    the shop.
8    Q.   Was that Tweed Drive?
9    A.   Teed Drive.
10       (Discussion off the record.)
11   Q.   As an operations manager, would you briefly
12   describe your duties and responsibilities for TDI?
13   A.   Yes. The overall operations, the scheduling
14   work, the supervision of all the employees, the hiring,
15   firing, the -- every operation basically that had to do
16   with operations. Dealing with the sales departments,
17   et cetera.
18   Q.   Now, in the Randolph office, when you came on
19   board as operations manager of TDI, was the contract
20   that was serviced one with the MBTA?
21   A.   Was that --
22   Q.   Free advertising?
23   A.   The contract with the MBTA?
24   Q.   Yes.

13

1    A.  Yes, it was with MBTA.

2    Q.  Were there other contracts in addition to the

3  MBTA that were --

4    A.  That were handled out of that job?

5    Q.  Yes.

6    A.  No.  They have other contracts.  They're a

7  national and international company.  They have other

8  cities, other contracts, everything else.

9    Q.  I was just focusing on the Randolph, the

10  MBTA, the old name.

11    A.  Yes.

12    Q.  Now, when you became the operations manager,

13  you had an opportunity to meet with the employees?

14    A.  Right.

15    Q.  And these employees had been with TDI for

16  some period of time?

17    A.  No.  The employees were -- TDI won a

18  contract.  We didn't take over Park or anything else.

19  We won a contract.  The employees were offered jobs.

20    MS. ANDERSON:  Employees of who?

21    A.  Of Park.  And this normally happens in this

22  business.  Union employees, we stay with the union.

23  They offered jobs to come on board with TDI.  Their

24  actual start date -- I mean that's the first time

14

1  they'd be working with TDI.  Their actual start date

2  was July 1 when we officially took over the contract.

3    Q.  Is it fair to say that a number of employees

4  who worked for Park, the predecessor, accepted

5  employment with TDI?

6    A.  Excuse me.  I didn't hear you.

7    Q.  Is it fair to say that a number of the

8  employees who previously worked with Park accepted

9  employment with TDI?

10    A.  Yes.

11    Q.  Now, were you involved in the process of

12  negotiating a union contract with the union which

13  represented those employees?

14    A.  No.  That was William Murphy who negotiated

15  the contract.

16    Q.  And tell me, if you know, what happened when

17  TDI took over.  Did they immediately negotiate a new

18  collective bargaining agreement or did they simply

19  accept the previous collective bargaining agreement for

20  a period of time?

21    A.  I believe they just accepted the original

22  bargaining agreement for a period of time.  You know,

23  we picked them up, et cetera.  It wasn't one of these

24  things that you have to pick up these employees.

15

1  Basically you offer them the job and everything else.

2  No cut in pay or anything else went along with it.

3    Q.  Now, you mentioned Mr. Murphy.  Was it

4  Richard Murphy?

5    A.  No.  That's William Murphy.

6    Q.  And you said he negotiated the contract at

7  some point?

8    A.  Yes.  He was the -- He's a senior vice

9  president at Viacom and he's in charge of this.

10    Q.  Labor relations?

11    A.  Right.

12    MS. ANDERSON:  At Viacom Outdoor?

13    A.  Viacom Outdoor, yes.

14    Q.  And do you have any knowledge of Mr. Murphy's

15  previous background before having worked for Viacom

16  Outdoor?

17    A.  Oh, yes.  William Murphy was a union business

18  agent in Boston.

19    Q.  For the union which represented the

20  employees?

21    A.  Yes.

22    Q.  With whom TDI later negotiated?

23    A.  Yes.  Which I was once a union member when I

24  worked for --

16

1    MS. ANDERSON:  Could you speak up a

2  little.

3    A.  I was once a union member when I worked for

4  Orion & Batchelder and in fact when I went to work for

5  TDI for a short time until I became manager.

6    Q.  Were you a member of the same union,

7  the -- if I may, the Painters & Allied Trades --

8    A.  Yes.  I believe it was a different name at

9  the time.  I think it was bill posters and sign hangers

10  at the time or something, but it was so many years ago.

11    Q.  Now, when you became the operations manager,

12  tell me first what -- or how did TDI in the Randolph

13  office -- Let me rephrase that.  When you became the

14  operations manager, did you have any responsibility for

15  drafting policies and procedures?

16    A.  Policies and procedures?  No.  You mean -- I

17  don't know which policies and procedures you're talking

18  about.

19    Q.  Okay.  I'll narrow it or try to be more

20  focused.  Did you have any responsibility for drafting

21  policies and procedures with respect to employees and

22  what kind of work they would perform and circumstances

23  under which they would work?

24    A.  Basically, yes, because I would be assigning

**17**

1  the people, what they do.
2      Q.  Were you involved in creating any written
3  policies and procedures?
4      A.  No.  That's kind of -- I guess I'd have that
5  responsibility to make sure that any rules or
6  regulations were followed, things like that there.
7          MS. ANDERSON:  He's asking you --
8          MR. NEVINS:  I'll get it.
9      Q.  My question was a little more focused though.
10  Did you play any role or participate in the drafting of
11  any written policies and procedures?
12     A.  No.
13         MS. ANDERSON:  He's asking were there
14  written policies and procedures.
15     A.  Yes, there are written.
16     Q.  I'll come back to that.  I'll focus in.  Did
17  you have -- As far as you know, in terms of written
18  policies and procedures, where did they originate?
19     A.  With the contract that we picked up, there
20  were certain rules and regulations, and also there
21  were written rules and regulations as a part of the
22  contract.  It also specifies in the back that -- all
23  those rules are on the back.  There are other
24  situations basically that would fill up between the

