**57**

1  since you became an operations manager?
2      A.  Maybe one or two.
3      Q.  I notice also on page 2 there's a note which
4  is lighter.
5      A.  Yes.  That's a note I made -- I made it the
6  following date because I was wondering what I could do
7  with this.  Basically I didn't want to -- I didn't
8  really want to discipline, suspend or anything like
9  that there, and I was hoping that I could get a point
10  across somehow to put an end to this.  And I made a
11  note to give him a warning, but I didn't want to make
12  it the very next day that Kenny had talked to me and
13  involve Kenny into it.
14      Q.  Could you read that, please, aloud slowly?
15      A.  "Walter's been warned about this before, in
16  parentheses, last August and sometime in September.
17  Short of letting Ken take heat, get warning to all of
18  immediate dismissal for this violation.  Maybe it will
19  cut it short."
20      Q.  What did you mean by the phrase "maybe it
21  will cut it short"?
22      A.  Maybe it will -- I was hoping to, for lack of
23  a better word, smarten Walter up so that it wouldn't
24  continue to a point where he would have to end up being

**58**

1  suspended or terminated or for any other reason, that
2  he'd get the rule.
3      Q.  Now, you hadn't received any other complaints
4  about any other employees taking vehicles, doing
5  errands or other things, had you?
6      A.  No.
7      Q.  Do you know whether other employees ever took
8  the vehicle, quote, unquote, off route?
9      A.  To my knowledge, no.  I imagine that some may
10  have gone off, but I had no way of knowing it.  I had
11  no reason to believe they did.
12      Q.  Now, on the last page there's a script
13  notation, "Day crew gathered around clock."
14      A.  Yes.
15      Q.  Is that your note again?
16      A.  Yes.
17      Q.  You say, if I look at that first paragraph,
18  the last line, "Kenny, Walter, Brian," and is that
19  Joey?
20      A.  Joe Maykis was -- he was the lead man.
21      Q.  Okay.  So this message was communicated to
22  these four individuals?
23      A.  Right.  It was also communicated to the night
24  crew, but I didn't put it in there.

**59**

1          MS. ANDERSON:  What did you say?
2      A.  I also communicated that to the night crew
3  too, but I didn't -- that's not in here.
4      Q.  Now, the last two notations deal with this
5  incident in December, the off-road accident; is that
6  correct?  If you look at Exhibit No. 2, your notes.
7  12/11/01.  Is that correct?
8      A.  Yes.
9      Q.  I'll be asking some questions about that
10  specifically.  Let me show you, if I may, another
11  document.
12          (Exhibit 5 marked
13           for identification.)
14      Q.  I want to show you what's been marked Exhibit
15  No. 5.  Now, this is a two-page document.  First
16  question I have is I notice there's a name at the top,
17  Sandy.  Is that a he or a she?
18      A.  Sandy is the -- She was the DET officer who
19  called the first time that we had a -- that Walter
20  applied for unemployment.  She worked for unemployment,
21  DET.  She called to give a telephone interview, I
22  guess.
23      Q.  Now, there's some --
24      A.  And she had asked for a copy of this.

**60**

1      Q.  There's a script in the middle, "Whose fax
2  number is this?"  Whose handwriting is this, if you
3  know, sir?
4      A.  I don't know.
5      Q.  There's a signature at the bottom or there's
6  a notation, "1/10/02."  And that may be a name above
7  it?
8      A.  Is that "faxed out"?
9      Q.  Is that what it says?  You don't see a name?
10      A.  "Faxed out."  I don't know.
11      Q.  Now, I notice also if you look at the top
12  there's a notation.  Is that "Ed," if you know?
13      A.  Yes.  Ed faxed this over to Sandy.
14      Q.  Who is Ed?
15      A.  He's the operations -- He's the office
16  manager for operations.
17          MS. ANDERSON:  What's his last name?
18      A.  Ha, H-A.
19      Q.  He works with you?
20      A.  Yes.
21      Q.  And he faxed this over to Sandy.  And do you
22  know Sandy's last name?
23      A.  No, I didn't.  She just gave a -- I don't
24  think she gave me the last name, or I didn't know it at

61

1  the time. It was right after the conversation. She
2  asked me if I had a letter of suspension -- Is that
3  what it is? Yes, a letter of suspension. And I faxed
4  that to her and I just handed it to Ed. I said, "Ed,
5  please fax this to Sandy," and I gave him the telephone
6  number.
7      Q. Let me show you another document, if I may.
8          MR. NEVINS: And this will be Exhibit
9  No. 6.
10         (Exhibit 6 marked
11         for identification.)
12     Q. Now, this is a four-page document. And
13  I know that -- If I would just say for the
14  record -- Go ahead. You can take a look at it. It
15  involves -- well, a series of documents which I'll
16  inquire into. You may take a moment.
17         (Pause.)
18     Q. First question, page 1, Mr. MacLean, is that
19  your signature?
20     A. Yes, it is.
21     Q. And termination, the reason checked is
22  unauthorized use of company vehicle?
23     A. Right.
24     Q. And that particular phrase, was that

62

1  the -- the use of that phrase, was that your phrase or
2  was that a phrase that was suggested to you by --
3      A. No, that was my phrase, "unauthorized use of
4  company vehicle."
5      Q. Now, take a look at page 2. That's a copy of
6  the termination notice that you gave to Mr. Preble; is
7  that correct?
8      A. Right.
9      Q. Page 3 begins a facsimile, name is Magnus?
10     A. Sent to.
11     Q. Sent to. And Magnus' last name has
12  previously been --
13     A. Acheampong-Quay.
14     Q. And then on page 4, Boston Operations -- Let
15  me ask you first, if I may, the Randolph facility, do
16  you refer yourself to the Randolph facility as the
17  Boston Operations?
18     A. Yes.
19     Q. And the name is Carol at the top?
20     A. Carol is -- Carol Gomez, she works in
21  payroll, payroll out of New York.
22     Q. And it's from Ed again?
23     A. That's from Ed, yes.
24     Q. And his last name again is?

63

1      A. Ha, H-A.
2      Q. And do you know whether this is -- The script
3  to Carol, is that from Ed?
4      A. Yes. It looks like his writing.
5      Q. Let me, if I may, ask you some questions
6  involving this incident with Mr. Preble's termination.
7  On the day of the incident, December 11, 2001,
8  Mr. Preble and his partner were assigned to the Cabot
9  and Albany garages; is that correct?
10     A. Three barns that day. I'm not sure.
11  Bartlett, Albany Street and Cabot Street.
12     Q. Albany Street, Cabot Street. And what was
13  the third barn?
14     A. I believe the first one was Bartlett.
15     Q. Who was his partner on that day?
16     A. Kenneth Barrus.
17     Q. The shop steward?
18     A. Yes.
19     Q. Now, for the record also, where is the
20  Bartlett garage?
21     A. The Bartlett garage is on Washington Street
22  in Roxbury. It's almost adjacent to Dudley Street
23  Station.
24     Q. And the Albany Street garage, for those who

64

1  do not reside in Boston?
2      A. Is on Albany Street toward the end of
3  Harrison Avenue, down toward -- past the New England
4  Medical Center.
5      Q. Down in the vicinity of the Southeast
6  Expressway; is that correct?
7      A. Right.
8      Q. And the Cabot garage or Cabot barn is located
9  in South Boston; is that correct?
10     A. Yes.
11     Q. And it's a fact also that Mr. Preble resides
12  in South Boston; is that true?
13     A. Correct.
14     Q. And South Boston, also to be clear on the
15  record, is a small geographic peninsula?
16     A. Right.
17     Q. A couple of square miles?
18     A. I'm not familiar with it, but if you say so.
19     Q. Now, was there any sequence that the Randolph
20  office insisted by which these three barns were to be
21  serviced by Mr. Barrus and Mr. Preble on that day, on
22  December 11?
23     A. Yes, basically in order, Bartlett, Albany and
24  Cabot.

