UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WALTER S. PREBLE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 04-cv-11005 RWZ |
| ) | |
| TRANSPORTATION DISPLAYS, ) | |
| INCORPORATED, dba ) | |
| VIACOM OUTDOOR, and ) | |
| PAINTERS AND ALLIED ) | |
| TRADES DISTRICT COUNCIL 35, ) | |
| IUPAT, AFL-CIO, ) | |
| ) | |
| Defendants. ) | |

**STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF DEFENDANT PAINTERS AND
ALLIED TRADES DISTRICT COUNCIL NO. 35'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Defendant Painters and Allied Trades District Council No. 35 submits this Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment.

1. Transportation Displays, Inc. ("TDI") is in the business of outdoor advertising. (Deposition of Walter Preble at 20-22. A copy of excerpted pages from Mr. Preble's deposition is attached to the Affidavit of Jonathan M. Conti, which has been submitted in support of Defendant's Motion for Summary Judgment).

2. Defendant Painters and Allied Trades District Council No. 35 ("Union") is the collective bargaining representative for all employees at TDI's facility located in Randolph, Massachusetts. (Affidavit of Charles E. Fogell, ¶ 3).

3. Charles E. Fogell is the Business Representative from Painters and Allied Trades District Council No. 35 who has represented the bargaining unit employees at TDI and its predecessors since approximately 1990. (Fogell Dep. at 14; Fogell Aff., ¶ 1).

4. The Union represents all employees at TDI's Randolph, Massachusetts facility except for supervisors and others excluded by the National Labor Relations Act. (Fogell Aff., ¶ 3).

5. At all relevant times, TDI and the Union were parties to a collective bargaining agreement with effective dates of November 3, 2001 through July 31, 2004. (Fogell Aff., ¶ 4, Exh. A).

6. TDI has a contract with Massachusetts Bay Transit Authority ("MBTA"), pursuant to which TDI's employees install advertising materials on busses, subway cars, and commuter trains, including the metal frames which hold those materials. (Preble Dep. at 20-22).

7. Plaintiff Walter Preble is a former employee of TDI, and was a member of the Union while he was employed by TDI. (Preble Dep. at 103).

8. Mr. Preble's general responsibilities while he was employed by TDI were to drive a TDI truck to various MBTA "barns" to install advertising on MBTA's vehicles. (Preble Dep. at 27-28).

9. Mr. Preble was employed by Park Transit until the summer of 2000, when TDI acquired Park Transit. (Preble Dep. at 26).

10. After TDI acquired Park Transit, employees were required to travel to and from customer sites only in TDI vehicles, rather than the employees' own vehicles. (Preble Dep. at 28-29).

11. Following TDI's acquisition of Park Transit, Operations Manager Richard MacLean became Mr. Preble's supervisor. (Preble Dep. at 26). Mr. MacLean informed the bargaining unit employees on several occasions that employees were not to drive TDI's vehicles off route. (Preble Dep. at 30).

12. In or about October 2000, Mr. Preble, while driving a TDI vehicle, was involved in an incident with another driver whom Mr. Preble believed was driving too slowly. (Preble Dep. at 41-43).

13. Following the incident in October 2000, a police officer visited the TDI garage on that same evening to investigate. (Preble Dep. at 41-42).

14. When Mr. MacLean learned of the October 2000 incident, he characterized the incident as "road rage" and warned Mr. Preble not to let such an incident happen again. (Preble Dep. at 45). Mr. MacLean told Mr. Preble that he could be terminated if Mr. Preble had "another incident of road rage . . . or if [Mr. Preble] gave somebody the finger or some other form of communication." (Preble Dep. at 45).

15. In or about February 2001, Mr. Preble was involved in another incident while driving in the center lane of a three-lane road. Mr. Preble was in the middle lane, and another truck was to the left of Mr. Preble's TDI vehicle.

3

Both the other vehicle and Mr. Preble made left hand turns. (Preble Dep. at 46-47).

16. After making the turn, Mr. Preble realized that his lane was about to become a right turn only lane, and therefore he unsuccessfully attempted to pass the truck on his left. Mr. Preble then "hit the brakes" and pulled behind the other truck. (Preble Dep. at 48-49).

