UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WALTER S. PREBLE,<br><br>Plaintiff,<br><br>v.<br><br>TRANSPORTATION DISPLAYS,<br>INCORPORATED, dba<br>VIACOM OUTDOOR, and<br>PAINTERS AND ALLIED<br>TRADES DISTRICT COUNCIL 35,<br>IUPAT, AFL-CIO,<br><br>Defendants. | C.A. No. 04-cv-11005 RWZ |

## AFFIDAVIT OF CHARLES E. FOGELL

1. My name is Charles E. Fogell and I am employed by Painters and Allied Trades District Council No. 35. I have held the position of Business Representative with the Union since approximately 1990. The Union's office address is 25 Colgate Road, Roslindale, Massachusetts.

2. As a Business Representative, my responsibilities include negotiating collective bargaining agreements, policing those agreements, and filing and processing grievances on behalf of bargaining unit employees and the Union.

3. The Union represents all employees at Transportation Displays, Incorporated, d/b/a, Viacom Outdoor's ("TDI"), Randolph, Massachusetts facility except for supervisors and others excluded by the National Labor Relations Act. I have been the Union's bargaining representative for the employees at TDI, or its predecessor, since approximately 1990.

4. The Union and TDI are parties to a collective bargaining agreement, attached hereto as Exhibit A, with effective dates of November 3, 2001 through July 31, 2004.

5. Plaintiff Walter Preble is a former employee of TDI, and was a member of the Union while he was employed by TDI.

6. Mr. Preble's general responsibilities at TDI were to install advertising on vehicles owned by the Massachusetts Transit Authority. Mr. Preble drove a TDI-owned vehicle to MBTA "barns" as part of his work duties.

7. In or about February 2001, Mr. Preble was involved in an incident while driving a TDI-owned vehicle in which Mr. Preble followed another driver home. The driver was an MBTA mechanic. Mr. Preble and the other driver exchanged words in front of the other driver's home.

8. As a result of the incident, TDI suspended Mr. Preble for one week. Mr. Preble did not file a grievance over his suspension.

9. On December 11, 2001, Mr. Preble went home for lunch with his TDI vehicle. As he was returning to work from his home, Mr. Preble struck a parked car in South Boston.

10. On December 12, 2001, TDI terminated Mr. Preble's employment. A copy of Mr. Preble's termination letter is attached as Exhibit B. On that same day, I received a telephone call from Mr. Preble. Mr. Preble informed me that he had been terminated for the alleged unauthorized use of a company vehicle. I had Mr. Preble explain to me what had transpired that day, and asked questions so that I understood Mr. Preble's version of the events. As Mr. Preble told me that he did

not believe that he was off his route, I asked him to determine the distance in miles between his home in South Boston and the various MBTA "barns" he worked at on December 11, 2001.

11. On or about December 17, 2004, I met with Mr. Preble at the Union hall to further discuss his termination. After meeting with Mr. Preble for approximately ninety minutes, I filed a grievance on his behalf with TDI to protest his discharge pursuant to Article 9, Section 2 of the parties' collective bargaining agreement. A copy of the grievance is attached hereto as Exhibit C.

12. On December 19, 2001, I attended a Step One grievance meeting with TDI Operations manager Richard MacLean. During the meeting, Mr. MacLean mentioned that Mr. Preble had been suspended in February 2001 for an incident of "road rage"; that Mr. MacLean had explained to the bargaining unit members, including Mr. Preble, in August 2001 and on other occasions that they were not to go off their routes and that doing so was cause for dismissal; and that he had spoken directly with Mr. Preble and told him to take his lunch with his partner, and not to go off on his own.

13. I asked Mr. MacLean if there was a posted, written rule pertaining to taking one's truck home from lunch, and I questioned the distance between Mr. Preble's home and the MBTA barn. Mr. MacLean stated that there was no written rule about going off route, but that he had told the employees on several occasions that they were not permitted to do so.

14. At the conclusion of the Step One grievance meeting, which lasted approximately forty-five minutes to an hour, I requested that Mr. MacLean provide me with all

3

documents in Mr. Preble's personnel file. Mr. MacLean refused to reinstate Mr. Preble at that time. I received the requested documents from Mr. MacLean on or about December 20, 2001.

15. On or about December 26, 2001, I advanced Mr. Preble's grievance to Step Two of the grievance procedure, pursuant to Article 9, Section 9.2(a) of the collective bargaining agreement. A copy of my letter advancing the grievance to Step Two is attached hereto as Exhibit D.

16. On or about December 27, 2004, I interviewed Union steward and bargaining unit member Kenneth Barrus as part of my investigation. Mr. Barrus worked with Mr. Preble on December 11, 2001. I asked Mr. Barrus whether Mr. MacLean had ever held any meetings in which he had warned the employees they were not to go off route with the Company's trucks, as Mr. MacLean had claimed in the Step One grievance meeting. Mr. Barrus confirmed that Mr. MacLean had on several occasions warned the employees not to go off route, and that they were not to take their vehicles home for lunch.