**18**

1  union.  And the company has the right to set some
2  certain policies, work policies, work standards, and
3  these would be followed.
4      Q.  Let me just see if I understand this and step
5  back a little bit.  When you refer to contracts, you're
6  talking about -- are you referring to the contract
7  between --
8      A.  The union contract.
9      Q.  Oh.  The union collective bargaining
10  agreement?
11     A.  Right.
12     Q.  So clearly it's the collective bargaining
13  agreement?
14     A.  Right.
15     Q.  And that was in effect.  But in addition to
16  the union -- the collective bargaining agreement
17  between the union and TDI, my question is -- Well, let
18  me be more specific, then.  Were there specific
19  personnel policies that were issued from your office
20  involving TDI employees who worked at Randolph?
21     A.  Yes, verbal rules that were laid out for
22  them.
23     Q.  But my question is were there specific
24  written personnel policies and procedures?

**19**

1      A.  Ones that are on the back page of the
2  contract.
3      Q.  Of the collective bargaining agreement?
4      A.  Yes.
5      Q.  Do you know whether TDI in their national
6  office or some other office issued personnel policies
7  and procedures which were distributed to operations
8  managers such as yourself?
9      A.  No.
10     Q.  Now, I think in various documents in this
11  proceeding there were references to a policy of
12  progressive discipline with respect to employees.  Let
13  me ask you first, if there was a policy involving
14  progressive discipline, was it in writing?
15     A.  Yes.  On some of it, yes.
16     Q.  What parts of it were in writing?
17     A.  There's certain things, no show, no call.
18  There's certain steps to go through, you know, written
19  warning, verbal warning, suspension, et cetera.
20     Q.  Now, where did these written policies come
21  from?  Where could they be found?
22     A.  They'd be on the back of that contract.
23     Q.  In the collective bargaining agreement
24  itself?

**20**

1      A.  Right.
2      Q.  In addition to the collective bargaining
3  agreement, were there any other -- any specific company
4  policies in writing involving progressive discipline?
5      A.  Besides the contract?
6      Q.  Yes.
7      A.  No.  No.  I'm not sure.
8      Q.  And would you tell us, for the record, what
9  was your understanding of progressive discipline and
10  how it works?
11     A.  Progressive discipline is basically that if
12  you have -- if a situation arises and, you know, just a
13  straight talk to a person doesn't seem to help, within
14  a certain amount of time -- in fact in the contract it
15  basically says a year -- if there's another incident of
16  anything, that, you know, you can give a written
17  warning.  And then, secondly, you would go with a
18  suspension and a termination, whatever it took.  A lot
19  of it depended on the severity of it, of the incident.
20     Q.  And since you've been the operations manager,
21  in addition to Mr. Preble, how many other employees
22  working out of the Randolph location had been subjected
23  to progressive discipline which resulted in their
24  discharge from employment?

21

1    A.  Two.  John Hayes and Brian Carson.  As far
2  as -- Now, you're saying their termination.
3    Q.  Yes.
4    A.  There have been others who have had
5  progressive discipline.
6    Q.  I understand.  I'm focusing on discipline.
7  Mr. Hayes was terminated for what?
8    A.  Gross insubordination.
9    Q.  And when was he terminated, approximately?
10    A.  Approximately, I believe -- I don't have the
11  approximate date.  I don't remember that well.
12    Q.  How about John Carson?
13    A.  John Carson?  Brian Carson.
14    Q.  Brian Carson.
15    A.  Brian Carson was terminated in the past two
16  weeks.
17    Q.  And what was the reason for his termination?
18    A.  He was terminated for a no call, no show.
19    Q.  And am I correct in my recollection that the
20  issue of no call, no show was one that's specified in
21  the union contract?
22    A.  Right.  And, as it turned out, Brian Carson
23  actually abandoned his job.  We didn't know he wasn't
24  coming back.  He applied for unemployment, and we had

22

1  no way of knowing he had done that.
2    Q.  Let me show you a document, if I may.
3            MR. NEVINS:  And I would ask that this
4  be marked as Exhibit No. 1, please.
5            (Exhibit 1 marked
6            for identification.)
7    Q.  This is a document that you prepared?
8    A.  Yes.
9    Q.  And I notice there's a difference.  And
10  that's your print notation next to actual date?  In
11  other words, in print it says, "Actual date 7/22/02."
12  Is that your print next to the date at the top?
13    A.  Up at the top?
14    Q.  Yes.
15            MS. ANDERSON:  That handwritten --
16    Q.  Handwritten, yes.
17    A.  Yes.
18    Q.  And as of the date this was prepared, this
19  was accurate, to the best of your knowledge?
20    A.  Yes.
21    Q.  You in fact prepared this?
22    A.  Yes.
23    Q.  And I notice that if we go beginning with
24  Brian Carson and counting down from September of 2000

23

1  until February 20, 2001, six additional employees were
2  hired by TDI?
3    A.  Yes.
4    Q.  Is that correct?
5    A.  Yes.
6    Q.  Now, I notice they're also designated as car
7  carders?
8    A.  Yes.
9            MR. NEVINS:  C-A-R-D-E-R.
10    Q.  Could you tell us what a car carder is?
11    A.  A car carder installs cards, installs -- they
12  install advertising material in frames on vehicles, in
13  stations, anywhere we have platforms, whatever.  It's
14  installing material in frames.
15    Q.  Now, I notice also in your notation at the
16  top there, the individuals -- all of the individuals
17  below Mr. Ha are members of the collective bargaining
18  group beginning with Mr. Maykis?
19    A.  Yes.  All the way through, yes.
20    Q.  Could you tell us just briefly, what is a
21  lead man?
22    A.  A lead man is basically a union foreman.  He
23  has the ability to direct people, to assign work, et
24  cetera, et cetera.  He does not have the ability to