**65**

1  Q. So they were going to go the Bartlett garage
2  first in Roxbury?
3  A. Yes. Usually that's what -- if they have
4  need to change it, they have a radio with them. They
5  can call in if they have to change. If they get to
6  Bartlett, there's nothing there, they go on to
7  somewhere else, they have a radio, they can call.
8  Q. Are you familiar with the Dudley Street area?
9  A. Right.
10  Q. And individuals who worked for TDI and then
11  Viacom when they serviced the Bartlett street garage in
12  Roxbury, do you have any knowledge as to whether they
13  felt comfortable taking lunch in the vicinity of the
14  garage?
15  A. I never had them come to me, approach me and
16  say they had problems with it.
17  Q. Are you familiar with the area?
18  A. Yes. And, to be honest with you, I had no
19  problems having lunch there.
20  Q. Do you know whether there are a lot of
21  restaurants located in that area?
22  A. No. But usually if there's a barn around,
23  there's usually a place to eat. They do have catering
24  trucks near the barns. If a barn has a number of

**66**

1  employees, there's usually an area right nearby that
2  you can eat.
3  Q. And if there were a catering truck, it's fair
4  to say that a catering truck would have only certain
5  kinds of food, donuts, cakes, things of that nature?
6  A. Yes.
7  Q. Albany Street, the barn, you're familiar with
8  that area?
9  A. Yes.
10  Q. And it's fair to say there aren't any
11  restaurants near that facility?
12  A. Not in that immediate area, no.
13  Q. So if an employee didn't bring his lunch with
14  him, he would have to go somewhere else --
15  A. Right.
16  Q. -- to obtain lunch; isn't that correct?
17  A. Yes.
18  Q. And did you have any specific requirements or
19  preferences as to which direction that employee drove
20  if he needed to get lunch?
21  A. Hopefully it would be on route. As I said,
22  nobody's ever come to me and told me beforehand that
23  they were having trouble getting a place to eat. If
24  they had, I would have done something about it. All I

**67**

1  know is that most drivers -- as far as I knew, all the
2  drivers brought their lunch or had a place to eat
3  nearby.
4  Q. Now, you said hopefully it would be on route.
5  Well, if we take Albany Street, did you have some
6  understanding of what the route would be there?
7  A. The shortest way to the barn, which -- you
8  know, from barn to barn. And these people were
9  all -- they all knew it. They all had a history of
10  driving to these places.
11  Q. So if they're at the Albany Street barn, to
12  explore this hypothetical, and they didn't take their
13  lunch with them, they needed to get lunch, if they went
14  to the -- if they drove north, would that be considered
15  off route? If they drove north, they'd be heading into
16  the vicinity of the New England Medical Center, for
17  example.
18  A. No. If it was a route to and from their
19  barns, or -- and, as I say, if they had to go off route
20  to get lunch, they could have called and got
21  permission.
22  Q. So you required that they call if they went
23  to get lunch somewhere else off route?
24  A. I didn't really tell them that, no.

**68**

1  Q. Now, do you know whether there were any
2  restaurants on the route between the Albany Street barn
3  and the Cabot Street?
4  A. Down in that area, that Broadway, yes,
5  there's a couple of restaurants down in the Broadway
6  area. There's a McDonald's. There's a sub place down
7  there. There's a donut shop.
8  Q. Do you have any knowledge as to whether -- Do
9  you have any personal knowledge as to whether a
10  McDonald's or a donut shop would be an appropriate
11  place for someone suffering from diabetes to take
12  lunch?
13  A. No.
14  Q. Now, you became aware of the -- Mr. Preble's
15  activities on December 11 the following day; isn't that
16  correct?
17  A. The following day, yes.
18  Q. And did you have a conversation with
19  Mr. Barrus first?
20  A. No.
21  Q. Did Mr. Barrus complain to you that
22  Mr. Preble had gone home to take lunch?
23  A. No.
24  Q. In fact Mr. Barrus was working at the Albany

69

1   Street garage, was he not, around lunchtime, if you
2   know?
3       A. Yes. Afterwards I found out, yes.
4       Q. And Mr. Preble was going to the Cabot Street
5   garage to service that facility?
6       A. Yes.
7       Q. Was that a one-man job?
8       A. No, it's usually a two-man job. Or he makes
9   you stay together because of one radio and the truck,
10  and the team stays together.
11      Q. And how did you become aware of this
12  incident?
13      A. Walter came into my office. I had worked the
14  night before and I didn't get into the shop until about
15  10:30.
16          MS. ANDERSON: A.m. or p.m.?
17      A. A.m. And Walter came into the shop and, my
18  recollection, he said he had a minor accident the day
19  before. And I said, "What do you mean you had a minor
20  accident the day before?" And he said, Well, I was on
21  my way to Cabot, or something, and I hit a parked car.
22  I didn't know I hit the parked car. I went around the
23  corner, and a policeman flagged me down and told me to
24  go back and put my information on the vehicle. I told

70

1   him I thought it was a very serious matter and how come
2   he didn't tell me about this earlier because basically
3   I was in the shop the day before, and he didn't tell me
4   then.
5       Q. Why did you tell him you thought it was a
6   serious incident?
7       A. Because he was off route again. Where he
8   told me the accident was, he was at least a block and a
9   half off route, and also an indication that he had been
10  going home. In fact I told him, you know, I said to
11  him, "You were off route." And he said to me, "Define
12  route." And I said to him, "Off route" -- "Define
13  route is the shortest and quickest way to and from the
14  barns, and you know that you were off route and your
15  street is not part of your route." And he did not deny
16  that he was on his street.
17      Q. Tell me, is it your position as an operations
18  manager that when the employees -- Well, let me break
19  this down into a couple of questions. When employees
20  are -- take lunch, are they on the clock or off the
21  clock?
22      A. Well, they're off the clock.
23      Q. They're on their own time?
24      A. Yes.

71

1       Q. Is it your position as an operations manager
2   that when an employee is off the clock on his own time,
3   he is still subject to the work rules that you
4   communicate to the employees?
5       A. If they're driving a company vehicle and it
6   involves the company, yes.
7       Q. Now, this particular work rule was never
8   negotiated with the union; isn't that correct?
9       A. Which work rule is that?
10      Q. Well, being off route, for example.
11      A. I don't know if that was negotiated
12  specifically for that, but the work rules on
13  the -- What would you call it? -- the addendum to the
14  contract, the last page of the contract calls for that
15  basically the management has the right to set certain
16  work rules, et cetera, and that -- although they aren't
17  listed on a page, and the union has the right to grieve
18  those rules, regulations or whatever.
19      Q. My question is in terms of the specific
20  language of the contract, there's no description or
21  definition of route?
22      A. No.
23      Q. Correct?
24      A. Right.