17. When he pulled behind the other truck, Mr. Preble realized from the license plate that the vehicle was being driven by an MBTA mechanic who lived near Mr. Preble, although the two had never met. (Preble Dep. at 50). Mr. Preble was also aware that the individual driving the vehicle was a mechanic who worked at an MBTA garage in Charlestown. (Preble Dep. at 50).

18. Mr. Preble followed the MBTA mechanic to his home, at which time Mr. Preble and the mechanic exchanged words. (Preble Dep. at 51-52). Mr. Preble rolled down his window and asked the mechanic "what the problem was, why he cut [him] off back there." (Preble Dep. at 51-52).

19. The mechanic told Mr. Preble that his left turn was illegal, and gestured at Mr. Preble with something that looked like a wooden club in his hand. (Preble Dep. at 52). Mr. Preble told the mechanic, "why don't you go back to Charlestown," and then drove away. (Preble Dep. at 53).

20. Mr. Preble did not report the October 2000 incident with the MBTA mechanic to Mr. MacLean, but the MBTA mechanic called TDI and spoke with Mr. MacLean. (Preble Dep. at 54).

4

21. As a result of the incident, TDI suspended Mr. Preble for a week. (Preble Dep. at 55). Mr. Preble did not grieve the suspension after speaking with Union Business Representative Charles Fogell. (Preble Dep. at 61, 62, 105).

22. On December 11, 2001, Mr. Preble went off his route to go home for lunch with a TDI vehicle. As he returned from lunch, Mr. Preble struck a parked car as he turned a corner in South Boston. (Preble Dep. at 75-77).

23. Mr. Preble claimed he did not immediately realize he had struck the vehicle, but a police officer who witnessed the accident flagged him down. (Preble Dep. at 77).

24. Following the accident, Mr. Preble drove back to the MBTA garage where he had left his partner, Kenneth Barrus, and returned to the TDI garage in Randolph, Massachusetts. (Preble Dep. at 78-79).

25. Mr. Preble never mentioned the accident to Mr. Barrus, and when he got back to the TDI garage he did not report the incident to Mr. MacLean or anyone else. (Preble Dep. at 79-80).

26. Mr. Preble had previously been in an accident in 2001 in which the TDI truck's mirror was struck by another car, and his passenger at the time, another TDI employee, wrote a report of the incident. (Preble Dep. at 81). Mr. MacLean had previously instructed employees, including Mr. Preble, to write up a report if they were involved in an accident. (Preble Dep. at 84-85).

27. On December 12, 2001, Mr. Preble informed Mr. MacLean that he had hit a parked car a day earlier. Mr. MacLean told Mr. Preble to write a report regarding the incident. (Preble Dep. at 88).

28. On December 12, 2001, Mr. MacLean terminated Mr. Preble, telling him that he had once again been off his route, and that he was being terminated for the "unauthorized use of a company vehicle." (Preble Dep. at 91-93; Fogell Aff., ¶ 10, Exh. B).

29. On December 12, 2001, Mr. Preble telephoned Union Business Representative Charles Fogell and informed him that he had been terminated. (Preble Dep. at 108; Fogell Aff., ¶ 10). Mr. Preble explained to Mr. Fogell what had happened, and Mr. Fogell asked him questions to get a better idea as to what transpired. (Fogell Dep. at 22).

30. Mr. Fogell told Mr. Preble to check the distance between the MBTA "barn" at which he had been working on December 11, 2003 and his home. (Preble Dep. at 109).

31. On or about December 13, 2004, Mr. Preble met with Mr. Fogell at the Union office. Mr. Preble brought the information concerning the mileage distance between the MBTA barn and his house, and they discussed the circumstances that led to Mr. Preble's termination. (Preble Dep. at 109-110).

32. On or about December 17, 2004, Mr. Fogell filed a grievance over Mr. Preble's discharge pursuant to Article 9, Section 2 of the collective bargaining agreement. (Fogell Aff., ¶ 11, Exh. C).