17. As part of my investigation, I also interviewed bargaining unit employee Joseph Maykis. I asked Mr. Maykis whether he recalled any employee meetings in which Mr. MacLean had warned the employees about taking their vehicles off route. Mr. Maykis confirmed that such meetings had been held, and that Mr. MacLean had warned the employees about going off route.

18. On December 28, 2004, I attended a Step Two grievance meeting with Mr. Preble. Prior to the meeting, Mr. Preble and I met to prepare for the meeting. Mr. MacLean and William Murphy, Vice-President of Operations, represented TDI.

At the meeting, the Company stated that Mr. Preble had been warned on numerous occasions about going off route; had been warned about staying with his co-worker rather than going off on his own during lunch; had been warned about going home for lunch after he locked his keys in the Company truck outside his house; had been suspended for following an MBTA worker to his home in February, 2001, an incident the Company labeled "road rage"; and, finally, took his truck home for lunch on December 11, 2001, struck a parked vehicle on his way back from his home, waited until the next day to report the accident to anyone at TDI, and failed to provide information for an accident report concerning the struck vehicle.

19. During the meeting, Mr. MacLean asked Mr. Preble if he had brought in any more information concerning the vehicle he had struck on December 11, 2001. Mr. Preble stated that he had the information in his wallet, but when he opened up his wallet, he did not have the information. Mr. Preble sarcastically stated that he must have forgotten the information, and then laughed.

20. When Mr. Preble laughed, Mr. Murphy became upset and stated, "No, hah, hah, hah. You are fired." I then asked for a caucus, at which point Mr. Preble and I went outside the room.

21. During the caucus, I tried to calm Mr. Preble down and told him that maybe he should start thinking about giving the Union some flexibility in trying to make a deal to get him reinstated. Mr. Preble responded, "No. Screw them. I want full back pay and reinstatement." Mr. Preble then told me that he wanted to take the matter to arbitration. I informed Mr. Preble that the Union would ultimately make

the decision as to whether to file for arbitration, and that at this point, his case did not look good.

22. Following the Step Two grievance meeting, I reviewed Mr. Preble's record, what had occurred in the Step One and Step Two grievance meetings, and the information I had gathered from my interviews with Kenny Barrus and Joseph Maykis. I also discussed the case with the Union's legal counsel. I then concluded that the Union would not be successful at arbitration, and that the Union should therefore not process Mr. Preble's grievance to arbitration.

23. In a letter dated January 2, 2002, attached hereto as Exhibit E, I informed Mr. Preble that the Union would not be pursuing his grievance to arbitration:

> Based upon the research and the Step One and Two Grievance meetings conducted by the Union-
> The Union has determined that no further action or processing of your termination grievance shall be conducted nor shall the matter be subjected to arbitration, due to lack of merit as disclosed at the grievance meetings. Should you disagree with the actions of District Council #35, I would suggest that you contact the Business Manager/Secretary-Treasurer Ralph Harriman within five (5) days of your receipt of this letter.
> I have enclosed a list of D.C.#35 signatory contractors should you desire to seek employment with any of our signatory employers.

24. Following receipt of my January 2, 2002 letter, Mr. Preble contacted Business Manager/Secretary-Treasurer Ralph Harriman. On February 12, 2002, Mr. Harriman sent Mr. Preble a letter, attached hereto as Exhibit F, stating that the Union would not be pursuing the case any further:

> This letter is in response to your letters dated January 4, 2002 and February 6, 2002 as well as a follow-up to our phone conversation on or about January 8th, 2002 regarding your termination grievance.
> I have once again reviewed the information and research attributed to the step one and step two grievance meetings conducted by this Union.
> It is quite apparent that your lack of adherence to company policy (private use of company vehicles) and your previous record of following a "T"

6

> employee to his home after an incident while returning to the shop, followed by a verbal confrontation with the individual, led to your termination.
>
> Your all or nothing position (reinstatement with full back pay) left this Union few options during the grievance process. Therefore, we must inform you that the case will not proceed to arbitration due to lack of merit as previously stated.
>
> As per your request, enclosed please find a copy of the District Council #35 By-laws.

25. Mr. Preble never told me that he had diabetes or that he believed he had been discharged due to his age or medical condition. Mr. Preble never argued during the grievance process, nor did he ask me to argue that his termination was due to his age or medical condition.

26. Mr. Preble never provided TDI or the Union with any medical documentation showing that he needed to go home for lunch due to his diabetes.

27. Although Kenneth Barrus is the Union's steward at TDI, he has very limited responsibilities as steward. Those responsibilities consist almost exclusively of answering bargaining unit employees' basic questions about the collective bargaining agreement. Mr. Barrus does not investigate grievances and had no role in the Union's investigation of Mr. Preble's grievance. He also had no involvement in the Union's decision not to pursue Mr. Preble's grievance to arbitration.

28. I have the initial authority to decide whether or not to pursue a grievance to arbitration. If a union member protests my decision, however, then Business Manager/Secretary-Treasurer Ralph Harriman has final authority to overturn my decision.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 16th DAY OF DECEMBER, 2004.

_____
Charles E. Fogell

ORIGINAL

8