24

1  hire or fire or effectively make recommendations for
2  firing.
3    Q.  Because that's a management prerogative; is
4  that correct?
5    A.  Right.
6    Q.  For purposes of the record, would you
7  describe also what a journeyman is?
8    A.  A journeyman is a -- besides the car carder,
9  et cetera, and everything else they do there, they also
10  install frames on the walls or things like that.
11    Q.  And looking at this list also, I'm correct in
12  my understanding that as of the date this document was
13  prepared, the most senior union employee, union member
14  was Alan Brunswick?
15    A.  Right.
16    Q.  And Mr. Preble would have been second in
17  seniority?
18    A.  Yes.  I guess, yes.
19    Q.  Now, tell me also, since the time that this
20  document was prepared, has -- Is this called Viacom
21  Outdoor, TDI, or what's the term?
22    A.  It's Viacom Outdoor right now.
23    Q.  And that's the title by which it goes?
24    A.  Right.

25

1    Q.  Not TDI?

2    A.  No.

3    Q.  Since the date of preparation of this

4    document, have additional individuals been employed by

5    Viacom Outdoor in the Randolph operation?

6    A.  No.

7    Q.  In other words, if you look at the bottom,

8    Hak Ok was the most junior employee?

9    A.  Yes.  February 20, 2001.

10    Q.  So Viacom Outdoor has not employed anyone

11    since Hak Ok?

12    A.  No.

13    Q.  Now, when you became the operations manager,

14    you made the acquaintance of Mr. Preble and the other

15    employees; is that correct?

16    A.  Yes.

17    Q.  How would you describe your initial

18    relationship with Mr. Preble?

19    A.  Fine.

20    Q.  Now, over time, would you -- Well, in what

21    way, if any, did your relationship with Mr. Preble

22    change?

23    A.  As far as the relationship, it was basically

24    over progressive discipline.  I don't think my feelings

26

1    towards anybody changed.  I basically try to make sure

2    that I don't have personal feelings or anything, and

3    that it was because of progressive discipline if I had

4    any problems with Walter at all.

5    Q.  How would you describe your working

6    relationship with the union as an operations manager?

7    A.  With the union itself?

8    Q.  Yes.

9    A.  Good, I guess.  I don't have that much to do

10    with them.

11    Q.  Would that be Mr. Murphy who would generally

12    deal with the union?

13    A.  Well, on negotiations and everything else,

14    but if there's any --

15    MS. ANDERSON:  Let me just make a

16    stipulation.  Mr. Murphy now works for Viacom Outdoor.

17    MR. NEVINS:  Yes, I understand that.

18    That's why I asked.

19    A.  If there's anything locally, the union will

20    come to me.

21    MR. NEVINS:  To be clear, the testimony

22    was Mr. Murphy represents the company and his previous

23    union background.  So in response to the question, it

24    was whether Mr. Murphy would deal primarily with the

27

1    union.

2    MS. ANDERSON:  I'm sorry.  You speak

3    fast, and I missed some of the words.

4    A.  On local matters they --

5    Q.  Grievance procedures, step one, step two?

6    A.  Right.  On a grievance procedure, there's a

7    procedure that basically the first grievance is with

8    me.  If it isn't resolved, then it's with me and the

9    national labor officer.

10    Q.  And is it Mr. Fogell who is the business

11    agent for the union with whom you would deal with

12    grievances?

13    A.  Charles Fogell, yes.

14    Q.  And how would you describe your relationship

15    with Mr. Fogell?

16    A.  Good, I guess, you know, business.  I haven't

17    had any problems.

18    Q.  Let me show you another document, if I may.

19    (Exhibit 2 marked

20    for identification.)

21    Q.  I show you what has been marked Exhibit No.

22    2, and I would note that there's a printed notation

23    above, "2-F."  That's my notation to simply indicate

24    that it came from a document that was produced to me

28

1    yesterday by counsel.  Now, my first question is, this

2    was a document that was prepared by you, Mr. MacLean?

3    A.  Yes.

4    Q.  And this is your handwriting?

5    A.  It is.

6    Q.  And when did you prepare this document, sir?

7    A.  This is basically something I put together.

8    I believe it was for what I was going to be

9    talking -- the talking points I was going to have on

10    one of the grievance meetings.

11    Q.  So it was prepared after Mr. Preble was

12    terminated?

13    A.  Yes.

14    Q.  Do you recall how soon or how long after

15    Mr. Preble's termination?

16    A.  Well, I believe this was when I was going to

17    meet with Chuck Fogell, and that would have been during

18    the week or so, I believe.

19    Q.  Now, if we may take a moment to go through

20    this.  First, the first notation is 9/1/00, correct?

21    A.  Right.

22    Q.  And you described an incident involving a

23    door.  You also indicate that -- am I correct, in the

24    very bottom sentence of that paragraph, "No

29

1   disciplinary action taken"? Is that correct?
2       A.   Right. Well, disciplinary action, I gave him
3   a verbal warning. I talked to him. And that was the
4   extent of the disciplinary action.
5       Q.   He wasn't given a written reprimand?
6       A.   No.
7       Q.   You didn't report it to senior management?
8       A.   No. Well, senior management was there at the
9   shop at the time.
10          MS. ANDERSON: Who are you referring to?
11      A.   William Murphy in the shop.
12      Q.   Mr. Murphy was there?
13      A.   Yes.
14      Q.   And tell me, did you -- when this incident
15  occurred, you prepared some notes concerning the
16  incident itself?
17      A.   Actually, no, I don't think I did. I don't
18  remember if I did or not. I don't think I did.
19      Q.   And what was the purpose of your including
20  this particular incident and these talking points?
21      A.   That was part of progressive -- his driving
22  history.
23      Q.   There's a second incident with an arrow which
24  states, "About a week or so after the above incident."