72

1       Q. And to explore your understanding of
2   management prerogatives under the collective bargaining
3   agreement, is it your understanding that any rules that
4   management adopted would have to be applied fairly
5   evenly and consistently to all employees?
6       A. Yes.
7       Q. Now, when you became aware of this incident
8   and you told Mr. Preble that you considered it to be a
9   very serious -- or fairly serious incident, with whom
10  did you speak at Viacom management thereafter?
11      A. Thereafter? After the conversation I had
12  with him I spoke to William Murphy. I told him what
13  had happened, what my interviews with Walter had
14  brought. Actually, I told Walter -- I believe that day
15  after the talk I told him to go out. He wasn't to
16  drive, come back in the afternoon, and I'd give him my
17  decision then. And in discussion with Bill Murphy, I
18  decided I was going to terminate Walter.
19      Q. And why did you do that, sir?
20      A. Walter throughout all the progressive
21  disciplines, et cetera, refused to take the
22  responsibility or show any reason to give hope that he
23  would change his behavior; that essentially -- And in
24  fact I think I told him on more than one occasion.

73

1   That was the biggest problem that I saw; that because
2   he wouldn't accept the responsibility, that nothing was
3   going to change and we'd have these things again,
4   eventually it was going to get out of hand where
5   somebody was going to get hurt.
6          He was putting his co-workers at jeopardy on
7   their jobs. If he was terminated or he was doing
8   something wrong and they had to go along with him, he
9   wasn't respecting their rights. So basically that's
10  why he was progressive, and I saw that nothing was
11  changing. It was just getting out of hand. It was
12  just going to go, you know --
13         And he had been given the progressive
14  discipline. He had been warned of it. He did know
15  that when he took that truck home that day he was
16  breaking the rule; that he had been warned about this,
17  everybody had been warned about this, and he knew that
18  he was breaking the rule.
19     Q.  Well, let's talk a little bit about the
20  progressive discipline. He received at some
21  point -- He was suspended in February; is that correct?
22     A.  Yes.
23     Q.  But that wasn't an incident involving
24  unauthorized use of the vehicle, was it?

74

1      A.  In February?
2      Q.  Yes.
3      A.  Unauthorized use of the vehicle, yes. He had
4   been warned against -- When given the trucks and other
5   times too, when they were given the trucks, they were
6   told how to act with the vehicles; that they weren't to
7   engage in any type of unsafe driving; that they were
8   not to -- well, at the time I think I told them flip
9   the bird or get into any verbal confrontations with
10  people.
11     Q.  So you considered those to --
12     A.  And he also passed --
13     Q.  I'm sorry.
14     A.  -- in a lane that is a left-hand turn lane,
15  and it's a short enough left-hand turn lane, in order
16  for him to pass this vehicle it had to be at a high
17  rate of speed. I don't care if the guy was doing 20
18  miles an hour.
19     Q.  So to be clear in my own mind, it's your
20  position that that kind of an incident that occurred in
21  February constituted unauthorized use of a vehicle
22  also?
23     A.  Yes.
24     Q.  And you found that to be similar to the

75

1   incident for which you decided to terminate him or
2   discharge him from employment, December 11?
3      A.  Yes.
4      Q.  But December 11, the incident did not involve
5   an issue of road rage, though, did it?
6      A.  No, it did not.
7      Q.  At the time you made this decision to
8   terminate Mr. Preble, did you take a look at his
9   driving record with the Registry of Motor Vehicles?
10     A.  No. I had the -- Basically what I had is his
11  driving record that he had with us.
12     Q.  His driving record, as far as the Registry of
13  Motor Vehicles was concerned, was fine; is that
14  correct?
15     A.  Yes, I guess.
16     Q.  Let me show you a last document, if I may.
17        (Exhibit 7 marked
18        for identification.)
19     Q.  I want to show you what has been marked as
20  Exhibit No. 7. Have you ever seen this document
21  before?
22     A.  No.
23     Q.  That's just a yes or no.
24     A.  No.

76

1      Q.  And tell me, did you have -- you didn't have
2   any -- Well, did you have any concerns at the time this
3   December 11 incident was described to you that
4   Mr. Preble had not properly identified himself to the
5   police or to anyone else?
6      A.  Repeat that again.
7      Q.  At the time you made the decision to -- After
8   the incident was reported to you --
9      A.  Right.
10     Q.  -- the following day, I guess, December 12,
11  did you have any concerns that Mr. Preble hadn't
12  properly identified himself to the police?
13     A.  That he hadn't properly?
14     Q.  Had not, yes.
15     A.  Not that, no.
16     Q.  That wasn't a concern on your part?
17     A.  No. My concern was that he had hit the
18  vehicle and he had to be flagged down by a police
19  officer and told to go back to it; and that when he did
20  return, he didn't get enough pertinent information on
21  the vehicle to -- But I didn't think that -- I believe
22  that when Walter told me that he went back and put
23  the information on the vehicle, I didn't think that
24  he -- it didn't enter my head that he left a false note

**Gabriel & Sweeney Court Reporting**

77

1  or anything like that.
2      Q.  So to be clear, then, the reason you made a
3  decision to terminate Mr. Preble's employment was
4  because you didn't consider him to be -- well, if I may
5  use the term, you considered him to be incorrigible?
6      A.  At that point, yes, on that.
7          MR. NEVINS:  I haven't any further
8  questions.  Do you want to take a break for a moment?
9          MS. ANDERSON:  Yes, let's take a break.
10     (Recess taken.)
11         CROSS-EXAMINATION
12 BY MS. ANDERSON:
13     Q.  Dick, I just have a few questions to clarify
14 the record.  You said that -- Directing your attention
15 to July of 2000, you said that you spoke to employees
16 about the use of the vehicles?
17     A.  Right.
18     Q.  Do you know if the employees when they worked
19 for Park had vehicles?
20     A.  Under Park, I assume from what was left
21 there, Park Transit I think had two vehicles, and that
22 the -- a lot of times the workers would take their own
23 vehicles.
24     Q.  Take them where?

78

1      A.  When they needed extra vehicles, they'd use
2  their vehicles between the barns and everything.
3      Q.  During the workday or getting to and from
4  work?
5      A.  During the workday.
6      Q.  And how many vehicles did TDI acquire?
7      A.  We ended up with eight total.  There was
8  enough vehicles basically to send teams out, and they
9  have everybody out in the shop at the same time.  And
10 in fact that was part of the rule, was that they were
11 not to use their own vehicles.  They were using company
12 vehicles.
13         I gave them a talk at the time about the use
14 of the company vehicles; that they weren't allowed to
15 take the vehicles home for lunch, that they weren't
16 allowed to go off route.  They knew what their route
17 was and to stay on route.  They all had radios.  If
18 they had to go off route for any specific reason, they
19 could call in, get the clearance; that the name of the
20 company vehicle was on our vehicle; and not only for
21 that reason but also for safety reasons, speeding.
22 They were to obey the road laws.  They weren't to flip
23 anybody the bird or swear at anybody or things like
24 that there, anything that could bring, you know, a

79

1  problem to TDI.
2      Q.  And why did you not want the men to use the
3  trucks off route or go home for lunch?
4      A.  Well, insurance liabilities, the extra wear
5  and tear on the vehicles, et cetera.  They had the
6  vehicles.  There was no reason for them.  Also, I say
7  taking the things home or use them for personal use,
8  you know, that's -- taking them shopping or going and
9  visiting friends, what have you, it's -- it was wrong.
10     Q.  It was what?
11     A.  It was wrong, because the vehicles are
12 insured with us.  It's our liability.
13     Q.  All right.  And then at the end of your
14 testimony earlier you said that you viewed the
15 incidents of Mr. Preble to be sort of one and the same,
16 unauthorized use of company vehicle?
17     A.  Right.
18     Q.  So you included -- Were you including the
19 accident in that?
20     A.  No.  The accident compounded it.  Basically I
21 had to come to the same decision had he not had the
22 accident when I found out he had taken the vehicle
23 home.  The accident compounded it.  And the fact that
24 he left the scene of the accident and had to be flagged

80

1  down even compounded it.  He was released for the
2  unauthorized use of the vehicle.
3          MS. ANDERSON:  I have no other
4  questions.
5      A.  If not for the accident, I probably wouldn't
6  have known that he had taken the vehicle home again,
7  and it would have been another incident.  But it was
8  just progressive.
9          MS. ANDERSON:  Right.  I have no other
10 questions.
11         MR. NEVINS:  I have just one follow-up.
12         REDIRECT EXAMINATION
13 BY MR. NEVINS:
14     Q.  You said he left the scene of the accident.
15 What do you base that statement upon?
16     A.  His own words.  He told me that he -- He told
17 me a policeman flagged him down.  He told me he didn't
18 know he hit the vehicle.  He told me, "A policeman
19 flagged me down and told me to go back and leave the
20 information on the" -- "on the vehicle."
21     Q.  So to be clear, then, Mr. Preble told you
22 that he was unaware that he had clipped the vehicle; is
23 that correct?
24     A.  Right.