33. On December 19, 2004, Mr. Fogell met with Mr. MacLean at the Step One grievance meeting. (Fogell Dep. at 30; Fogell Aff. ¶¶ 12-13). At the meeting, Mr. MacLean told Mr. Fogell that Mr. Preble had previously been suspended in February 2001 for a "road rage" incident; that Mr. MacLean had explained to the bargaining unit employees in August 2001 that they were not to go off their routes and that doing so was cause for dismissal; and that Mr. MacLean had spoken directly with Mr. Preble about the need to take lunch with his fellow employees and not to go off on his own. (Fogell Dep. at 31).

34. During the Step One grievance meeting, Mr. Fogell asked Mr. MacLean if there was a posted rule against taking one's truck home for lunch. While Mr. MacLean admitted that there was no such written rule, he stated that the employees had been verbally told on several occasions not to do so. (Fogell Dep. at 31; Fogell Aff., ¶ 13). Mr. Fogell also questioned how far off his route Mr. Preble was when he went home for lunch. (Fogell Dep. at 31; Fogell Aff., ¶ 13).

35. At the conclusion of the Step One grievance meeting, which lasted between forty-five minutes to an hour, Mr. Fogell requested all documents in Mr. Preble's personnel file. Mr. MacLean sent the requested documents to Mr. Fogell on or about December 20, 2004. (Fogell Aff., ¶ 14 ). Mr. MacLean refused to change his position regarding the termination of Mr. Preble. (Fogell Aff., ¶ 14 ).

36. On or about December 26, 2001, Mr. Fogell advanced Mr. Preble's grievance to Step Two of the grievance procedure, pursuant to Article 9, Section 9.2(a) of the collective bargaining agreement. (Fogell Aff., ¶ 15, Exh. D).

37. On or about December 27, 2004, Mr. Fogell interviewed Union steward Kenneth Barrus, who had worked with Mr. Preble on several occasions, including on Mr. Preble's last day of employment. Mr. Fogell spoke with Mr. Barrus and inquired as to whether Mr. MacLean had held any meetings concerning going off route, as Mr. MacLean had claimed in the Step One Grievance meeting. (Fogell Dep. at 38-39; Fogell Aff., ¶ 16). Mr. Barrus confirmed that Mr. MacLean had on several occasions instructed the employees that they were not to go off route, and were not to take the truck home for lunch. (Fogell Dep. at 39; Fogell Aff., ¶ 16).

38. Mr. Fogell's investigation of the grievance also involved speaking with bargaining unit employee Joseph Maykis regarding whether Mr. MacLean had held any employee meetings in which he had warned the employees about taking their trucks off route. (Fogell Aff., ¶ 17). Mr. Maykis confirmed that these meetings occurred and that Mr. MacLean had made such statements. (Fogell Dep. at 41; Fogell Aff., ¶ 17).

39. On December 28, 2004, Mr. Fogell and Mr. Preble attended a Step Two grievance meeting with Mr. MacLean and William Murphy, TDI's Vice-President of Operations. (Fogell Dep. at 42-43; Fogell Aff., ¶ 18). Prior

to the meeting, Mr. Fogell and Mr. Preble again met to prepare for the grievance meeting. (Fogell Dep. at 42; Fogell Aff., ¶ 18).

40. At the Step 2 grievance meeting, the Company stated that Mr. Preble had been warned on numerous occasions about going off route; had been warned about staying with his co-worker rather than going off on his own during lunch; had been warned about going home for lunch after he locked his keys in the Company truck outside his house; had been suspended for following an MBTA worker to his home in February, 2001, an incident the Company labeled "road rage"; and, finally, after taking his truck off route to go home for lunch on December 11, 2001, struck a parked vehicle on his way back from his home, waited until the next day to report the accident to anyone at TDI, and failed to provide information for an accident report concerning the struck vehicle. (Fogell Aff., ¶ 18).

41. During the Step Two grievance meeting, the Company asked Mr. Preble if he had brought in any information on the vehicle he had struck on December 11, 2001. (Fogell Dep. at 47; Fogell Aff., ¶ 19). Mr. Preble stated that he had the information in his wallet, but when he opened up his wallet, he didn't have the information. Mr. Preble stated that he must have forgotten the information, and then laughed. (Fogell Dep. at 47-48; Fogell Aff., ¶ 19).