30

1       A.   Oh, yes.
2       Q.   Do you see that?
3       A.   Yes. Walter called Joe on the radio. He had
4   locked his keys in his car, and he was at home at the
5   time.
6       Q.   And this continues onto the second page; is
7   that correct?
8       A.   Yes.
9       Q.   Now, it's a fact, is it not, that Mr. Preble
10  explained to you that he often went home for lunch?
11      A.   The conversation was that -- But he -- First,
12  when the men were given the trucks when we first took
13  over, they were told, with no exceptions, unauthorized
14  use of motor vehicles was forbidden, that was taking
15  the vehicles home, taking vehicles home for lunch,
16  personal use of the vehicles.
17          They were also instructed that since the
18  company name is on these trucks and that they are
19  insured with us and they are our property. I did not
20  want to see any type of speeding or anything like that
21  there. I didn't want them flipping the bird at
22  anybody. They weren't to get into verbal
23  confrontations with anybody. They were to remember
24  that the vehicles had our name on it and they were

31

1   representing us, that they were to follow all the rules
2   and just be gentlemanly on the road. This was in July.
3       Q.   July of 2000?
4       A.   Yes.
5       Q.   Let me, if I may, inquire a little further
6   there. You said you told them?
7       A.   Right.
8       Q.   And it's fair to say there wasn't a written
9   policy that was promulgated given to the employees?
10      A.   No.
11      Q.   Now, let me be clear also in my own mind.
12  Did the employees drive their own vehicles down to the
13  Randolph facility in the mornings?
14      A.   Yes.
15      Q.   And then they were given trucks?
16      A.   Yes. Well, basically they were told this is
17  the arrangement. They were to report to Randolph.
18  I -- MBTA, car, whatever. They were to report to
19  Randolph. From there they were to be assigned vehicles
20  to do the work.
21      Q.   So they would drive their vehicle to the
22  Randolph lot?
23      A.   Right.
24      Q.   They would be assigned a Viacom, was it, or

32

1   TDI? How was it --
2       A.   TDI at the time.
3       Q.   By the way, when did it change its name to
4   Viacom?
5       A.   I believe it was August of 2001.
6       Q.   And they would then --
7          MS. ANDERSON: Just let me make a
8   stipulation for the record. Viacom, Inc. Corporation
9   bought a group of -- well, first they bought TDI. Then
10  they bought another outdoor advertising company based
11  in Phoenix, and to sort of show that it was all one
12  company, they then changed the name of those companies
13  to Viacom Outdoor. But the date of it I'm not sure
14  either.
15      Q.   So they were then told that they would be
16  assigned a vehicle?
17      A.   Right.
18      Q.   And they would also be given a route where
19  they would perform their work installing advertising?
20      A.   Yes.
21      Q.   Now, if I'm correct also, the routes they
22  would be assigned would be within obviously the MBTA
23  area, is that correct?
24      A.   Right.

33

```
1      Q.   And there were specific places where they
2   would be assigned?
3      A.   Certain barns, yes.
4      Q.   Barns?
5      A.   Certain locations, yes.
6      Q.   And was Mr. Preble normally assigned the
7   Albany and Cabot barns, for example?
8      A.   Not normally.  Basically it depended on what
9   needed to be done that day and how many people were
10  sent at certain times.  We do things on a daily basis.
11  Advertising, we get it in, and it has a certain number
12  of days to get it up, the rate of copy.  So depending
13  on how often that barn had been hit, you know, I mean
14  you'll do a swing.  A man would hit almost every barn
15  at one time or another.
16     Q.   So we're clear on the record, for people who
17  aren't familiar with advertising, particularly in terms
18  of moving vehicles, the purpose of going to the barn
19  would be to --
20     A.   Install advertising and frames.
21     Q.   Within the vehicles themselves?
22     A.   Right.
23     Q.   Buses, trains and so forth, correct?
24     A.   Or stations, whatever.
```

34

```
1      Q.   Now, after they completed their work in a
2   given day, employees were then to drive back to the
3   Randolph facility?
4      A.   Right.
5      Q.   And leave off the vehicles?
6      A.   Right.
7      Q.   And there was a certain period of time during
8   the day, was there not, when employees were permitted
9   to take lunch?
10     A.   Yes.
11     Q.   And they were not compensated for that lunch;
12  isn't that correct?
13     A.   No.  It was 7:30 to 4 o'clock with a half
14  hour off for lunch.
15     Q.   And it's fair to say also that Viacom didn't
16  make any -- or TDI at the time -- any provisions to
17  provide the employees with lunch; isn't that correct?
18     A.   No.
19     Q.   So they were pretty much on their own when
20  they ate lunch; isn't that correct?
21     A.   As long as it was on their route.  Most of
22  the drivers brought their lunch.  Most people brought
23  their lunch.  If there was a McDonald's or something
24  that was on their route, yes.
```