**Gabriel & Sweeney Court Reporting**

81

1    Q. And you considered that to constitute leaving
2  the scene of an accident?
3    A. Well, constitute if the policeman wasn't
4  there that we wouldn't have known about the accident
5  or anything else. I mean -- But I'm not saying
6  that -- You know, he gassed it and took off. Where the
7  policeman wasn't there to flag him down, I wouldn't
8  have known about the accident unless somebody else had
9  reported it to us.
10    MR. NEVINS: I have no further
11  questions.
12
13    MS. ANDERSON: Me either.
14    (Whereupon the deposition
15    was concluded at 11:40 a.m.)
16
17
18
19
20
21
22
23
24

83

1    COMMONWEALTH OF MASSACHUSETTS
2    SUFFOLK, SS.
3
4    I, Karen A. Interbartolo, Registered Professional
5  Reporter and Notary Public in and for the Commonwealth
6  of Massachusetts, do hereby certify that RICHARD
7  MACLEAN, the witness whose deposition is hereinbefore
8  set forth, was duly sworn by me and that such
9  deposition is a true record of the testimony given by
10  the witness.
11
12    I further certify that I am neither related to nor
13  employed by any of the parties in or counsel to this
14  action, nor am I financially interested in the outcome
15  of this action.
16
17    In witness whereof, I have hereunto set my hand
18  and seal this 11th day of May, 2003.
19
20
21
22    Notary Public
23    My commission expires
24    March 18, 2005

82

1    CERTIFICATE
2
3    I, RICHARD MACLEAN, do hereby certify that I have
4  read the foregoing transcript of my testimony, and
5  further certify that said transcript is a true and
6  accurate record of said testimony with the exception of
7  the following corrections listed below:
8  Page    Line    Correction
9  _____   _____   _____
10 _____   _____   _____
11 _____   _____   _____
12 _____   _____   _____
13 _____   _____   _____
14 _____   _____   _____
15 _____   _____   _____
16 _____   _____   _____
17 _____   _____   _____
18 _____   _____   _____
19 _____   _____   _____
20 _____   _____   _____
21    Signed under the pains and penalties of perjury
22  this _____ day of _____, 2003.
23    _____
24    RICHARD MACLEAN

**Gabriel & Sweeney Court Reporting**

# EXHIBIT 6

VOLUME: 1

PAGES: 1 to 31

EXHIBITS: None

COMMONWEALTH OF MASSACHUSETTS

COMMISSION AGAINST DISCRIMINATION

- - - - - - - - - - - - - - - x

WALTER S. PREBLE,

    Complainant,

    v.            Docket No.

            02BEM02103

TRANSPORTATION DISPLAYS,

INCORPORATED, dba

VIACOM OUTDOOR,

    Respondent.

- - - - - - - - - - - - - - - x

DEPOSITION OF WALTER S. PREBLE

April 25, 2003

12:35 p.m.

Law Office of Paul L. Nevins

47 Church Street

Wellesley, Massachusetts

Reporter: Karen A. Interbartolo, RPR

---

I N D E X

EXAMINATION OF:

WALTER S. PREBLE            PAGE

Direct Examination by Ms. Anderson    4

Cross-Examination by Mr. Nevins    22

Redirect Examination by Ms. Anderson    28

E X H I B I T S

No.               Page

(None)

---

APPEARANCES:

    PAUL L. NEVINS, ESQ.

    47 Church Street

    Wellesley, Massachusetts 02482

    (781) 237-9018

    Counsel for the Complainant

    CBS

    By Susan K. Anderson, Esq.

    1515 Broadway

    New York, New York 10036-5794

    (212) 846-3351

    Counsel for the Respondent

---

PROCEEDINGS

WALTER S. PREBLE

a witness called for examination by counsel for the Respondent, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. ANDERSON:

    Q.  Would you tell us about your background, where you went to school and your employment history?

    A.  I went to Boston English High School and I graduated there in 1973. My first job was a bundle boy at Capital Market on Morrissey Boulevard. I worked there approximately two years. Then I moved onto Jordan Marsh Department Store, downtown Boston, and roughly about another two years there.

    Then I became a truck driver for Society of St. Vincent Nepal on 1280 Washington Street, which is no longer there. After that I started at the advertising company. I believe it was Transit America or -- I'm not -- The name has changed so many times. But I worked there roughly for 24 years. And I was

April 25, 2003

**Page 5**

1  terminated last -- a year ago -- 14 months ago December
2  12. That's roughly about my employment.
3      Q.   You're lumping together your years -- the
4  contract, the MBTA contract?
5      A.   Yes. I worked for TDI it was roughly 17
6  months, I believe.
7      Q.   And what have you been doing since you were
8  terminated from TDI?
9      A.   Looking for a job anywhere I could. I was
10  going for the MBTA fueler's position.
11      Q.   Say that again. The MBTA what?
12      A.   Fueler's position that was in the newspaper.
13  I got all my documents that I needed, and they came
14  down to my physical exam and they said I couldn't pass
15  the eye test or I had to get a note from my doctor
16  showing my blood sugar being in control, which it
17  wasn't at the time, and I'm still under care to have it
18  under control.
19      Q.   So are you working anywhere at this time?
20      A.   I'm working for a temporary agency filing
21  paperwork. And that's about it.
22      Q.   And when you started at TDI, which has now
23  become Viacom -- So I'll tend to refer to it as Viacom
24  because that's how I know it.

**Page 6**

1      A.   Yes.
2      Q.   Well, actually, before that you were working
3  for Parker most recently, right -- or Park?
4      A.   Park Transit.
5      Q.   And at Park did you have a truck every day
6  for work issued by the company?
7      A.   Some days I did. Other days I took my own
8  vehicle.
9      Q.   And then when you started working for TDI,
10  did you have a truck issued by the -- by TDI every day
11  for work?
12      A.   Yes, I did.
13      Q.   And you were told by Mr. MacLean shortly
14  after you started work that you were not allowed to
15  take that truck home for lunch; is that correct?
16      A.   I was told not to take it out of my area or
17  out of my route.
18      Q.   Off your route?
19      A.   Yes.
20      Q.   And did he tell you that more than once? Did
21  Mr. MacLean tell you that?
22      A.   A couple of times he's mentioned it.
23      Q.   And there came a time when you took it home
24  for lunch and you mistakenly locked the keys in it; is

**Page 7**

1  that right?
2      A.   Yes.
3      Q.   And did he talk to you about that incident
4  after you came back to work?
5      A.   I don't recall at that time. No, I don't
6  believe he...
7      Q.   Did he tell you that you shouldn't take the
8  truck home for lunch?
9      A.   He's always mentioned not to be out of your
10  area. And when I asked to define what is my area, I
11  was never told one way or the other where my area was
12  or -- I assumed it was the MBTA system was my area.
13      Q.   Did there come a time when he told you that
14  you couldn't take the truck to your home at lunch or at
15  any time?
16      A.   It was mentioned that you couldn't go out of
17  your area for other -- any reason other than -- well,
18  you just couldn't go out of your area.
19      Q.   Did he say off route, you couldn't go off
20  route?
21      A.   Couldn't go off route, out of area to me was
22  the same. When I asked what was out of area or off
23  route, he would never say to me what it was or where I
24  could go, where I couldn't go.