42. When Mr. Preble laughed about forgetting to bring the information, Mr. Murphy became upset and stated, "No, hah, hah, hah. You are fired." Mr. Fogell then asked for a caucus, at which point Mr. Fogell and

    Mr. Preble went outside the room. (Fogell Dep. at 48-49; Fogell Aff., ¶ 20).

43. During the caucus, Mr. Fogell attempted to calm Mr. Preble down and spoke to him about giving the Union some flexibility in trying to negotiate some sort of settlement that involved reinstatement. Mr. Preble responded: "No. Screw them. I want full back pay and reinstatement." (Fogell Dep. at 45; Fogell Aff., ¶ 21).

44. During the caucus, Mr. Preble told Mr. Fogell that he wanted to go to arbitration. Mr. Fogell told Mr. Preble that the Union would eventually decide whether to pursue the grievance to arbitration (Fogell Aff., ¶ 21), and that based upon what had occurred in the Step Two meeting, "it doesn't look good at all." (Fogell Dep. at 45-46).

45. Following the Step Two grievance meeting, Mr. Fogell reviewed Mr. Preble's record, what had occurred in the Step One and Step Two grievance meetings, and the information he gathered from his interviews with Kenny Barrus and Joseph Maykis. Mr. Fogell also discussed the case with the Union's legal counsel. (Fogell Aff., ¶ 22).

46. In a letter dated January 2, 2002, which Mr. Preble received shortly thereafter (Preble Dep. At 116), Mr. Fogell informed Mr. Preble that the Union would not pursue his grievance to arbitration:

> Based upon the research and the Step One and Two Grievance meetings conducted by the Union-
> The Union has determined that no further action or processing of your termination grievance shall be conducted nor shall the matter be subjected to arbitration, due to lack of merit as disclosed at the grievance meetings.

> Should you disagree with the actions of District Council #35, I would suggest that you contact the Business Manager/Secretary-Treasurer Ralph Harriman within five (5) days of your receipt of this letter.
> I have enclosed a list of D.C.#35 signatory contractors should you desire to seek employment with any of our signatory employers. (Fogell Aff., ¶ 23, Exh. E).

47. Following receipt of Mr. Fogell's January 2, 2002 letter, Mr. Preble contacted Business Manager/Secretary-Treasurer Ralph Harriman. On February 12, 2002, Mr. Harriman sent Mr. Preble a letter, which Mr. Preble received shortly thereafter (Preble Dep. At 117), stating that the Union would not be pursuing the case any further:

> This letter is in response to your letters dated January 4, 2002 and February 6, 2002 as well as a follow-up to our phone conversation on or about January 8th, 2002 regarding your termination grievance.
> I have once again reviewed the information and research attributed to the step one and step two grievance meetings conducted by this Union.
> It is quite apparent that your lack of adherence to company policy (private use of company vehicles) and your previous record of following a "T" employee to his home after an incident while returning to the shop, followed by a verbal confrontation with the individual, led to your termination.
> Your all or nothing position (reinstatement with full back pay) left this Union few options during the grievance process. Therefore, we must inform you that the case will not proceed to arbitration due to lack of merit as previously stated.
> As per your request, enclosed please find a copy of the District Council #35 By-laws. (Fogell Aff., ¶ 24, Exh. D).

48. While employed at TDI, Mr. Preble suffered from Type II diabetes, which required no insulin injections but did require him to monitor his blood sugar levels. (Preble Dep. at 12-13).

49. Once per day, Mr. Preble would prick his finger, draw blood onto a test strip, and insert the strip in a small handheld machine, a process that took "a minute." (Preble Dep. at 17).

50. Mr. Preble's practice was to test his blood sugar at lunch time. (Preble Dep. at 17).

51. Mr. Preble could have taken the blood testing machine with him to work. (Preble Dep. at 94-95).

52. Mr. Preble could have brought a lunch to work that would have allowed him to meet the dietary restrictions of his diabetes. (Preble Dep. at 107).

53. Mr. Preble never told Mr. Fogell that he had diabetes, never told Mr. Fogell that he believed he had been discharged due to his age or medical condition, and never argued, nor urged Mr. Fogell to argue during the grievance process that his termination was due to his age or medical condition. (Preble Dep. at 113-114; Fogell Aff., ¶ 25).