35

```
1      Q.   Well, now, what was your definition of on the
2   route?
3      A.   On route was the shortest and quickest way to
4   the barn.  And it was always pointed out that their
5   homes were not the route.
6      Q.   What if there were no restaurants on the
7   route; what were they supposed to do then?
8      A.   If they found that, I think what they should
9   have done or would have been the correct thing to do
10  was to tell me and bring it up and let me know.
11     Q.   Now, it's clear also at some point that
12  Mr. Preble communicated to you the fact that he was a
13  diabetic, did he not?
14     A.   Not really.  How I got that he was
15  diabetic?  I mean he didn't specifically tell me he was
16  diabetic and he didn't specifically ask for anything.
17  I think it was October, right after Viacom -- right
18  after we changed the name to Viacom Outdoor, we were
19  all issued new medical cards.  He had not received his
20  card yet.  He went out to get some medication.  He
21  called me and told me he needed to get some medication.
22  He didn't have the -- They wouldn't take his card, what
23  should he do.  I asked him if he had the money on him
24  to pay it, and he says.  I told him, "Well, why
```

36

```
1   don't you pay it.  I'll give you the money when you get
2   here."  He said he needed the medicine.
3           I told him I'd give him the money when he
4   got here, and when he got it all straightened out with
5   the -- our medical provider, that we'd handle it then.
6   When he came back into the shop, he came in, and I was
7   sitting at the desk.  And he said something about, yes,
8   I had to stop.  I had to get test strips or what have
9   you.  And I figured test strips are for diabetes.  He
10  didn't say that there was a problem with it or anything
11  else.
12          And that was it.  And the next thing I
13  heard -- The next time I heard of diabetes was in a
14  telephone interview with DET when she said something
15  about he said he had to go home to get his diabetes
16  strips.  I told her that was the first I heard that.
17     Q.   And by DET, you're referring to the
18  Massachusetts Division of Employment Training?
19     A.   Yes.
20     Q.   Now, tell me, in Exhibit No. 2, if we look at
21  the second page, this paragraph which began on the
22  previous page is rather expansive.  What was the reason
23  why you wrote so much about this particular issue of
24  having lunch and going off route?
```

**37**

1    A.   No.  It's that he had been issued a warning,
2    and when he came back -- He locked the keys in the car.
3    What happened was Joe Maykis came by my desk and he
4    said, "I have to go out."  And this was -- We were
5    fairly new here.  He says, "I have to go out.  I have
6    to bring the keys to Walter."  I said, "Well, where are
7    you going?"  "Why, what happened?"  He said, "He locked
8    the keys in the car" -- "in the truck."  And I said,
9    "Well, where did he lock the keys in the truck?  Where
10   are you going?"  He said, "At his house."
11       And I told Walter -- I told him to make sure
12   he comes back and tells me or have Walter see me as
13   soon as he got back.  Walter didn't call me.  He called
14   Joe and asked Joe if he could get the keys and bring
15   them out.  And I don't know if Joe was supposed to say
16   anything to me or not.
17       I know when Walter came back -- I had given
18   him warnings about taking the vehicle off route and I
19   wanted to make sure that he understood it, that we
20   weren't going to have a problem with this.  I don't
21   want to see anything develop where I have to
22   discipline, suspend or anything else, if I can get rid
23   of it with a couple of warnings and the person
24   understands and there's a rule on it and changes his

**38**

1    ways.  And that's why I gave him this warning.
2        And during it he told me that he had been
3    used to -- I believe this is the one where he was used
4    to taking the truck home for 23 years, et cetera, and I
5    told him that was the end of that policy.  You're
6    driving our truck now.  This is a new company, a new
7    policy, and you are not to take your vehicle home for
8    lunch.
9        And I don't know if I ever noted it in this
10   or not, but I know that about two weeks afterwards I
11   again reminded him of this.  I asked him if he was
12   taking the truck home.  He said no.  And he said, "But
13   I don't understand why I can't."  And I told him why he
14   can't.
15       Q.   By the way, how do you recollect the dates
16   when you had these conversations?  Did you take notes?
17       A.   No.  The dates on -- On most things I have a
18   note.  On this thing here, I have the date here because
19   this was the -- this was the Friday before Labor Day.
20   It was the Friday before Labor Day on that.  This here,
21   I don't have a date on that.  I don't have a date on
22   when I spoke with him the second time on that.
23       Q.   And prior to your preparing this particular
24   narrative, Exhibit No. 2 to which we're referring, did

**39**

1    you prepare some other written document about these
2    incidents?
3        A.   A record in the file.  I might have taken
4    these things -- gone through the file and taken these
5    things.
6        Q.   Would you have then placed a copy in
7    Mr. Preble's personnel record?
8        A.   Of what?
9        Q.   Of this incident, for example, the one we've
10   just been discussing about the lunch and dropping the
11   keys in the car -- locking them.
12       A.   No, because I believe that was after.  After.
13   These are recollections more, I think.
14       Q.   And if we just focus in on this incident
15   which continues on page 2 and stops with the
16   "unauthorized use of company vehicle."  Did you issue
17   Mr. Preble a written warning or reprimand?
18       A.   No, I did not.
19       Q.   And to be clear also, there was no written
20   policy in effect about what constituted staying on
21   route; isn't that correct?
22       A.   Right.
23       Q.   And there was no written policy about what
24   constituted unauthorized use of a vehicle; isn't that

**40**

1    correct?
2        A.   Right.
3        Q.   Now, the next incident you make reference to
4    is a 10/23 incident, "Issued verbal warning"?
5        A.   What --
6        Q.   If you would tell us about that.
7        A.   This is the -- 10/23.  I don't have the -- Is
8    that the --
9        Q.   I'll show you a copy of a position statement.
10       A.   Is that the one where the Randolph Police
11   came into the shop at night?
12           MS. ANDERSON:  Yes, it is.  This is the
13   position statement.  You want to read this.
14       Q.   There's a document that would refresh your
15   recollection, the position statement?
16       A.   Yes.
17       Q.   Go ahead.  Take a moment, if you would.
18       A.   I believe I remember now.
19           MR. NEVINS:  While he's reading that,
20   let me, if I may, also just request that this be marked
21   as the next exhibit, which would be 3.
22           (Discussion off the record.)
23           (Exhibit 3 marked
24               for identification.)