**Page 8**

1      MS. ANDERSON: Can I just have a moment.
2      (Discussion off the record.)
3      Q.   Mr. Preble, when you locked the keys in your
4  vehicle and you returned to the shop either that day or
5  the next day, did there come a time when Mr. MacLean
6  talked to you about that incident?
7      A.   I recall some conversation, but I can't
8  remember the exact conversation that we had.
9      Q.   And then later that fall, in October, there
10  came a time when you had an incident with a car where
11  you passed it in the left-hand turning lane and you
12  told Mr. MacLean that. Do you recall that incident?
13      A.   Yes, I do.
14      Q.   Do you recall the conversation you had with
15  Mr. MacLean concerning that incident?
16      A.   Yes.
17      Q.   And what did you say and what did he say?
18      A.   I told him I could pass in that lane because
19  there's a broken white line before the left-hand turn,
20  and he told me I could not do that. I said I passed
21  the vehicle, went to the gas station, and gassed up
22  before I returned to the shop. The same vehicle pulled
23  in the gas station behind me, stayed back probably 25,
24  30 yards, never got out of his vehicle.

April 25, 2003

**9**

1    I returned to the shop that afternoon, and
2  the Randolph Police Department showed up at 11 o'clock
3  that night claiming it was a hit and run accident
4  involving the company vehicle. As far as I know, they
5  found no damage to the vehicle, and I thought that was
6  the end of it.
7    Q.  Did you hit the vehicle?
8    A.  No, I did not.
9    Q.  Did you speak to the Randolph Police about
10  it?
11    A.  After the fact I talked to them. They didn't
12  talk to me that night. I wasn't there. I went down
13  later on to try to clear up the situation. I called
14  them on the telephone. They told me I was leaving the
15  scene of property damage. I went down and talked to
16  Officer Jackson, I'm not sure, about maybe a month
17  later. And he told me, I want your name, date of
18  birth, and if you need any information, I'll mail it to
19  you. That's the last I heard of it.
20    Q.  And when you talked to the police, it was
21  when you were still employed at TDI?
22    A.  Yes.
23    Q.  There came a time when you were suspended; is
24  that correct?

**10**

1    A.  Yes.
2    Q.  Tell us about that incident.
3    A.  I was working in Charlestown that day with
4  Brian Carson. On the way back, the expressway was at a
5  standstill, which usually happens in the afternoons, so
6  I cut through City Square through South Boston to get
7  back on the expressway further on so it saves a lot of
8  time. As I was driving down D Street, there's a
9  three-lane road. The left lane and the middle lane can
10  take a left-hand turn.
11    I was in the middle lane. This other
12  gentleman, Mr. Gatto, was in the left-hand lane. We
13  both turned at the same time, and he began to race back
14  and forth with me going down until where the street
15  turns into one lane, which is just before the bridge.
16  He wouldn't let me in between the vehicle in front of
17  him, and so I just hit my brakes and went behind him.
18    Further down the road he had pulled over, and
19  I rolled down my window and I asked the gentleman what
20  was the problem. And he told me I could not take the
21  turn back there like I did. I said, yes, I could. At
22  that time he made a threatening gesture with a club in
23  his hand. He looked at the club; he looked at me. I
24  made a comment about why don't you go back to

**1**

1  Charlestown, because I realized he was a mechanic for
2  the MBTA and he worked in Charlestown.
3    Q.  How did you know that?
4    A.  Because of his plate, Gatto's. He lives one
5  block away from where I live in South Boston. I
6  recognize the truck from being parked in Charlestown
7  all the time.
8    Q.  You mean you recognize it from the license
9  plate?
10    A.  Yes. And I drove off. I didn't exchange
11  swears or angry words or anything. I made three
12  comments to him, and that was all that I understood.
13  And I assumed he had called my shop to report the
14  incident. And I don't know anything else that happened
15  after that.
16    Q.  Did Mr. MacLean speak to you about that?
17    A.  Yes, he did.
18    Q.  And what did he say and what did you say?
19    A.  He said it was road rage. I was again at
20  fault. I explained I was just asking the gentleman a
21  question. I was not -- I didn't believe it was any
22  road rage. I said he works for the MBTA. I see him
23  every day in Charlestown or I know he works in
24  Charlestown. I didn't want to have any problems down

**2**

1  the road with any -- you know, for whatever reason. I
2  just wanted to clear up what the problem was. And all
3  he explained to me was I couldn't take that turn back
4  on the road, which I stated that I could.
5    Q.  And did Mr. MacLean tell you why he was
6  suspending you?
7    A.  For the incident of road rage. And because
8  it involved an MBTA employee.
9    Q.  Did you grieve that suspension through the
10  union?
11    A.  I went to the shop steward and asked him to
12  start the grievance procedure. He told me I could do
13  that myself. I went to Chuck Fogell and expressed my
14  interest in starting a procedure. At that time he
15  recommended that I don't. He says, "You were wrong.
16  Take the suspension." We're negotiating a contract,
17  and number of months with this new company, didn't want
18  to cause any waves. So they recommended at that time
19  that I take the suspension.
20    Q.  Tell me what happened on the day of -- on
21  December 11, 2001.
22    A.  I recall a conversation with Mr. Barrus as we
23  were traveling between Bartlett and Albany Street.
24    Q.  Between what?

**13**

1  A. Bartlett garage and Albany Street. And with
2  the new construction going on in front of the Albany
3  Street garage, I believe the way I was traveling was
4  the shorter distance driving Harrison Ave. than it
5  is -- Our normal route would be Albany Street, which
6  runs parallel with Harrison Ave. Harrison Ave. became
7  a shorter distance after they put up an island which
8  you have to negotiate around to get to.
9       And at that time I said to Mr. Barrus, "I
10  suppose that I'm considered out of my area now because
11  I'm on Harrison Ave. instead of Albany Street." And he
12  stated, "Yes, you are." Later on that day we were
13  working together, and the buses had stopped coming into
14  Cabot, so to split up the work, he suggested I drop him
15  off at Albany Street so he can catch a few straggling
16  buses coming in in the afternoon. I said I would take
17  Cabot and sit there and wait for the other buses to
18  come in.
19       He had taken his lunch I believe at 9:30 that
20  morning. On the way out he had his sandwich, so I had
21  my lunch late in the afternoon after I had dropped him
22  off at Albany Street.
23  Q. And where did you have that lunch?
24  A. I went to my house and grabbed a sandwich,