54. Mr. Preble never provided TDI or the Union with any medical documentation showing that he needed to go home for lunch due to his diabetes. (Preble Dep. 114; Fogell Aff., ¶ 26).

55. Mr. Preble's diabetes did not affect his ability to perform any job, nor restrict how long he could work on any particular day. (Preble Dep. 18).

56. Asked generally how his diabetes "affect[ed his] daily life" while employed at TDI, Mr. Preble responded, "Not too much. As long as I kept my [blood sugar] numbers in check, I was fine." (Preble Dep. at 16).

57. As a result of a heart attack in 1997, Mr. Preble was advised "not to lift extremely . . . heavy items," or to shovel snow, but otherwise has no work restrictions. (Preble Dep. at 11-12).

58. When Mr. MacLean learned of Mr. Preble's heart condition, Mr. MacLean told him that "whenever I had to, to take it easy, take a break, or whatever I need to do to take care of my situation." (Preble Dep. at 98).

59. Mr. Preble never heard Mr. Fogell make any comments about Mr. Preble's or anyone else's age, nor did Mr. Preble ever hear Mr. Fogell make comments about Mr. Preble's diabetes or heart condition, or the medical condition of any other employee. (Preble Dep. 118-119). Mr. Preble never told Mr. Fogell that he had diabetes. (Fogell Aff., ¶ 25).

60. At no point during the grievance process did Mr. Preble tell anyone in the Union, or at TDI, that he thought the Company had discriminated against him. (Preble Dep. at 114).

61. Mr. Preble does not have any reason to believe that Mr. Fogell is biased against older workers or employees with disabilities and/or medical conditions. (Preble Dep. at 119).

62. Although Kenneth Barrus is the Union's steward at TDI, he has very limited responsibilities as steward. Those responsibilities consist almost exclusively of answering bargaining unit employees' basic questions about the collective bargaining agreement. (Fogell Dep. at 57-58; Fogell Aff., ¶ 27). Mr. Barrus does not investigate grievances and had no role in the Union's investigation of Mr. Preble's grievance. He also had no

> involvement in the Union's decision not to pursue Mr. Preble's grievance to arbitration. (Fogell Dep. at 58-59; Fogell Aff., ¶ 27).

63. Union Business Representative Charles Fogell has the authority to decide whether or not to pursue a grievance to arbitration. (Fogell Dep. at 14; Fogell Aff., ¶ 28). If a union member protests such decision, however, then Business Manager/Secretary-Treasurer Ralph Harriman has final authority to overturn a Business Representative's decision. (Fogell Dep. at 14-15; Fogell Aff., ¶ 28).

64. Following the Union's final notification that it would not be pursuing his grievance to arbitration, Mr. Preble filed charges with the Massachusetts Commission Against Discrimination against both Painters and Allied Trades District Council No. 35 and TDI on May 17, 2002, alleging discrimination on the basis of age and disability. (Conti Aff., ¶ 4, Exh. 3).

65. On March 27, 2004, Mr. Preble withdrew his cases with the Massachusetts Commission Against Discrimination to pursue a private right of action against the Union and TDI. (Conti Aff., ¶ 4, Exh. 3).

66. On April 7, 2004, the Plaintiff filed a Complaint in Suffolk Superior Court alleging that the Union violated Massachusetts General Laws c. 151B, § 4, age discrimination; M.G.L. c. 151B, §§ 4.2 and 4.16, disability discrimination; and M.G.L. c. 151B, § 4.4A, and unlawful retaliation for exercise of statutory rights under c. 151B. Plaintiff also filed suit against TDI claiming that it discriminated against him on the basis of his age and

alleged disability when it terminated his employment on December 12, 2001.

67. Painters and Allied Trades District Council No. 35 successfully removed Plaintiff's Complaint to the United States District Court for the District of Massachusetts.

> Respectfully submitted,
>
> Defendant Painters and Allied Trades
> District Council No. 35
> By its Attorney,
>
> _____
> Jonathan M. Conti (BBO # 657163)
> FEINBERG, CAMPBELL & ZACK, P.C.
> 177 Milk Street
> Boston, MA 02109
> (617) 338-1976

Dated this 17th day of December, 2004.