---

**41**

1    Q.   Mr. MacLean, if I may just direct your
2  attention to what has now been marked as Exhibit No. 3,
3  page 3, this third incident on October 23, 2000. To be
4  clear, first of all, this -- the description of this
5  incident in the position statement is the one to which
6  you refer in your handwritten notes, Exhibit No. 2?
7    A.   Right.
8    Q.   Is that correct?
9    A.   Yes.
10    Q.   Now, if I direct your attention to the
11  position statement itself, which has a narrative, you
12  informed Mr. Preble that if an incident of this nature
13  occurred again he would be dismissed?
14         MS. ANDERSON: You're directing his
15  attention to the third incident part of it?
16    Q.   Yes, I am.  Third incident, October 23, 2000.
17  Do you see that?
18         MS. ANDERSON: The bottom of page 3.
19    Q.   Tell me if I've read this correctly.
20  "However, Mr. MacLean" --
21         MS. ANDERSON: Tell him where you're
22  reading, if you would.
23    Q.   The very bottom of the page, last sentence,
24  the bottom of the page.

---

**42**

1    A.   Yes, I see that.
2    Q.   "However, Mr. MacLean told Mr. Preble he
3  would be dismissed the next time he engaged in
4  aggressive behavior while driving a company vehicle."
5  Have I read that correctly?
6    A.   Right.
7    Q.   Is that what you told him?
8    A.   I'm not 100 percent positive I said
9  dismissed or could be -- lead to dismissal, you know,
10  further -- further discipline, but it could be a
11  dismissal.
12    Q.   Now, this incident is one that resulted in
13  your issuing -- Well, what did you do with respect to a
14  warning to Mr. Preble?  Was it verbal, written?
15    A.   Verbal.
16    Q.   Not one that was communicated to senior
17  management, management above your level?
18    A.   No, not...
19    Q.   Was a written reprimand or record of this
20  incident placed in Mr. Preble's personnel record?
21    A.   No.  Just my notes.
22    Q.   When you prepared your notes on this
23  incident, did you tell Mr. Preble that you in fact had
24  prepared notes?

---

**43**

1    A.   No.
2    Q.   Did you ever, by the way, tell your employees
3  that it was your practice to maintain notes involving
4  infractions?
5    A.   Yes, I told some.  I told Kenny Barrus that.
6    Q.   Why did you tell Kenny Barrus that?
7    A.   He was a union steward.  Basically I told him
8  any discipline.  Because I notify him on any
9  discipline.  I told him I keep notes.
10    Q.   Did you tell Kenny Barrus at any point that
11  you kept notes on Walter Preble?
12    A.   I don't know specifically.
13    Q.   Did Kenny Barrus ever tell you or express to
14  you any position of the union regarding notes about
15  disciplinary proceedings that were kept by management?
16    A.   No.
17    Q.   Did he ever suggest to you that there was a
18  union policy that you couldn't keep private notes on
19  employees?
20    A.   No.
21    Q.   Did you ever have any conversations with
22  anyone at TDI, or later Viacom Outdoor, in which you
23  discussed whether you could keep notes involving
24  personnel incidents about employees that were not

---

**44**

1  included in their personnel records?
2    A.   I don't understand.
3    Q.   Well, I'll rephrase it.  Did you ever receive
4  any training on the Massachusetts Personnel Records
5  Act?
6    A.   No.
7    Q.   Are you familiar with the Massachusetts
8  Personnel Records Act?
9    A.   No.
10    Q.   Did anyone at Viacom Outdoor ever tell you
11  that when you prepared notes concerning employees that
12  copies of those notes had to be included in the
13  employee's personnel record?
14    A.   No, but that's what I tried to do.  They are
15  in the personnel records.
16    Q.   They are in the personnel records now?
17    A.   Yes.  If I have one -- I don't know of any,
18  but I believe I kept the notes in the personnel
19  records.
20    Q.   So, for example, when Mr. Preble requested
21  his personnel record from Viacom Outdoor, did he
22  receive copies of all the notes that you had prepared
23  involving disciplinary infractions on his part?
24    A.   Yes.  Up to his termination, yes.

---

45

1    Q.   In addition to the personnel record, did you
2    keep notes somewhere else?
3    A.   No.
4    Q.   This particular Exhibit No. 2, that was not
5    included in his personnel record?
6    A.   No, but this was after his termination. I
7    think that -- I think what I did is I kept his
8    termination up to then. This here was more or less a
9    talking note that was after the termination. And I
10   believe I just kept this with a -- with the grievances
11   or the DET notices or anything that happened
12   afterwards.
13   Q.   Let me direct your attention to the last page
14   of Exhibit No. 2, your handwritten notes. There's
15   reference to an incident on November 16, 2000?
16   A.   Right.
17   Q.   Now, what was the purpose of your reducing to
18   writing this particular incident?
19   A.   That was actually -- I don't think he -- That
20   was an incident he -- Another truck hit him, I believe,
21   a Ford vehicle, if I remember right, hit him, broke the
22   mirror. He went back after him and he got the
23   information from the driver. I put that in there
24   because I didn't know whether anything would come of it