**14**

1  and I checked my blood sugar count on my meter or unit,
2  whatever you want to call it.
3  Q. And did something happen to your vehicle as
4  you were leaving your house?
5  A. On the way back I had -- they were setting up
6  a construction area. I believe that it was the corner
7  of B and 2nd Street.
8  Q. How far is that from your house?
9  A. 1.2 miles.
10  Q. What street do you live on?
11  A. I live on East 5th Street, 589 East 5th.
12  Q. And what happened at the corner of B and 2nd?
13  A. I was taking a turn wide because of the
14  police officer in the middle of the road. I was taking
15  a right-hand turn actually out of the left-hand lane.
16  The right-hand lane was blocked, so I was taking a turn
17  technically from the left-hand lane. And as I was
18  turning the corner, the police officer that was in the
19  middle of the street told me I clipped the lens of the
20  car, SUV vehicle that was parked at the corner.
21       So I pulled my truck over, went over and
22  investigated, and the lens was cracked. So I gave my
23  information to the officer. He wrote all the details
24  up and left it on the windshield of the car. I got

**15**

1  back in my vehicle and continued on to pick up
2  Mr. Barrus at Albany Street. And after I picked him
3  up, we ended up going back to Randolph to the shop.
4  Q. Did you tell Ken Barrus about the accident?
5  A. No, I did not.
6  Q. When did you next go to the shop?
7  A. That afternoon after I picked him up I went
8  directly --
9  Q. On December 11?
10  A. Yes.
11  Q. And when did you tell Mr. MacLean about the
12  accident?
13  A. I told him December 12, the following
14  morning.
15  Q. And why did you not tell him on the 11th?
16  A. Because he had visitors from New York that
17  were engaged in conversation when I returned to the
18  shop that day. I didn't want to bother him in the
19  middle of the -- with all the other gentlemen and state
20  the facts of what happened that day. I didn't think it
21  was a serious enough accident that I would disturb him
22  and mention it in front of all these other people who I
23  was not aware who they are. All I knew is they were
24  from New York. They were from Viacom Outdoor, I

**16**

1  assume.
2  Q. And did you report the accident in any other
3  way that day?
4  A. No, I did not.
5  Q. And why is that?
6  A. I didn't feel it was a necessary thing to do
7  at the time.
8  Q. Weren't there papers that you were required
9  to fill out for your work each day, something called a
10  production report and something called a daily
11  conditions report?
12  A. Yes, but that would be for my work, not for
13  any other extra activities involved in an accident like
14  that.
15  Q. What about an accident report?
16  A. No, there was not.
17  Q. There was nothing that you kept in your truck
18  that you would have -- in the TDI vehicle, the Viacom
19  vehicle that you were required to fill out if there was
20  an accident?
21  A. Not that I know of.
22  Q. When did you report the accident to
23  Mr. MacLean?
24  A. About 10:30 the next morning on December 12.

April 25, 2003

**17**

1  Q. And what did he say and what did you say?
2  A. I said there was -- I was involved in a minor
3  incident or accident, and he said, "Well, this is
4  serious." I said I didn't think it was serious. And
5  he said it was. He handed me a piece of paper, a
6  yellow legal pad, and says, "Fill out the information
7  on this." And I put down the information that I was
8  aware of and then handed it to him, and then he asked
9  me to sign it.
10  Q. Is this a copy of the note that you signed?
11  A. Yes.
12  MS. ANDERSON: That's in the record as
13  part of Exhibit 3, I think, position letter 3 or is it
14  1?
15  MR. NEVINS: It's Exhibit 6.
16  A. I think if it was an accident form, I would
17  have been handed that to fill out, but I wasn't handed
18  that accident form. I was just handed a legal pad of
19  paper and told to write it on that.
20  Q. And what else did he say to you?
21  A. That he didn't want me driving that day, go
22  with Brian Carson and be his helper. And that was what
23  he told me to do that day. When I returned that
24  afternoon, I was called into Mr. MacLean's office, and

**18**

1  he handed me a letter stating my termination. And that
2  was roughly about it.
3  Q. Did he speak to you?
4  A. Not really, no.
5  Q. At any time that day did he tell you that it
6  was serious because he considered it all part of
7  unauthorized use of the vehicle?
8  A. Not that I know of, no.
9  Q. Did he say to you that where the accident
10  occurred was near your house and off route?
11  A. He said I was out of my area, and I said it
12  was roughly two-tenths of a mile away from Cabot garage
13  where the accident happened.
14  Q. Did you not say to him, "Define route"?
15  A. Yes, I did.
16  Q. And what did he say to that?
17  A. Nothing.
18  Q. You spoke earlier about your diabetes.
19  During the course of your employment with TDI, did you
20  have a conversation with Mr. MacLean about your
21  diabetes?
22  A. I'm not sure if I mentioned to him about the
23  disease. I mentioned to him about my heart condition,
24  and all he said to me was, "Well, if you need an extra

**19**

1  rest or anything like that, take it if necessary." I
2  might have mentioned the diabetes the time when I
3  purchased the medicine at the pharmacy.
4  The medical card that they gave us had
5  expired, and they didn't bother to tell us that until a
6  month later. He said, "Well, we'll get a new card
7  later on. Pay for it out of your own pocket, and then
8  I'll reimburse you the difference. I'll reimburse you
9  when you come back to the shop." And then when the
10  insurance company settled later on, "We'll take care of
11  it at that point."
12  Q. Did he do that?
13  A. Yes, I did.
14  Q. Did he do that? Did he take care of it?
15  A. Yes, he did.
16  Q. So he reimbursed you?
17  A. Yes.
18  Q. Did you ever ask him to allow you to go home
19  for lunch because you had diabetes?
20  A. No, not that I know of.
21  Q. Even though he was telling you to stay on
22  route, not go home, you never discussed your diabetes
23  as your reason for going home?
24  A. I mentioned to him, I believe, something

**20**

1  about it's like telling me I can't go to Burger King
2  across the street, where I have to go to McDonald's. I
3  said I don't believe he had the right to tell me where
4  I had my lunch.
5  Q. So he did tell you that you could not go home
6  for lunch, and you said --
7  A. He told me I could not go out of my area,
8  which the area was never defined to me. When I asked
9  about it, it was just left up in the air. I said I
10  consider my area anywhere in between the garages of the
11  MBTA, north and south of the city.
12  Q. And didn't he disagree with that?
13  A. He never said one way or another. After I
14  explained that to him, he just never returned the
15  argument, or whatever you want to -- he never answered
16  my question about it.
17  Q. So it's your testimony that he never told you
18  you couldn't go home for lunch?
19  A. Right. He never said those words -- He said
20  I could not go out of my area or out of -- off route
21  was his term.
22  Q. I'm not sure I asked you. Did you tell your
23  co-worker Ken Barrus on December 11 that you had had
24  the accident while you had the vehicle --

**21**

1   A.   No, I did not.

2   Q.   -- on your way back?  Is it your testimony

3   that Mr. MacLean never told you that on route was the

4   shortest distance between the two jobs that you had?

5   A.   The first time I heard that was at my second

6   phase of my arbitration hearing.

7   Q.   You mean your unemployment hearing?

8   A.   Yes -- No.  The meeting at the office was the

9   first time I heard that terminology.

10   Q.   Meeting at what office?

11   A.   At 45 Teed Drive when I had the meeting with

12   Mr. Murphy, Mr. MacLean, Chuck Fogell and myself.

13   Q.   That was after you were discharged?

14   A.   Yes.  That was the first time I heard that

15   term, the most direct and shortest route between

16   garages or barns.

17   Q.   So it's your testimony that you never

18   understood that you were required to use the vehicle on

19   route.  You thought that it was just within the whole

20   area of the MBTA's business?

21   A.   Where I usually work, yes.

22   Q.   It's your testimony Mr. MacLean didn't tell

23   you that you had to stay on route and not take the

24   truck home for lunch?