46

1    in the future, the driver would come back at us or
2    anything else. And that was put into his file. Also,
3    it went into the file that basically he knew enough to
4    get the information that was needed.
5    Q.   So this wasn't an incident for which you held
6    Mr. Preble to have been responsible?
7    A.   No. I had no idea -- At the time, I don't
8    know if this guy could have come back at us and said
9    this happened then, so it was kept in the file. But it
10   wasn't a disciplinary thing.
11   Q.   Now, next there's a reference to a 2/14/01,
12   2001 incident. You called it road rage?
13   A.   Right.
14   Q.   And I notice that Exhibit No. 3, the position
15   statement, has a two-paragraph discussion of that
16   particular incident on page 4. Do you see that?
17   A.   Right.
18   Q.   Did you have some other notes beyond this
19   Exhibit No. 2 that had described or discussed the road
20   rage incident?
21   A.   Yes. That should have been in his file.
22   Q.   And did you make any investigation on your
23   own as to the circumstances that surrounded this
24   particular incident?

47

1    A.   Yes.
2    Q.   And what did you do, sir?
3    A.   Well, basically I interviewed Walter and
4    Brian, and they both admitted the incident took place.
5    Q.   And did you interview the driver of the other
6    vehicle?
7    A.   Telephone. I talked to him by telephone on
8    two occasions. I think they recorded it on the
9    following day.
10   Q.   You indicate also that in that incident
11   Mr. -- The driver of that other vehicle, was his name
12   Mr. Gatto?
13   A.   Gatto, yes, I believe.
14   Q.   He worked for the MBTA?
15   A.   As it turned out, he worked -- Yes. He
16   worked at the Charlestown bus garage.
17   Q.   Your notation indicates that you suspended
18   Mr. Preble for one week?
19   A.   Right.
20   Q.   And that was the first time Mr. Preble had
21   been suspended, to your knowledge?
22   A.   Yes.
23   Q.   Would you tell us why -- Well, first of all,
24   who made the decision to suspend him?

48

1    A.   I did.
2    Q.   And what were the reasons you decided to
3    recommend or suspend him for one week?
4    A.   The progressive driving history of his and
5    that on -- he had been given a verbal warning
6    that -- against road rage, what I considered a road
7    rage incident with the -- Go back to what date is that,
8    10/23, to when he had the incident with the driver near
9    the shop on North Street. And he was told at that time
10   that he was to take his foot off the gas in any type of
11   a situation like that, take his foot off the gas, slow
12   down, and let the other guy get away. I don't want any
13   type of confrontation at all because it could escalate.
14   It could be turned into a confrontational thing and
15   that it was completely against the rules. And I
16   believe that's when I told him that further of this
17   could lead to dismissal. I mean but it wasn't just you
18   would be dismissed, but it could lead to dismissal. So
19   that was the second incident of that.
20   Q.   But in the previous incident to which you
21   alluded in October, he did not receive a written
22   reprimand for that incident?
23   A.   No.
24   Q.   Did anyone have to approve the decision to

49

1   suspend above you, or was that entirely your
2   prerogative as an operations manager?
3       A.   That I usually sent down to Magnus
4   Acheampong-Quay, and he approved it.
5       Q.   Could you spell the name, please?
6       A.   First name Magnus, M-A-G-N-U-S, second name
7   Acheampong-Quay, A-C-H-E-A-M-P-O-N-G, dash, Q-U-A-Y.
8           MS. ANDERSON:  And who is that?
9       A.   Magnus Acheampong-Quay is in operations.
10  He's in charge of bus operations.  And I sent -- Any
11  termination I sent down I sent down for his approval or
12  to discipline.  So he approved.
13      Q.   So he approved?
14      A.   Yes.
15      Q.   Do you know whether Mr. Preble grieved his
16  suspension?
17      A.   I heard afterwards he had.  I had no
18  knowledge of it until I believe it was after he was
19  released that I found out that he grieved.  It was
20  through some paper.
21      Q.   Well, if he had grieved it, wouldn't you have
22  known, step one -- wouldn't you have been involved as a
23  party at step one?
24      A.   Right.

50

1       Q.   So you never were approached at step one of
2   any grievance?
3       A.   No.
4       Q.   So, so far as you know, nobody ever
5   approached you from the union at step one saying we
6   have a grievance over a suspension?
7       A.   No.
8       Q.   Did you ever discuss with Mr. -- Is it Kenny
9   Barrus?
10      A.   Barrus.
11      Q.   -- Barrus or Mr. Fogell why it was that a
12  step one grievance was never presented?
13      A.   No.  I believe that -- Do we have the letter
14  of suspension?
15      Q.   Well, we'll get to that in a while.  If I may
16  now continue on Exhibit 2, there's a -- is it a 7/27/01
17  incident, "Barrus" --
18      A.   Where?  Yes.
19      Q.   Now, again, this is the union steward,
20  correct?
21      A.   Yes.
22          MS. ANDERSON:  For the record, Barrus is
23  spelled B-A-R-R-U-S.
24      Q.   I'll show you a document, if I may, that I