**22**

1   A.   It was never defined to me what my route was

2   or what off route meant.

3   Q.   Taking you back to right after you started

4   working for TDI and you locked the keys in the truck at

5   your home for lunch, when you came back, did you have a

6   conversation -- you had a conversation with Mr. MacLean

7   about that incident, right?

8   A.   I don't recall the conversation.

9   MS. ANDERSON:  I think I have no further

10   questions.

11   (Recess taken.)

12   MR. NEVINS:  I have a couple of

13   questions, I hope.

14   CROSS-EXAMINATION

15   BY MR. NEVINS:

16   Q.   Mr. Preble, first, with respect to the

17   incident which occurred at B and 2mnd Street --

18   A.   Yes.

19   Q.   -- again, how far was that of a distance

20   between the Cabot Street garage?

21   A.   I believe it was two-tenths of a mile from

22   the Cabot Street garage.

23   Q.   How old are you?

24   A.   47.

**3**

1   Q.   And if I show you Exhibit No. 1 in the

2   deposition of Mr. MacLean, where do you stand in the

3   roster of seniority?

4   A.   I believe second in seniority.

5   Q.   Now, I want to show you a copy of the transit

6   advertising collective bargaining agreement between

7   TDI, Transportation Display, Incorporated, and Painters

8   & Allied Trades District Council.

9   MR. NEVINS:  I guess I'll have this

10   marked as an exhibit.  And, if you want, we'll make a

11   copy for you.

12   MS. ANDERSON:  We have a copy of the

13   contract.  I'm assuming it's the same one.

14   MR. NEVINS:  This is the one which is

15   effective July 1, 2000 through November 2, 2001.

16   MS. ANDERSON:  Mr. MacLean brought his

17   copy from the shop.

18   MR. MACLEAN:  2001 to 2004.

19   MR. NEVINS:  You have a more recent one.

20   If I may.

21   Q.   I want to show you -- I'll refer to this

22   because it indicates draft.  We assume -- Well, we'll

23   hope it's the same one.  I'll show you a copy of the

24   transit advertising collective bargaining agreement

**24**

1   between Viacom Outdoor Group and the Painters & Allied

2   Trades District Council effective November 3, 2001

3   through July 31, 2004.  Now, to be clear, the date

4   of your termination from employment was?

5   A.   December 12, 2001.

6   Q.   Now, I want to show you first Exhibit B, work

7   rules.  And I'd ask you to take a moment and look at

8   the work rules, Exhibit B.  Do you see any explanation

9   there of what TDI work rules are?

10   A.   Yes.  There's four rules stating one for

11   being tardy without calling in and excessive tardiness,

12   being absent without prior authorization, no call, no

13   show, possession of taking alcoholic beverages of drugs

14   or under the influence of alcohol and drugs.

15   Q.   Now, with respect to compensation for

16   employees, you were a journeyman at the time you were

17   employed --

18   A.   Yes.

19   Q.   -- at the date of your discharge?  And you

20   had worked for Viacom and its predecessors in interest

21   for how many years?

22   A.   24 years.

23   Q.   And what was the difference in compensation

24   that you enjoyed as a result of your position as a

**25**

1  journeyman with 24 years of employment and the
2  compensation of Mr. Hak Ok, for example, if you know?
3      A.  Well, I was based on a salary wage from the
4  union and vacation time and all that.  I'm not aware of
5  Mr. Ok's benefits that he was being paid or not being
6  paid.  I'm not sure.
7      Q.  Let me rephrase the question.  Under the
8  collective bargaining agreement, as you understood it,
9  were there lanes based upon longevity, number of years
10  of service?
11      A.  I believe there was.
12      Q.  Let's see if we can be specific.
13          MS. ANDERSON:  Is that what you're
14  talking about?
15      Q.  Okay.
16      (Discussion off the record.)
17      Q.  If I can direct your attention to page 6
18  under article 3, wages, hours and work conditions.
19  Would you take a look at this.  Is there a distinction
20  in compensation between journeymen and carders?
21      A.  Yes, there is.
22      Q.  In the event of adverse employment actions,
23  reductions in force as a result of physical conditions,
24  what was your understanding, if any, with respect to

**26**

1  seniority and --
2      A.  Well, I believe it was in reverse seniority
3  for layoffs.
4      Q.  And as a journeyman with your seniority,
5  where did you -- how did determination of work
6  sites -- Well, did you have any say in the
7  determination of work sites or a preference over other
8  individuals?
9          MS. ANDERSON:  Are you saying
10  termination -- Oh, determination.
11          MR. NEVINS:  Determination.
12      A.  No, I wasn't.
13      Q.  As a senior journeyman, did you enjoy
14  preference in terms of the hours and conditions of
15  work -- the hours of work?
16      A.  Not that I know of.
17      Q.  Well, could you -- Were you permitted to
18  select day or evening work?  How was that determined as
19  to which hours of work?
20      A.  At one point Mr. MacLean asked if we wanted
21  to join the night crew or stay on days.  Other than
22  that, I was never offered any other positions.
23          MS. ANDERSON:  When you say "we," are
24  you talking about just you or --

**27**

1      A.  Myself and fellow workers, Kenny Barrus, Joe
2  Maykis and Brian Carson that worked during the daytime.
3      Q.  And if I direct your attention to section
4  4.2, vacations, was there a preference -- as a result
5  of your years of seniority as an employee of Viacom
6  Outdoor and its predecessors in interest, did you enjoy
7  any preference in terms of vacations under section 4.2,
8  vacations, 4.2A?
9      A.  If you put it in by a certain day, as long as
10  no one else had the vacation with 30 days' notice, then
11  you were entitled to take whatever vacation you
12  requested.
13      Q.  And if you notice also, with respect to
14  employees who are continuously employed for over eight
15  years or more, was there any preference in terms of
16  vacation time?
17      A.  I believe it was one extra week for a total
18  of three weeks after eight years of service.
19      Q.  Tell me also in terms of section 4.3, sick
20  leave, under the collective bargaining agreement, as
21  you understood it, was sick leave something that got
22  carried over or was it a use or it lose it, as you
23  understood it?
24      A.  In the past it was always given to us when we

**28**

1  wanted it, but I believe with the new company, that if
2  you carried it over, you would lose half the time or
3  they would entitle you to half of what you were
4  entitled to.
5      Q.  Your understanding was that you could carry
6  some of it over?
7      A.  Yes.
8          MR. NEVINS:  Okay.  I haven't any
9  further questions.
10          REDIRECT EXAMINATION
11  BY MS. ANDERSON:
12      Q.  You said your understanding was that you
13  could carry over sick days?
14      A.  Yes.
15      Q.  And who told you that you could do that?
16      A.  I believe it was in the contract that you
17  could carry over half the time, or Mr. MacLean
18  explained it to us one time or another time.  I never
19  carried mine over.  I also had an option of being paid
20  at the end of the year for my sick time, which I --
21          MS. ANDERSON:  Okay.  I just found it.
22  Okay.  Thank you.  I have no questions.
23          MR. NEVINS:  I have no further
24  questions.

```
 1
 2           (Whereupon the deposition         29
 3           was concluded at 1:20 p.m.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1    COMMONWEALTH OF MASSACHUSETTS                31
 2    SUFFOLK, SS.
 3
 4        I, Karen A. Interbartolo, Registered Professional
 5    Reporter and Notary Public in and for the Commonwealth
 6    of Massachusetts, do hereby certify that WALTER S.
 7    PREBLE, the witness whose deposition is hereinbefore
 8    set forth, was duly sworn by me and that such
 9    deposition is a true record of the testimony given by
10    the witness.
11
12        I further certify that I am neither related to nor
13    employed by any of the parties in or counsel to this
14    action, nor am I financially interested in the outcome
15    of this action.
16
17        In witness whereof, I have hereunto set my hand
18    and seal this 11th day of May, 2003.
19
20
21                    Notary Public
22                    My commission expires
23                    March 18, 2005
24
```

```
 1              C E R T I F I C A T E              30
 2
 3        I, WALTER S. PREBLE, do hereby certify that I have
 4    read the foregoing transcript of my testimony, and
 5    further certify that said transcript is a true and
 6    accurate record of said testimony with the exception of
 7    the following corrections listed below:
 8    Page      Line          Correction
 9    ____      ____      _____
10    ____      ____      _____
11    ____      ____      _____
12    ____      ____      _____
13    ____      ____      _____
14    ____      ____      _____
15    ____      ____      _____
16    ____      ____      _____
17    ____      ____      _____
18    ____      ____      _____
19    ____      ____      _____
20    ____      ____      _____
21        Signed under the pains and penalties of perjury
22    this _____ day of _____, 2003.
23                    _____
24              WALTER S. PREBLE
```