51

1   ask be marked as Exhibit No. 4.
2           (Exhibit 4 marked
3           for identification.)
4       A.   These two are out of order.
5       Q.   I was giving them to you in the order in
6   which I received them.  So what did you do?  You took
7   them apart?
8       A.   Yes.  This here's the second page of the
9   notes.
10      Q.   Where's the top part that has the exhibit
11  number on it, though?
12      A.   Right here, the second page.
13          MS. ANDERSON:  So you're saying that
14  that's really page 2?
15          THE WITNESS:  Right.
16          MS. ANDERSON:  And the page under it
17  that's dated 7/27/01 is page 1?
18          THE WITNESS:  Yes.
19          MR. NEVINS:  Well, the record has to
20  reflect that counsel is adding a notation to the
21  exhibits, page 1, page 2, so forth.  That's the actual
22  exhibit.
23          MS. ANDERSON:  I'm sorry.  I thought I
24  was writing on the one to me.  It's not going to change

52

1   the outcome of the case.
2       Q.   Now, Mr. MacLean, let me -- let's take them
3   in the sequence in which I have them in.  I think first
4   you wanted to say something, if you would, in terms of
5   the order.
6       A.   What I want to say is that the way it was
7   handed to me, the note on top -- the thing is marked
8   No. 4.  The note on top is actually the continuation of
9   the page underneath it.
10      Q.   Okay.  Got you.  Now, first of all, let's
11  take -- spend a moment on the note itself.  And I guess
12  we'll start from the second page, keep it that way,
13  7/27, 3:45.  The reference is to Ken.  That's
14  Mr. Barrus?
15      A.   Right.
16      Q.   And tell me, if you would, this is a
17  conversation that you had with Mr. Barrus?
18      A.   Right.
19      Q.   And whose handwriting is this note?
20      A.   That's mine.
21      Q.   So you reduced it to writing?
22      A.   Yes.  This is notes, yes.
23      Q.   And is this a note which at any point you
24  showed to Mr. Preble?

53

1    A.   No.

2    Q.   And you kept this -- Where did you keep this

3   note?

4    A.   This was in Mr. Preble's file.

5    Q.   And did you have control or custody of the

6   personnel files?

7    A.   Yes.

8    Q.   Did you ever tell your employees, by the way,

9   that they had the opportunity to come in and review the

10  files, look at them if they wanted to?

11   A.   No. I don't think I specifically did, but if

12  they did come in and asked to see their file, I showed

13  it to them.

14   Q.   Now, why did you make a note about this

15  incident?

16   A.   Because basically Kenny was -- They had come

17  back after being out in Charlestown at the end of the

18  day.

19       MS. ANDERSON:  Who is "they"?

20   A.   Kenny and Walter. Kenny called me aside and

21  he asked me -- He basically didn't want to get into

22  trouble. He knew that he had been issued warnings

23  that -- you know, on the use of the vehicles. And they

24  were also told that as a team when they go out

54

1   together, if somebody's doing something that they

2   shouldn't be doing, separate yourself from them because

3   you will be disciplined along with that person if you

4   don't.

5       So you have to make sure that, you know, you

6   don't go along with somebody. If they're going to be

7   breaking the rules and everything, discipline yourself,

8   cut yourself off. I think at the time I told them, if

9   you have to, you have a work order, you rip the work

10  order in half, put your name on one side, give the

11  other guy the other side, and let him explain why it

12  didn't get turned in, if you didn't want to get into

13  it, you know.

14      So that Kenny came to me and he told me that

15  basically here he doesn't know how to handle the

16  situation with Walter. Walter takes the truck home for

17  lunch or he takes off, and he's afraid he's going to

18  get on his watch, as he put it, "On my watch, I'm

19  worried to get myself in a jam." I guess he's talked

20  to Walter about it, and it didn't seem to help.

21      So I didn't want -- And he asked me if he

22  could -- He didn't want me to tell Walter that he had

23  told me, if he could keep out of it. I told him I

24  would try to keep him out of it. I didn't approach

55

1   Walter that day, but I made a note that I would talk to

2   Walter. I would talk to everybody, because I wasn't

3   out to discipline Walter basically. I was trying to

4   warn him that his continuing behavior was leading to

5   worse discipline, and I was trying to give a warning.

6       And I gave another warning to the men all

7   together. I made sure Walter was there. I made sure

8   they were all together, and I made a specific warning

9   of the use of the company vehicle.

10   Q.   So, to be clear, you didn't have any personal

11  conversation with Walter Preble where you said,

12  Mr. Preble, I've had a report that you're going home,

13  doing errands?

14   A.   Not on this, no.

15   Q.   Let's be clear also. Mr. Barrus is a shop

16  steward?

17   A.   Yes.

18   Q.   So as a shop steward, one of his

19  responsibilities is to represent employees in

20  grievances?

21   A.   Right.

22   Q.   And did Mr. Barrus have a habit of regularly

23  coming in and exchanging confidences with you?

24   A.   No. I believe this here -- On this one it

56

1   was basically he was worried about that he was going to

2   get --

3    Q.   And he told you he was worried?

4        MS. ANDERSON:  Let him finish his

5   answer. That he was going to get?

6    A.   That he'd be caught in something or lose his

7   job or be disciplined.

8    Q.   And did Mr. Barrus previously have

9   conversations with you about his relationship with

10  Mr. Preble?

11   A.   No.

12   Q.   How long had Mr. Barrus been employed for

13  TDI, Viacom, its predecessors?

14   A.   By its predecessors, I believe he's there 20

15  years. I'm not sure. He went to work in 1981. He

16  started in 1981, but with TDI since July of 2000.

17   Q.   And tell me as a -- in your capacity as an

18  operations manager, have you found Mr. Barrus to be an

19  aggressive shop steward representing employees?

20   A.   I don't think he's -- As far as I've heard of

21  other union shops or anything else or horror stories of

22  what is overly aggressive or not, no, he's not overly

23  aggressive.

24   Q.   How many grievances has he presented to you

**Gabriel & Sweeney Court Reporting**