Gabriel & Sweeney Court Reporting

# EXHIBIT 7

12/12/01    Walter Preble    617-269-75 37

Terminated Unauthorized use of Company Vehicle

On Tuesday December 11, 2001 Walter and
Kenny Barrub were working between Calvary
Garage and the Albany St Garage.
At about 1:00 he dropped Ken off at
Albany and went home to make a sandwich
for lunch. On the way back he had to
maneuver around a construction site and
damaged a parked car with the company truck.
There was a policeman right there who
took Walter's info and put it on the windshield
of the parked car, he was only two blocks
away from the garage when the accident
occurred.
    Damage to the car was a broken tail
light and just a scratch on the company
truck.
    Accident took place at B ST and 4t
in S. Boston
    Time of accident was 1:20 PM
    He told me when they work at the shop
they take lunch at 12:00 but there's no
set time when your on the road
    When I asked if other employees
take the truck to lunch, such as Stopping

at Burger King or Dunkin Donuts he said — Quite a few do!

Walter has been working the same job for 24 years

Employees work until 7:30 AM 4:00 PM

SECTION 3.2 (A) HOURS AND O.T.
Section (A) states meal period is unpaid between the hours of 7:30 and 4:00 P.M NO DEFINITION OF LUNCH TIME

12/13 BILL MURPHY CALLED 9:15 AM will arrange meeting Wednesday or Thurs of DEC 19 or 20

✱ Have you received any other written reprimands? Yes one letter due to an argument on the road

During the Box truck only (1)

Never has posted a notice or informed employees

After he had accident picked up
Kenny and finished day at Cabot

When he returned Dick was meeting
with company reps from N.Y.

**12/12**  Next morning as soon as Dick showed
up Walter reported it to Dick, he
said this is serious,

Walter explained and filled out
company report which was merely a
note pad NO OFFICIAL FORM.

Dick told Walter not to drive
company trucks until its investigated

Sent out to do a days work with
Brian Carson

When he returned secretary said see
Dick. Dick said he talked to Murph
and were letting you go.
He gave him paycheck and letter
terminated employment

Employees have never received company policy
or hand book of any kind

PREBLE  Home                    589 E. FIFTH ST
                                S. BOSTON

Company knows he has a
heart condition

Joe Miscall Boston Police
Called Joe Sheehan and described
to Joe about this situation

*EXHIBIT 8*



# VIACOM
O U T D O O R

## *Boston Operations Memo*

To : Blake Beath
From : Richard MacLean
Date : October 19, 2001
Re :Disciplinary  Notice:

Company : VIACOM OUTDOOR
cc:

Blake Beath,

On the night of October 17, 2001 you failed to complete your work assignment and turned in a falsified Completion Report. You also disposed of the clients copy, thus making it impossible to complete the contract.

This would normally call for an immediate discharge for a first time offense, but taking into consideration your personal circumstances, I am suspending you for five days without pay. Suspension will begin the night of 10/21/01 through and inclusive of the night of October 25, 2001. You will also be required to pay the replacement costs of reprinting of the clients car cards.

CC: File
    Magnus Acheampong-Quaye.
    Kenneth Barrus

45-B Teed Drive, Randolph, MA  02368

Tuesday 10/19/01

I decided (against my better judgement) to suspend Blake without Pay for 5 days and be sure he makes restitution for reprinting of Mass Alliance — 11/28 - 60 cords.

Thursday Night 10/18/01

I asked Blake what happened last night
that at best he had a lousy night of
production. I asked him if he had any-
thing he wanted to tell me.
I took him into the office and told him
I had his nos. checked + what the results
were. I told him if he had fudged the
nos - if the cards were not up he had
better tell me now.
Blake said he had gotten flustered trying
to get as many cards in as he could but
was not finding any dead copy to remove —
he said he got all confused + lost track of
nos + some of the nos might be wrong but
he was sure he had gotten about 60 of the
cars done.
I told him if I had to sign a completion
report he had better be sure those cards
were in + that now I was going to have
to get someone to find which cars were
carded with which clients.
I asked him if there was any problems
I should know about and he said with the
new house + all he just felt under pressure.
I told him I could understand one or
two nights of low production but that it
had to be the last two nights +

He would have to improve vastly —
I told him if & when he had problems
with the work or production there was no
excuse to let it go a whole night — he
is supposed to call Leo — Leo would
tell him how to get it done and or come
& give him a hand. — At any time if some-
one was having a problem they were to call
Leo. I told Blake I was going to assign
him with Tommey & Leo for a month or so
and that I expected him to come around
fully.

Blake left the office & came back
about 3 minutes later & said, "Dick, I
can't lie to you, it's eating me up,
I don't sign your name to any completions.
I didn't get all those cards up."
I told him this was cause for dismissal,
immediate dismissal. He told me he had
never done anything like this before & it
was really bothering him — he told me he had
a lot of things on his mind & the tension
was getting to him so that he couldn't even
think straight — he said the job was really
important to him & that he swore he would
make it up & never let anything make him
do such a stupid thing like this again.

He said the stress has been killing him the past few weeks + it just came to a head the night before. I told him I should throw him out the door right then but I would take the night to think about his circumstances + to call me tomorrow — Minimum would be suspension + reimbursement for lost cards.

10/18 Thursday morning while checking work hods
from Wednesday nite noted Blake had
only gone into approx 60 cars on red line.
Told Joe Blake only had 4 contracts —
60 cars — that was a lousy nights work —
checked his work card & many of the
numbers were cross-off — doubled — no
notations for which client's went where.
checked his condition report card and
no notes of problems — in fact no notes at
all were on sheet. Sheet was undated &
unsigned —
Leo's leadman report stated Blake had
gotten so many of each client — but finished
none.
Walter Prebble was sent out on the Red
Line with additional carding & told to
check for nos which were supposed to
have been done the night before with
Mass Energy Alliance — Out of 18 nos.
Blake had checked off as being done
only 2 cars actually had those cards in
them (same was true for other 3 client's)
Leo called — said he spoke to Blake about
the low production & unreadable work card
& said Blake gave him some rambling
excuses which didn't make much sense.

Blake called - in in the afternoon to tell Joe about the confused nos. I spoke to Blake & told him I wasn't happy with his production or his work method's — I asked him if he had worked the whole night + he said he had. He said he had some trouble trying to juggle the cards + had lost track of some trans nos. — He wasn't making himself very clear and I told him I'd see him tonight.